## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                         No. CR 18-3902 JB

FRANCIS WOODY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Motion in Limine To Prohibit Discussion of Sentencing or Punishment at Trial, filed May 14, 2019 (Doc. 40)("Sentencing MIL"); (ii) the United States' Motion for a <u>Lafler</u>-<u>Frye</u> Hearing, filed May 14, 2019 (Doc. 41)("<u>Lafler</u>-<u>Frye</u> Motion"); (iii) the United States' Motion in Limine to Permit Statements Made for Medical Diagnosis and Treatment, filed May 14, 2019 (Doc. 42)("Medical MIL"); (iv) the United States' Sealed Motion in Limine to Admit Evidence Pursuant to Rules 413, 414 and 404(b), filed May 14, 2019 (Doc. 43)("Past Conduct MIL"); (v) the United States' Sealed Motion in Limine to Exclude Evidence of the Victims' Sexual Behavior and Predisposition, filed May 16, 2019 (Doc. 48)("Victim MIL"); (vi) the United States' Motion in Limine to Exclude Irrelevant, Prejudicial, Self-Serving and/or Hearsay Statements and Notice of Intent to Offer Defendant's Self-Inculpatory Statements in Evidence, filed May 20, 2019 (Doc. 49)("Interview MIL"); (vii) the Plaintiff's Motion in Limine to Allow the United States to Use Transcripts as Demonstrative Aids, filed May 20, 2019 (Doc. 50)("Demonstrative MIL"); (viii) the Defendant's Motion in Limine to Exclude Admission of Hearsay Testimony of Jane Doe 1's Father, Step-Mother, and Sister, filed May 20, 2019 (Doc. 56)("Hearsay MIL"); (ix) the Defendant's Motion in Limine Regarding Irrelevance and Speculation by FBI Agents Regarding Defendant Woody

Looking Like He Has a Lot on His Shoulders, filed May 20, 2019 (Doc. 57)("FBI MIL"); and (x) the Defendant's Motion in Limine to Exclude Admission of Testimony About Property Damage and Trespassing in October of 2016 or 2017, filed May 20, 2019 (Doc. 58)("Trespassing MIL"). The Court held a hearing on July 26, 2019. See Clerk's Minutes at 1, filed July 26, 2019 (Doc. 104). The primary issues are whether: (i) to permit Defendant Francis Woody to inform the jury about the consequences he faces as a result of its verdict; (ii) the Court should hold a hearing pursuant to Missouri v. Frye, 566 U.S. 134 (2012), and Lafler v. Cooper, 566 U.S. 156 (2012)("Lafler-Frye hearing"), to determine whether Woody's counsel has effectively communicated the Plaintiff United States' plea offer to Woody; (iii) to admit statements Jane Doe 1's father made to her doctor under rule 803(4) of the Federal Rules of Evidence; (iv) to admit evidence of Woody's past sexual abuse of Jane Doe 1 and Jane Doe 2; (v) to bar evidence concerning Jane Doe 1 and Jane Doe 2's sexual conduct; (vi) Woody may introduce self-exculpatory statements from his Federal Bureau of Investigation interviews without taking the witness stand; (vii) the United States may use a transcript of Woody's FBI interviews as a demonstrative aid; (viii) the United States may present testimony from Jane Doe 1's family regarding what she told them about her sexual abuse; (ix) the FBI agents who interviewed Woody may testify that he "looked like he had a lot on his shoulders"; and (x) the United States may introduce evidence concerning an incident in which Jane Doe 1's father destroyed property at Woody's residence. The Court concludes that: (i) it will not permit Woody to introduce information regarding the punitive consequence he faces if the jury finds him guilty; (ii) it will hold a Lafler-Frye hearing to determine whether Woody was adequately informed of the United States' plea offers; (iii) it will not admit Jane Doe 1's father's statements to her doctor under rule

803(4), but it will admit her statements; (iv) it will admit evidence of Woody's past sexual abuse of Jane Doe 1 and Jane Doe 2; (v) evidence of Jane Doe 1 and Jane Doe 2's sexual history is inadmissible; (vi) Woody may not admit his own exculpatory statements without facing cross-examination; (vii) the United States may use a transcript as a demonstrative aid; (viii) hearsay rules bar Jane Doe 1's family's testimony about her words, but her family members may testify to how they reacted to her statements; (ix) the United States may not present evidence that Woody "looked like he had a lot on his shoulders" when FBI agents interview him; and (x) the United States may not provide evidence concerning Jane Doe 1's father's trespassing incident unless Woody opens the door to this evidence.

## FACTUAL BACKGROUND

On October 29, 2016, eight-year-old Jane Doe 1 told her father and step-mother that Woody had been sexually abusing her. See Medical MIL at 1; Past Conduct MIL at 1; Hearsay MIL at 1-2. Jane Doe 1's sister may have also overheard Jane Doe 1's statements. See Hearsay MIL at 2. Jane Doe 1's father then took her to Presbyterian Hospital in Rio Rancho, New Mexico, where Dr. Stephen Pilon examined her. See Medical MIL at 1. Jane Doe 1, her father, and her stepmother made statements to Dr. Pilon regarding this abuse. See Medical MIL at 1. Dr. Pilon reported Jane Doe 1's sexual abuse to the Navajo Nation Division of Social Services, which referred the case to the Crownpoint, New Mexico Police Department. See Past Conduct MIL at 1-2. On March 1, 2017, the Navajo Nation Division of Social Services referred Jane Doe 1's case to the FBI. See Past Conduct MIL at 2. On April 14, 2017, Jane Doe 1 was forensically interviewed regarding her allegations. See Past Conduct MIL at 2.

On April 25, 2018, FBI agents Ross Zuercher and Thaddeus Clancy interviewed Woody. See Interview MIL at 2. During the interview, Woody admitted that he slightly penetrated Jane Doe 1's vagina with his left middle finger. See Interview MIL at 2. He also made exculpatory statements. See Interview MIL at 2. While investigating further, FBI agents learned of another victim. See Interview MIL at 2. FBI agents interviewed 25-year-old Jane Doe 2 on May 4, 2018. See Past Conduct MIL at 3. Jane Doe 2 discussed numerous instances of abuse. See Past Conduct MIL at 3-5.

FBI agents interviewed Woody again on October 23, 2018. See Interview MIL at 2. During this interview, Woody admitted that he sexually abused Jane Doe 2 while married to Jane Doe 2's mother. See Interview MIL at 2. At the end of the interview, Woody wrote an apology letter to Jane Doe 2. See Interview MIL at 6.

## PROCEDURAL BACKGROUND

On November 28, 2018, a federal grand jury returned an indictment against Woody, charging him with one count of aggravated sexual abuse in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(C), and one count of abusive sexual contact in violation of §§ 1153, 2244(a)(5), and 2246(3). See Redacted Indictment at 1-2, filed November 28, 2018 (Doc. 2). Woody was arrested on December 6, 2018. See Arrest Warrant Returned Executed, filed December 7, 2018 (Doc. 9). Woody pled not guilty at his arraignment. See Clerk's Minutes at 1, filed December 11, 2018 (Doc. 13). The Court scheduled a jury trial on Woody's charges from August 22, 2019, to August 26, 2019. See Notice of Hearing as to Francis Woody, filed August 12, 2019 (Doc. 110)(text-only entry). If convicted of aggravated sexual abuse, Woody faces between thirty years and life in prison. See 18 U.S.C. § 2241(c).

1.      **The Sentencing MIL**.

The United States' Sentencing MIL requests that the Court exclude evidence related to Woody's potential guideline sentencing range, the thirty-year mandatory minimum sentence which he faces, and the requirement to register as a sex offender upon conviction. See Sentencing MIL at 1. The United States argues that, according to the United States Court of Appeals for the Tenth Circuit, "'[u]nless a statute specifically requires jury participation in determining punishment, the jury shall not be informed of the possible penalties.'"  Sentencing MIL at 2 (quoting United States v. Parrish, 925 F.2d 1293, 1299 (10th Cir. 1991)). It argues that a contrary rule invites jury nullification and that other Courts of Appeals have ruled similarly. See Sentencing MIL at 2-3 (citing United States v. Johnson, 62 F.3d 849, 850-51 (6th Cir. 1995)). The United States also argued that admitting this evidence would contradict standard jury instructions. See Sentencing MIL at 3-4 (citing Tenth Circuit Pattern Jury Instruction § 1.04).

2.      **The Lafler-Frye Motion**.

The United States' Lafler-Frye Motion requests that the Court inquire whether Woody's defense counsel has communicated to Woody the United States' plea offer. See Lafler-Frye Motion at 1. It states that, under Missouri v. Frye and Lafler v. Cooper, defendants have the right to effective assistance of counsel during pre-trial plea negotiations. See Lafler-Frye Motion at 1. The United States provides sample language for the Court to use in this inquiry. See Lafler-Frye Motion at 2:

> I am informed that the government made you a plea offer that you rejected.
>
> Do not tell me about the content of any discussion between you and your counsel. Do not tell me the terms of any plea offer made by the government. This Court is not involved in any plea negotiations, and states no opinion regarding your

decision to plead guilty or proceed to trial.  I simply request a yes or no answer to the following questions:

> First, did you discuss with your attorney the plea offer made by the government?

> Second, are you satisfied that, prior to rejecting the plea offer, you had a full and complete opportunity to discuss the plea offer with your attorney?

Lafler-Frye Motion at 2.

### 3.      The Medical MIL.

The United States' Medical MIL asks that the Court conclude that Jane Doe 1's statements which she made during the course of her medical treatment, are admissible under rule 803(4).  See Medical MIL at 1.  The United States argues that courts admit evidence under similar circumstances, because "this information is needed to treat the child victim's emotional and psychological injuries, including preventing 'an abused child from being returned to an environment in which he or she cannot be adequately protected from recurrent abuse.'"  Medical MIL at 2 (quoting United States v. Renville, 779 F.2d 430, 438 (8th Cir. 1985), and citing United States v. Joe, 8 F.3d 1488, 1495 (10th Cir. 1993); United States v. Chaco, 801 F. Supp. 2d 1200 (D.N.M. 2011)(Browning, J.)).  The United States argues that a doctor could reasonably rely on Jane Doe 1's statements to recommend a course of treatment.  See Medical MIL at 2-3.

### 4.      The Past Conduct MIL.

The United States argues that the Court should admit evidence regarding Woody's past instances of sexual abuse.  See Past Conduct MIL at 1.  After discussing the conduct that it seeks to admit, see Past Conduct MIL at 1-6, the United States first argues that this evidence is admissible under rules 413 and 414 of the Federal Rules of Evidence, see Past Conduct MIL at 6.  It asserts that these rules provide for the introduction of evidence that rule 404 of the Federal Rules of

Evidence otherwise bars and that the Tenth Circuit recognizes a "'presumption in favor of admission.'" Past Conduct MIL at 7 (quoting United States v. Enjady, 134 F.3d 1427, 1431 (10th Cir. 1998)).

Next, the United States argues that the evidence it seeks to admit satisfies rules 413 and 414 of the Federal Rules of Evidence. See Past Conduct MIL at 8. It states that Woody is accused of crimes involving sexual abuse and child molestation, see Past Conduct MIL at 8, and that the evidence it seeks to admit demonstrates that Woody committed other similar offenses, see Past Conduct MIL at 9. The United States then argues that the evidence of uncharged sexual abuse is relevant, because it will "provide context for the charged offenses, including explaining how the abuse started, how often it occurred, and how this influenced the victims' decision to report the abuse," and because not admitting the evidence would harm the jury's ability to evaluate the victim's testimony. Past Conduct MIL at 9.

The United States argues that the evidence is admissible under rule 403 of the Federal Rules of Evidence. See Past Conduct MIL at 10. It notes that, for sexual abuse cases, courts tweak rule 403's balancing test to include "'how clearly the prior act was proved, how probative it is to the material fact, how seriously disputed the material fact is, and whether the government can use any less prejudicial evidence.'" Past Conduct MIL at 10 (quoting United States v. Willis, 826 F.3d 1265, 1273 (10th Cir. 2016)). The United States argues that its evidence satisfies this first factor, because Jane Doe 1 and Jane Doe 2's statements are detailed. See Past Conduct MIL at 11. The United States says that the second factor favors admission, because these past incidents are similar to the charged offenses and are "strong evidence of his motive, intent, and lack of mistake in abusing them." Past Conduct MIL at 11. The United States asserts that the third factor favors

admission, because "the only conceivable defenses in this matter is that Defendant did not sexually

abuse Jane Doe 1 and Jane Doe 2 and if he did sexually abuse them, he did so by accident or

mistake."  Past Conduct MIL at 12.  The United States argues that the fourth factor also favors

admission, because there is no other evidence that would provide necessary context for Jane Doe

1 and Jane Doe 2's testimony.  See Past Conduct MIL at 12.  The United States contends that the

prejudice which Woody would suffer from this evidence is not unfairly prejudicial, because it will

not require additional witnesses, expand the length of the trial, or produce a verdict "based on

emotions wholly apart from the jury's judgment as to Defendant's guilt or innocence."  Past

Conduct MIL at 12-13.

Last, the United States argues that this evidence satisfies rule 404(b).  See Past Conduct

MIL at 13.  It argues again that the evidence is relevant and is highly probative, because it

establishes his motivation.  See Past Conduct MIL at 13.  The United States also argues that the

evidence shows that Woody had access, and opportunity, to assault Jane Doe 1 and Jane Doe 2,

and that there was no mistake.  See Past Conduct MIL at 13-14.

### 5. **The Victim MIL**.

The United States requests that the Court exclude evidence regarding either victim's sexual

behavior or predisposition under rule 412 of the Federal Rules of Evidence.  See Victim MIL at 1.

It asserts that rule 412 is interpreted broadly and covers substantive and impeachment evidence.

See Victim MIL at 2.  It notes that, although rule 412 has three exceptions for criminal cases, see

Victim MIL at 3 (citing Fed. R. Civ. P. 412(b)(1)), the defendant has not complied with rule

412(c)'s procedure for admission, see Victim MIL at 3.  It then argues that none of rule 412's

exceptions apply to this case.  See Victim MIL at 4.  According to the United States, rule

412(b)(1)(A) does not apply, because it will not introduce evidence suggesting that Woody was the source of semen, injury, or other physical evidence; rule 412(b)(1)(B) does not apply because Woody's alleged victims were categorically too young to consent; and rule 412(b)(1)(C) does not apply, because Jane Doe 1 and Jane Doe 2's sexual histories are irrelevant "except as they directly involve Defendant," Victim MIL at 4, and the constitutional right to present a defense does not include the right to harass and embarrass witnesses, <u>see</u> Victim MIL at 5.  Finally, and in the alternative, the United States asks the Court to exclude this evidence under rule 403, because evidence of a victim's prior sexual behavior has no probative value in this case and risks confusing the issues and misleading the jury.  <u>See</u> Victim MIL at 5.  Woody filed a response indicating that he does not oppose the Victim MIL.  <u>See</u> Defendant's Response to United States' Motion in Limine to Exclude Evidence of the Victims' Sexual Behavior and Predisposition (Doc. 48) at 1, filed May 30, 2019 (Doc. 66).

      **6.**       **Interview MIL.**

The United States requests that the Court prohibit Woody from introducing any "irrelevant, prejudicial, self-serving, exculpatory, and/or inadmissible hearsay statements not offered against interest," and it asks for an order allowing it to introduce some of Woody's self-inculpatory statements that he made during interviews on April 25, 2018, and October 23, 2018.  Interview MIL at 1.  The United States' first argument is that a defendant's self-serving statements "are always inadmissible" if the defendant does not stand for cross-examination.  Interview MIL at 6-7 (citing <u>United States v. Larsen</u>, 175 F. App'x 236, 241 (10th Cir. 2006); <u>United States v. Cunningham</u>, 194 F.3d 1186, 1199 (11th Cir. 1999)).  It then argues that the Court should admit other portions of the same interview, because they are admissions of a party opponent and are

relevant to whether Woody sexually assaulted the victims.  See Interview MIL at 7.  It notes that Woody cannot use the same hearsay exception rule, because it requires that the statement "be offered *against* the party who made the statement," and therefore prevents defendants like Woody form offering self-serving statements through other witnesses.  Interview MIL at 7 (emphasis in original).

Next, the United States argues that Woody's inculpatory interview statements are admissible under rule 804(b)(3) of the Federal Rules of Civil Procedure, because they are a statement against interest.  See Interview MIL at 8.  It notes that the Supreme Court of the United States of America has held that the "most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory," and that self-inculpatory statements do not increase any self-exculpatory statements' plausibility.   Interview MIL at 9 (citing United States v. Williamson, 512 U.S. 594, 600-01 (1994)).   It argues that Woody's self-serving interview statements are not reliable, and, because Woody would introduce them to prove the matter asserted, they are hearsay.  See Interview MIL at 9.

Next, the United States argue that the Rule of Completeness does not permit Woody to introduce other parts of the interviews.  See Interview MIL at 10.  It notes that, where an admitted transcript segment is clear, admission of only inculpatory parts is permissible.  See Interview MIL at 10 (citing United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999); United States v. Branch, 91 F.3d 699, 726 (5th Cir. 1996)).   It argues that admitting Woody's self-serving statements would confuse the jury and that the Court cannot permit their admission.  See Interview MIL at 10-11.

7.       **The Demonstrative MIL**.

In the Demonstrative MIL, the United States seeks permission to introduce, as demonstrative aids, transcripts of audio recordings from April 25, 2018, and October 23, 2018, interviews between Woody and FBI agents.  See Demonstrative MIL at 2.  It argues that rule 611 of the Federal Rules of Evidence gives a trial court wide discretion to permit demonstrative evidence.  See Demonstrative MIL at 2 (citing United States v. Garcia, 334 F. App'x 609, 614 (5th Cir. 2009)).  It notes that, in the Tenth Circuit, recordings are substantive evidence, but transcripts are demonstrative aids, and it asks the Court to permit it to introduce demonstrative transcripts in its case-in-chief.  See Demonstrative MIL at 3 (citing Tenth Circuit Criminal Pattern Jury Instruction § 1.40).  Woody responded and stated that he did not oppose the Demonstrative MIL. See Defendant's Response to United States Motion in Limine to Allow The United States to Use Transcripts as Demonstrative Aids (Doc. 50), filed June 3, 2019 (Doc. 69)("Demonstrative MIL Response").

8.       **The Hearsay MIL**.

In the Hearsay MIL, Woody requests that the Court exclude evidence of what Jane Doe 1 told her father, step-mother, sister, or anyone else on October 29, 2016.  See Hearsay MIL at 1. Woody notes that the case's discovery shows that, on October 29, 2016, Jane Doe 1 told her father and step-mother that Woody had sexually assaulted her.  See Hearsay MIL at 1-2.  Woody asserts that Jane Doe 1's sister may have overheard these statements.  See Hearsay MIL at 2.  Woody argues that these people cannot testify to Jane Doe 1's comments, because such testimony is hearsay.  See Hearsay MIL at 2.

Woody contends that Jane Doe 1's October 29, 2016, comments are neither excited utterances under rule 803(2) nor statements "of a reputation concerning personal or family history."  Hearsay MIL at 2.  Woody also argues that Jane Doe 1's comments are irrelevant and therefore inadmissible.  See Hearsay MIL at 3 (citing Fed. R. Evid. 103, 401, 402).  He also argues that the danger of unfair prejudice substantially outweighs the evidence's probative value.  See Hearsay MIL at 3-4.  Last, he also argues that Jane Doe 1's family members "lacked requisite personal knowledge under Fed. R. Evid. 602 that Defendant sexually abused Jane Doe 1 at the much earlier time" and that their credibility is irrelevant.  Hearsay MIL at 4.

9.      **The FBI MIL.**

Woody requests that the Court exclude testimony from FBI Agent Zuercher or from any other FBI agent that Zuercher told Woody that: (i) he looked like "you got a lot on your shoulders"; and (ii) he looked like he hoped he would not have to address sexual abuse allegations, but that "today is the day."  FBI MIL at 1-2.  He argues that these comments are "inherently speculative and hearsay."  FBI MIL at 3.  He argues that, because these comments were speculative, they are irrelevant.  See FBI MIL at 3.  He also notes that the Tenth Circuit has held that nervousness and failure to make eye contact do not justify infringing in the context of the Fourth Amendment to the Constitution of the United States.  See FBI MIL at 4 (citing United States v. Davis, 94 F.3d 1465, 1468-70 (10th Cir. 1996)).  He argued that, in the Tenth Circuit, Zuercher could not reasonably suspect Woody of criminal activity based on his personal observations, and the evidence is therefore irrelevant.  See FBI MIL at 4-5.  Woody also argued that Zuercher's testimony would not pass the rule 403 balancing test, and that Zuercher does not qualify as an expert and cannot testify to his perception.  See FBI MIL at 5-6.

10.     **The Trespassing MIL**.

Woody requests that the Court exclude evidence concerning the trespassing and property damage that Jane Doe 1's father committed in October, 2016, or October, 2017.  See Trespassing MIL at 1.  He states that, in October, 2016, or October, 2017, Jane Doe 1's father and other people went to Woody's residence and "rammed a van on the property."  Trespassing MIL at 2.  He argues that this evidence does not pass rule 401's relevancy test and is more prejudicial than probative.  See Trespassing MIL at 2.  Woody contends that Jane Doe 1's father's property damage does not make whether Woody committed a crime more or less likely and that Jane Doe 1's father and others who went to his residence "lacked requisite personal knowledge under Fed. R. Evid. 602 that Defendant sexually abused Jane Doe 1."  Trespassing MIL at 2-3.  The United States responds to the Trespassing MIL and agrees that the trespassing incident is irrelevant, but it reserves the right to introduce the incident as rebuttal evidence if he "opens the door" to it.  United States' Response to Defendant's Motion in Limine to Exclude Admission of Testimony About Property Damage and Trespassing in October 2016 or 2017 at 1-2, filed June 3, 2019 (Doc. 77)("Trespassing MIL Response").

11.     **The Sentencing MIL Response**.

Woody responds to the Sentencing MIL and requests that the Court instruct the jury as to Woody's potential mandatory minimum, the Guidelines sentencing range, and whether he will have to register as a sex offender.  See Defendant's Response to United States' Motion in Limine to Prohibit Discussion of Sentencing or Punishment at Trial (Doc. 40) at 1, filed May 28, 2019 (Doc. 62)("Sentencing MIL Response").  Woody acknowledges that Supreme Court and Tenth Circuit precedent holds that courts may not instruct juries about a verdict's consequences, but he

argues that this position is ripe for reconsideration.  See Sentencing MIL Response at 2.  He states that the Supreme Court has, in recent opinions, suggested that it is returning to an originalist understanding of juries' role.  See Sentencing MIL Response at 3-4 (citing Blakely v. Washington, 542 U.S. 296, 305-06 (2004); Crawford v. Washington, 541 U.S. 36 (2004); Apprendi v. New Jersey, 530 U.S. 466, 498 (2000)(Scalia, J., dissenting)).  According to Woody, this ascendant originalist perspective requires a court to examine the role that juries played at the time of the country's founding.  See Sentencing MIL Response at 5.

Woody argues that colonial juries knew about their verdicts' consequences.  See Sentencing MIL Response at 5 (citing Nancy Gertner, Juries and Originalism: Giving 'Intelligent Content' to the Right to a Jury Trial, 71 Ohio St. L.J. 935, 937 (2010)).  This knowledge, he argues, allowed juries to act as a check against the state's oppression.  See Sentencing MIL Response at 5 (citing T. Ward Frampton, Comment, The Uneven Bulwark: How (And Why) Criminal Jury Trial Rates Vary By State, 100 Cal. L. Rev. 183, 184 (2012)).  Woody contends that, at the time, a desire to avoid capital conviction often motivated juries' verdicts.  See Sentencing MIL Response at 6 (citing United States v. Polouizzi, 549 F. Supp. 2d 308, 411 (E.D.N.Y. 2008)(Weinstein, J.), rev'd United States v. Polouizzi, 564 F.3d 142 (2d Cir. 2009)).  Woody argues that "the emergence of a professional class of lawyers and judges" which is "willing to annex territory that had once been the province of the jury" has severely limited the jury's power.  See Sentencing MIL Response at 6-7 (citing Jonathan Bressler, Reconstruction and the Transformation of Jury Nullification, 78 U. Chi. L. Rev. 1133, 1143 (2011)).

In light of recent Supreme Court opinions suggesting that courts should consider a jury's role at the country's founding, Woody argues that the Constitution requires the Court to instruct

the jury about mandatory minimums.  See Sentencing MIL Response at 7-8.  He argues that juries were originally intended "to temper the law in its application to the individual."  Sentencing MIL at 8.  Woody contends that not permitting such instructions "rob[s] our criminal justice system of the mitigating, humanizing, and democratic role the founders intended the jury to play in the constitutional structure of the republic."  Sentencing MIL Response at 8 (citing Rachel E. Barkow, Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing, 152 U. Pa. L. Rev. 33, 78 (2003)).

**12.    The Medical MIL Response.**

Woody responds to the Medical MIL and requests that the Court exclude all evidence from Navajo Nation Division of Social Services personnel or Dr. Stephen Pilon.  See Defendant's Response to United States' Motion in Limine to Permit Statements Made for Medical Diagnosis and Treatment (Doc. 42) at 1, filed May 28, 2019 (Doc. 63)("Medical MIL Response").  Woody notes that the discovery contains no report or statements from Jane Doe 1's examining doctor, and he argues that Dr. Pilon's opinion likely would serve only to vouch for Jane Doe 1's truthfulness.  See Medical MIL Response at 3-4 (citing United States v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999)).  He argues further that, because the medical examination occurred weeks or months after the alleged sexual assault, there was much less motivation for Jane Doe 1 to be truthful to obtain medical services, especially because she was no longer living with Woody.  See Medical MIL Response at 4-5 (citing United States v. Tome, 61 F.3d 1446, 1449 (10th Cir. 1995); Fed. R. Evid. 803(4)).  Woody then argues that the evidence is irrelevant and that it also is more prejudicial than probative.  See Medical MIL Response at 6 (citing United States v. Meacham, 115 F.3d 1488, 1495 (10th Cir. 1997)).

- 15 -

### 13. __The Past Conduct MIL Response__.

Woody responds in opposition to the Past Conduct MIL.  <u>See</u> Defendant's Response to United States' Motion in Limine to Admit Evidence Pursuant to Rules 413, 414 and 404(b) (Doc. 43), filed May 28, 2019 (Doc. 64)("Past Conduct MIL Response").  Woody concedes that the evidence satisfies rule 414's first two elements – that the evidence shows he committed other sexual offenses against a child -- but he argues that the evidence is not relevant.  <u>See</u> Past Conduct MIL Response at 3.  He argues that his alleged sexual abuse of Jane Doe 2 was thirteen years ago and is too distant to be relevant in this case.  <u>See</u> Past Conduct MIL Response at 3-4.  He also asserts that his desire and propensity to abuse sexually the victims is irrelevant to his charged crime's elements.  <u>See</u> Past Conduct MIL at 4.  He argues that the jury can get a full understanding of the charged crime without admitting his past conduct and that it is prejudicial to discuss more uncharged conduct than charged conduct.  <u>See</u> Past Conduct MIL at 4.

Woody argues further that the uncharged conduct has low probative value and that the United States has less prejudicial evidence.  <u>See</u> Past Conduct MIL at 5.  He asserts that he "seriously disputes" that these events occurred, and he notes that, although the United States has always been aware of the evidence, it has not charged him with this conduct.  <u>See</u> Past Conduct MIL at 5.  Woody also contends that these allegations are unfairly prejudicial, and inherently confusing, distracting, and time-wasting.  <u>See</u> Past Conduct MIL at 5-6.

### 14. __The Interview MIL Response__.

Woody responds to the Interview MIL and requests that the Court admit statements that he made during interviews with FBI agents.  <u>See</u> Defendant's Response to United States' Motion in Limine to Exclude Irrelevant, Self-Serving and/or Hearsay Statements and Notice of Intent to

Offer Defendant's Self-Inculpatory Statements in Evidence (Doc. 49), filed June 3, 2019 (Doc. 68)("Interview MIL Response").  Woody argues that "all of his statements elicited by government agents should be admissible in order for the jury, as the factfinder, to determine whether in fact Defendant's Woody's exculpatory statements are self-serving or not."  Interview MIL Response at 4.  He asserts that the jury will need this information to determine whether his statements were voluntary.  See Interview MIL Response at 5 (citing Tenth Circuit Criminal Pattern Jury Instruction § 1.25).  He also argues that the rule of completeness in rule 106 of the Federal Rules of Evidence requires admitting this evidence, and that the evidence passes the rule 403 balancing test.  See Interview MIL Response at 6.

      **15.**     **The Hearsay MIL Response**.

      The United States responds to the Hearsay MIL and argues that the Court should admit testimony from Jane Doe 1's father, stepmother, and sister.  See United States' Response to Defendant's Motion in Limine to Exclude Admission of Hearsay Testimony of Jane Doe 1's Father, Stepmother and Sister at 1, filed June 3, 2019 (Doc. 75)("Hearsay MIL Response").  The United States first argues that this evidence is not hearsay, because it will not be offered for the truth of the matter asserted but instead "to explain the reason for initiating the investigation."  Hearsay MIL Response at 3.  The United States notes that, because this evidence is not offered for its truth, it is not testimonial under Crawford v. Washington.  See Hearsay MIL Response at 3 (citing Crawford v. Washington, 541 U.S. at 51).  The United States argues further that Jane Doe 1's statements are not testimonial and were intended made to meet an "'ongoing emergency,'" Hearsay MIL Response at 3 (quoting Ohio v. Clark, 576 U.S. 237 (2015)), because under the Supreme Court's primary purpose test: (i) the statements were made in response to the ongoing

emergency regarding Jane Doe 1's safety; (ii) Jane Doe 1 spoke in an informal situation not involving law enforcement interrogation; and (iii) the conversation's purpose was not to create an out-of-court substitute for trial testimony, see Hearsay MIL Response at 5.

In the alternative, the United States requests that the Court admit the evidence under rule 807(a)(1) of the Federal Rules of Evidence. See Hearsay MIL at 5. It contends that Jane Doe 1's statements have strong guarantees of trustworthiness even if a hearsay exception does not specifically cover them. See Hearsay MIL Response at 6 (citing Fed. R. Evid. 807(a)(1)). It directs the Court to United States v. Farley, 992 F.3d 1122, 1125 (10th Cir. 1993), in which the Tenth Circuit admitted similar hearsay statements under a predecessor to rule 807. See Hearsay MIL Response at 6. It argues that, because Jane Doe 1 spoke to family members who were concerned for her well-being, like the victim in United States v. Farley, the Court should admit the evidence. See Hearsay MIL Response at 6.

### 16.    The FBI MIL Response.

The United States responds to the FBI MIL and argues that the FBI agents' personal observations of Woody' body language are relevant and not speculative. See United States' Response to Defendant's Motion in Limine Regarding Irrelevance and Speculation by FBI Agents Regarding Woody Looking Like He Has a Lot on His Shoulders at 1-2, filed June 3, 2019 (Doc. 76)("FBI MIL Response"). First, the United States argues that testimony regarding nonverbal conduct or gestures is factual evidence and not speculation. See FBI MIL Response at 2. It also notes that nonverbal conduct is not hearsay if the person does not intend to make an assertion. See FBI MIL Response at 2-3 (citing Fed. R. Evid. 801(c) advisory committee notes). The United States asserts that its witnesses will not testify to what Woody was thinking, but they

are able to testify to what they observed of his nonverbal conduct and demeanor.  See FBI MIL Response at 3.

17.     **The Sentencing MIL Reply**.

The United States replies to Woody's Sentencing MIL Response.  See United States' Reply to Defendant's Response to Motion in Limine to Prohibit Discussion of Sentencing or Punishment at Trial at 1, filed June 11, 2019 (Doc. 85)("Sentencing MIL Reply").  The United States asserts that Woody's request "is inconsistent with firm legal precedent."  Sentencing MIL Reply at 3 (citing United States v. Gehringer, 385 F. App'x 830, 834 (10th Cir. 2010); United States v. Parrish, 925 F.2d 1293, 1299 (10th Cir. 1991); United States v. Greer, 620 F.2d 1383, 1384 (10th Cir. 1980)).  It noted that the Court had previously expressed concern about precluding juries from hearing this sort of evidence, but the Court had nevertheless denied such motions.  See Sentencing MIL Reply at 3 (citing United States v. Young, No. CR 17-0694, 2019 WL 1979664, at *1 (D.N.M. May 3, 2019)(Browning, J.)).

18.     **The Medical MIL Reply**.

The United States replies to Woody's Medical MIL Response.  See United States' Reply to Defendant's Response to Motion in Limine to Permit Statements Made For Medical Diagnosis and Treatment, filed June 11, 2019 (Doc. 81)("Medical MIL Reply").  The United States notes that Woody has since corrected his assertion in the Medical MIL Response that the United States has not disclosed Dr. Pilon's report.  See Medical MIL Reply at 1-2.  It argues that Jane Doe 1's statements are admissible, because Jane Doe 1 was not suffering from visible medical injuries and otherwise Dr. Pilon would not have been able to appropriately treat her.  See Medical MIL Reply at 2.  The United States also reiterates its arguments that Dr. Pilon's testimony is admissible as a

fact witness apart from rule 803(4), because Jane Doe 1's statements would not be provided for their truth, but "to provide context and background information."  Medical MIL Reply at 2.

19.    **The Past Conduct MIL Reply.**

The United States replies to Woody's Past Conduct MIL Response.  <u>See</u> United States' Reply to Defendant's Response to Motion in Limine to Admit Evidence Pursuant to Rule 413, 414, and 404(b), filed June 11, 2019 (Doc. 82)("Past Conduct MIL Reply").  It argues first that this evidence is, contrary to the Past Conduct MIL Response, "extremely relevant," because the conduct was similar to the charged offense, it provides context for the jury, and not admitting the evidence might lead to "awkward presentation of the evidence" or a mistrial.  Past Conduct MIL Reply at 2.  It also asserts that, although Woody objects that he does not know the dates of the alleged sexual abuse, he has been sufficiently on notice of the abuse alleged and the ages of the victims.  <u>See</u> Past Conduct MIL Reply at 3-4.

The United States next argues that admitting this evidence satisfies rule 413 and rule 414's modified balancing test as set forth in <u>United States v. Enjady</u>.  <u>See</u> Past Conduct MIL Reply at 4. It argues that a jury could reasonably find by a preponderance of the evidence that these instances occurred.  <u>See</u> Past Conduct MIL Reply at 4 (citing <u>United States v. Mann</u>, 193 F.3d 1172, 1174 (10th Cir. 1999)).  It also contends that, while the evidence is prejudicial, the resulting prejudice is not unfair.  <u>See</u> Past Conduct MIL Reply at 4 (citing <u>United States v. Caraway</u>, 534 F.3d 1290, 1301 (10th Cir. 2008)).  The United States argues that the evidence is not likely to produce a verdict based on emotion rather than the evidence, because the "evidence will clarify, not distract, from the central issues and trial," and limiting instructions could moderate any unfair prejudice.  Past Conduct MIL Reply at 5.  The United States also argues that no other evidence provides context

for trial testimony on the charged offense.  <u>See</u> Past Conduct MIL Reply at 5.  The United States also asserts that Woody has admitted to the conduct regarding Jane Doe 2 that the United States seeks to admit, and that there is no other, less prejudicial evidence that the United States could use instead.  <u>See</u> Past Conduct MIL Reply at 6 (citing <u>United States v. Enjady</u>, 134 F.3d at 1433).

Finally, the United States argues that admitting this evidence is proper under rule 404(b). <u>See</u> Past Conduct MIL Reply at 6.  It reiterates that the past conduct helps to demonstrates motive, intent, plan, and absence of mistake or accident.  <u>See</u> Past Conduct MIL Reply at 7.  It asserts that Woody's motive was sexual gratification, that he used the same methods between Jane Doe 1 and Jane Doe 2, and that his argument that he inserted his finger in Jane Doe 1's vagina was a mistake is not credible.  <u>See</u> Past Conduct MIL Reply at 7.

### 20.     <u>The Interview MIL Reply</u>.

The United States responds to Woody's Interview MIL Response.  <u>See</u> United States' Reply to Defendant's Response to United States' Motion in Limine to Exclude Irrelevant, Prejudicial Self-Serving and/or Hearsay Statements and Notice of Intent to Offer Defendant's Self-Inculpatory Statements in Evidence at 1, filed June 11, 2019 (Doc. 84)("Interview MIL Reply"). The United States argues that Woody's Interview MIL Response "ignores fundamental concepts of hearsay authority, and he does not point to any exception to the hearsay rule, or other legal authority, that would permit Defendant to introduce into evidence his own out of court statements." Interview MIL Reply at 1.  The United States then argues that rule 804(b)(3), which provides that statements against interest are admissible hearsay when the declarant is unavailable, does not permit courts to admit non-inculpatory statements.  <u>See</u> Interview MIL Reply at 2 (citing <u>Williamson v. United States</u>, 512 U.S. at 601).  It contends that rule 801(d)(2), which states that

party opponent admissions are not hearsay also does not permit the Court to admit these statements, because the rule "does not permit self-serving, exculpatory statements made by a party and offered by that same party."  Interview MIL Reply at 2 (citing <u>United States v. Larsen</u>, 175 F. App'x 236, 241 (10th Cir. 2006)).  The United states also disputes Woody's reliance on the rule of completeness, because that rule only applies to written or recorded statements, and it requires the admission of extra material sufficient to render clear other parts.  <u>See</u> Interview MIL Reply at 2-3.  It argues that, without cross-examination, the Court cannot admit other parts of Woody's interview.  <u>See</u> Interview MIL Reply at 3.

    **21.**    <u>**The Hearing**</u>.

    The Court held a hearing on July 26, 2019.  <u>See</u> Transcript of Motion Hearing, filed August 12, 2019 (Doc. 108)("Tr.").  The Court addressed Woody's motions in chronological order.  <u>See</u> Tr. at 3:2-8 (Court).  The parties first argued the Sentencing MIL.  <u>See</u> Tr. at 3:21-25 (Court, Hotchkiss).

    **a.**    <u>**Sentencing MIL Arguments**</u>.

    The United States argued that the Supreme Court and every Court of Appeals have held that juries may not hear sentencing information.  <u>See</u> Tr. at 4:3-10 (Cowen).  The United States asserted that no legal authority supports the argument that a defendant can waive this right, because waiver prejudices the United States.  <u>See</u> Tr. at 4:10-24 (Cowen).  The United States therefore requested that the Court grant the Sentencing MIL.  <u>See</u> Tr. at 5:1-10 (Cowen).

    Woody conceded that his argument against the Sentencing MIL is contrary to precedent.  <u>See</u> Tr. at 5:17-19 (Hotchkiss).  He argued that the Supreme Court had "reinvigorated" the originalist perspective on juries' role, Tr. at 5:24 (Hotchkiss), and it was time to re-evaluate the

precedent that barred juries from hearing sentencing information, <u>see</u> Tr. at 5:20-25 (Hotchkiss). Woody otherwise rested on the arguments in the Sentencing Response.  <u>See</u> Tr. at 6:1-4 (Hotchkiss).

The Court expressed its sympathy to Woody's position.  <u>See</u> Tr. at 6:9-10 (Court).  It stated that it personally thinks that juries should be informed fully about sentencing and punishment during trial.  <u>See</u> Tr. at 6:14-20 (Court).  The Court then said that, despite its agreement with Woody's argument, precedent binds it to preclude any mention of sentencing or punishment at trial, and it would grant the Sentencing MIL.  <u>See</u> Tr. at 7:5-9 (Court).

### b.    The <u>Lafler</u>-<u>Frye</u> <u>Argument</u>.

The parties next took up the <u>Lafler</u>-<u>Frye</u> Motion.  <u>See</u> Tr. at 7:20-22 (Court).  Woody did not object to this motion.  <u>See</u> Tr. at 7:23 (Hotchkiss).  The Court then spoke with Woody about whether Woody's counsel had fully communicated the United States' plea offers.  <u>See</u> Tr. at 7:25-9:17 (Court, Hotchkiss, Woody).  The Court then suggested that the parties file the plea offers under seal.  <u>See</u> Tr. at 9:23-10:13 (Court).

### c.    The <u>Medical</u> <u>MIL</u> <u>Argument</u>.

The Court first gave the parties its impression on the Medical MIL.  <u>See</u> Tr. at 10:18-24 (Court).  The Court stated that it was inclined to admit Jane Doe 1's statements to her treating doctor but not her statements to family members at that time if they were also relayed to Dr. Pilon. <u>See</u> Tr. at 10:20-11:9 (Court).  The Court and the United States then discussed whether it was introducing this information for the truth of the matter asserted, <u>see</u> Tr. at 11:10-12:9 (Court, Ruiz-Velez), and the United States conceded that it was introducing these statements for their truth, <u>see</u> Tr. at 12:7-9 (Ruiz-Velez).  The Court noted that there was no recording or transcript of what Jane

- 23 -

Doe 1 said to her treating doctors, see Tr. at 12:21-24 (Court), and the United States said that it was seeking to admit what Jane Doe 1's parents told her doctors that she had told them, see Tr. at 13:2-23 (Ruiz-Velez).  The Court expressed its hesitation with admitting this evidence under rule 803(4).  See Tr. at 13:24-14:9 (Court).  The United States noted that Jane Doe 1 was present when her parents repeated her statements to her doctor, but the Court said that it was still disinclined to admit this evidence without more authority.  See Tr. at 14:24-16:1 (Court, Ruiz-Velez).

Woody then presented his comments on the Medical MIL.  See Tr. at 16:4-5 (Hotchkiss). He noted first that there was no evidence of any communication difficulty between Jane Doe 1 and her doctor that would have required Jane Doe 1's parents to speak on her behalf.  See Tr. at 16:13-17 (Hotchkiss).  He also stated that there is no physical evidence from the examination that Jane Doe 1 was sexually assaulted.  See Tr. at 16:18-22 (Hotchkiss).  Finally, Woody discussed United States v. Charley, in which, he contends, the Tenth Circuit held that, where there is no physical evidence from a medical examination, admitting a doctor's statements through rule 803(4) is impermissible vouching for the defendant.  See Tr. at 17:2-23 (Court, Hotchkiss).  Woody stated that United States v. Charley also suggests that a perpetrator's identity is inadmissible in these cases where there is no physical evidence supporting the accusation.  See Tr. at 18:12-17 (Hotchkiss).  He admitted that United States v. Charley holds that "'the identity of the abuser is reasonably pertinent if there is a nexus to treatment and diagnosis,'" but there is no concern in this case about Jane Doe 1 going back to live with Woody.  Tr. at 19:3-5 (Hotchkiss)(quoting United States v. Joe, 8 F.3d at 1495).  See id. at 19:12-20:5 (Court, Hotchkiss).

The United States then responded.  See Tr. at 20:12 (Ruiz-Velez).  It noted that, in United States v. Chaco, the Court admitted a child victim's statements to medical providers which

included the abuser's identity.  See Tr. at 20:23-21:1 (Ruiz-Velez).  It argued that Woody's identity was relevant for treatment, because her parents share custody and because, at the time of the alleged abuse, she was residing with the defendant.  See Tr. at 21:1-16 (Ruiz-Velez).  It then argued that statements of Jane Doe 1's father to her doctor are not hearsay, because they show why he took her to the hospital.  See Tr. at 21:17-23 (Ruiz-Velez).  The Court stated that, if that is what the United States wants from Jane Doe 1's father, "we can probably finesse it without having the statements repeated by the father again."  Tr. at 22:25-23:2 (Court).

Woody then argued the Medical MIL again.  See Tr. at 23:10 (Hotchkiss).  He read an excerpt from United States v. Charley which he argued shows that doctors may not merely vouch for their patients without any medical evidence.  See Tr. at 23:17-24:12 (citing United States v. Charley, 189 F.3d at 1266-67).  The Court then suggested that United States v. Charley concerns expert witnesses rather than witnesses under rule 803(4), and the United States agreed with the Court's hypothesis.  See Tr. at 24:13-24:22 (Court, Hotchkiss, Ruiz-Velez).  The Court then stated that, if it concerned an expert witness, the case was not helpful to Woody.  See Tr. at 25:3-10 (Court).

The Court then made its oral ruling.  See Tr. at 25:20 (Court).  It stated that it would exclude statements from Jane Doe 1's father and stepmother.  See Tr. at 25:20-24 (Court).  It said that it would allow Jane Doe 1's identification of her abuser if it was for medical diagnosis and treatment. See Tr. at 26:7-12 (Court).

### d.    Past Conduct MIL Argument.

The parties next took up the Past Conduct MIL.  See Tr. at 26:24-25 (Court).  The Court stated its initial inclination to grant the motion.  See Tr. at 27:1-8 (Court).  The United States then

made its opening argument.  See Tr. at 27:11 (Ruiz-Velez).  The United States briefly argued that this evidence "is critical for helping the jury understand and evaluate it for credibility, which is the central issue in this case," and that, without it, "the jury may have the impression that the indicted conduct was the only conduct that happened in this case."  Tr. at 28:1-6 (Ruiz-Velez).

Woody argued against admitting this evidence, and he stated his concern that "there might be more uncharged conduct presented than charged conduct."  Tr. at 28:19-21 (Hotchkiss).   He argued that the amount of past conduct the United States seeks to admit could be so overwhelming that its prejudicial effect starts to outweigh its probative value.  See Tr. at 29:4-7 (Hotchkiss).  Woody then stated that he intends to research further the issue, and this research may influence his proposed jury instructions.  See Tr. at 29:22-30:7 (Hotchkiss).  The United States' only comment in reply was that it would only introduce past conduct related to the case's two victims and would not bring in testimony of other victims.  See Tr. at 30:12-15 (Ruiz-Velez).  The Court then stated that it would grant the Past Conduct MIL.  See Tr. at 30:16-31:1 (Court).

## e.      **The Interview MIL Argument**.

The Court first presented its view on the Interview MIL.  See Tr. at 39:17 (Court).  It said that it saw no completeness problems with the proposed evidence, but it suspected that the United States would have to be careful before presenting excerpts, because Woody could present more information on cross-examination.  See Tr. at 39:23-40:6 (Court).  The Court reiterated, however, that the United States is entitled to present only parts of the interview; the Court otherwise stated that it was inclined to grant the Interview MIL.  See Tr. at 40:6-18 (Court).  The parties did not add any argument after the Court presented its thoughts.  See Tr. at 40:19-41:14 (Court, Hotchkiss, Ruiz-Velez).  The Court then orally granted the motion.  See Tr. at 41:15-24 (Court).

#### f.     The Hearsay MIL Argument.

The parties next discussed the Hearsay MIL.  <u>See</u> Tr. at 55:13-16 (Court).  Woody argued

that, given the passage of time, he did not see how the hearsay testimony of Jane Doe 1's family

was admissible.  <u>See</u> Tr. at 55:19-24 (Hotchkiss).  Woody stated that the length of time between

the last incident and Jane Doe 1's statements to her family was at least twenty-five days.  <u>See</u> Tr.

at 56:11-14 (Hotchkiss).  He argued that the context for which the United States seeks to admit

this evidence can be shown in other ways.  <u>See</u> Tr. at 56:14-23 (Hotchkiss).

The United States stated that it hoped that it could admit Jane Doe 1's comments that

Woody was sexually abusing her.  <u>See</u> Tr. at 57:5-12 (Ruiz-Velez).  The Court then stated that it

was inclined to handle this evidentiary issue similarly to its ruling on the Medical MIL and admit

the evidence to show that Jane Doe 1 was not sent back to Woody's house and was taken to a

doctor, but not admit Jane Doe 1's identifying statement.  <u>See</u> Tr. at 57:13-19 (Court).  The United

States asked whether Jane Doe 1's family can testify as to her demeanor, and the Court stated that

witnesses can testify to what they see and what non-assertions they hear.  <u>See</u> Tr. at 58:22-59:5

(Court, Ruiz-Velez).

#### g.     The FBI MIL Argument.

The Court stated that it does not mind some demeanor testimony but that the specific phrase

"a lot on his shoulders" concerns it.  Tr. at 60:1-3 (Court).  It suggested alternatives and said that

the current phrase is too close to testimony that Woody looked guilty.  <u>See</u> Tr. at 60:6-23 (Court).

The United States agreed that witnesses can describe what they see but not characterize what they

see.  <u>See</u> Tr. at 61:5-7 (Ruiz-Velez).  The United States noted, however, that this phrase is in the

recording of the interview.  <u>See</u> Tr. at 63:12-15 (Ruiz-Velez).  The Court said that Woody probably

would not object to this phrase on the tape but would object only if an FBI agent testified about Woody's demeanor in this way at trial.  See Tr. at 63:16-64:5 (Court, Hotchkiss).

> ### h.   **The Trespassing MIL Argument.**

The parties then discussed the Trespassing MIL.  See Tr. at 65:1-66:3 (Court).  The United States said that it is not interested in presenting the trespassing evidence unless Woody opens the door to the evidence.  See Tr. at 66:9-11 (Ruiz-Velez).  Woody stated that he would not give the United States a chance at trial.  See Tr. at 66:15 (Hotchkiss).  Accordingly, the Court granted the Trespassing MIL.  See Tr. at 66:16-18 (Court).

## LAW REGARDING JURY NULLIFICATION

One of the most precious and treasured rights that United States citizens and residents have is the Sixth Amendment to the Constitution's right to "an impartial jury."  U.S. Const. amend. VI. See Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 860 (2017).  This fundamental right is a cornerstone of the American criminal justice system, and the Sixth Amendment has long embodied and protected this means of resolving criminal charges that the government brings.  "That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.  Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."  Blakely v. Washington, 542 U.S. at 305-06.  The jury trial right as preserved in the Bill of Rights was passed down from the right that the Magna Carta enshrines.  See United States v. Booker, 543 U.S. 220, 239 (2005)("The Founders presumably carried this concern from England, in which the right to a jury trial had been enshrined since the Magna Carta.").

> ### 1.   **The Jury's Role at the Founders' Time.**

"The colonial jury played a vital and celebrated role in American resistance to British tyranny leading up to the revolution.  American counsel regularly argued the validity of laws directly to juries, which often refused to enforce British laws they felt were unjust."  Andrew J. Parmeter, Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification, 46 Washburn L.J. 379, 382-83 (2007)(footnotes omitted).  The Honorable Jack Weinstein, United States District Judge for the Eastern District of New York, has noted that, in 1791, at the time of the Sixth Amendment's ratification, "[i]t was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt.  In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to nullify."  United States v. Polouizzi, 549 F. Supp. 2d at 405 (internal quotations omitted).

The Supreme Court has recognized that the jury trial right that the Sixth Amendment affords to defendants was understood at the Founders' time to provide essential protections against government tyranny and to safeguard liberty:

> [T]he historical foundation for our recognition of these principles extends down centuries into the common law.  "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties,"  2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ."   4 [Sir William Blackstone, Commentaries on the Laws of England: In Four Books 343 (William D. Lewis ed., 2007)](1769).

Apprendi v. New Jersey, 530 U.S. at 477.  As Alexander Hamilton first noted, this belief in the jury trial right as a safeguard to liberty was widely shared during the constitution-framing era:

> The friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury.  Or if there is any

- 29 -

difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

The Federalist No. 83, at 456 (Scott ed. 1894)(Hamilton).  The jury trial right was part and parcel of the Framers' belief that the common person should participate in government, and essential to this participation was ensuring that the judiciary was justly and correctly effectuating the laws, whether the laws were written or natural laws.  See Clay S. Conrad, Jury Nullification 45 (1998)(citing Note, The Changing Role of the Jury in the Nineteenth Century, 74 Yale L.J. 170, 172 (1964)); Diary of John Adams, Feb. 12, 1771, in 2 The Works of John Adams 253 (1850)(quoted in Blakely v. Washington, 542 U.S. at 306 ("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature [as in the legislature.]")); Letter from Jefferson to L'Abbe Arnold, July 19, 1789, in 3 Works of Thomas Jefferson, 81, 82 (1854)(quoted in Mark D. Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582, 582 (1939)("Were I called upon to decide, whether the people had best be omitted in the legislative or judiciary department, I would say it is better to leave them out of the legislative.  The execution of laws is more important than the making of them.")).

The criminal jury's role at the Founders' time was primarily that of a factfinder, but also included as a secondary role acting as the community's conscience to determine whether the law, or the application of law to the facts, was conscionable.  See United States v. Courtney, 960 F. Supp. 2d 1152, 1164 (D.N.M. 2013)(Browning, J.).  Professor Irwin A. Horowitz notes: "While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not."  Irwin A. Horowitz, Jury

Nullification: An Empirical Perspective, 28 N. Ill. U. L. Rev. 425, 427 (2007-2008)(quoting Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 110 (1998)).  Similarly, Clay S. Conrad, a trial lawyer in Houston, Texas with the law firm of Looney & Conrad, P.C., asserts that the Sixth Amendment jury trial right implicitly recognizes criminal juries' right to determine the law -- and thus jury nullification if they believe the law wrong -- because, at the Framers' time, the concept of a jury included the idea that the jury not only decided the facts of a case, but also the law:

> The Sixth Amendment itself implicitly recognizes the right of criminal trial jurors to judge the law.  Although it does not mention that power explicitly, it can logically be assumed that the definition of a jury used in that document would be consonant with the prevailing definition in the legal dictionaries of the period.  The most common legal dictionary in Colonial Virginia was the British Jacob's Law Dictionary [(1782)]; and within the encyclopedic definition given in Jacob's, the word 'jury' is defined as:
>
> > Jury . . . [s]ignifies a certain number of men sworn to inquire and try the matter of fact, and declare the truth upon such evidence as shall be delivered them in a cause: and they are sworn judges upon evidence in matter of fact . . . .  Juries are . . . not finable for giving their verdict contrary to the evidence, or against the direction of the court; for the law supposes the jury may have some other evidence than what is given in court, and they may not only find things of their own knowledge, but they go according to their consciences.
>
> The right of jurors to judge "according to conscience," then, was implicit within the word "jury" as the drafters of the Bill of Rights understood it.  This was the trial by jury the founders knew, and this was the trial by jury they intended to pass on to their progeny.

C. Conrad, supra, at 46-47 (footnotes omitted).  The assertion that criminal juries embraced decisions of law as well as fact finds support in precedent caselaw from the Founders' era.

- 31 -

In <u>Georgia v. Brailsford</u>, 3 U.S. (3 Dall.) 1 (1794),[1] a civil case, the Supreme Court noted that the role of the jury is to be the ultimate finder both of the facts and of the law.  <u>See</u> 3 U.S. at 4.  A jury decided the case even though the Supreme Court had original jurisdiction, because the State of Georgia was a party to the case.  The Honorable John Day, then-Chief Justice of the Supreme Court of the United States, charged the jury:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide.  But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.  On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law.  But still both objects are lawfully, within your power of decision.

3 U.S. at 4.  In <u>People v. Croswell</u>, 3 Johns. Cas. 337 (N.Y. Sup. Ct. 1804), meanwhile, Mr. Hamilton was counsel for the defendant, who was indicted for libel against then-President Thomas Jefferson.  The trial court in the case instructed the jury that they were to enter a special, as opposed to general, verdict limited to finding only two issues: (i) whether the article was published; and (ii) whether the article's innuendos were true or false.  <u>See</u> 3 Johns. Cas. at 342.

---

[1] <u>Georgia v. Brailsford</u> is the only published case in which the Supreme Court has presided over a jury trial.  The Seventh Amendment to the Constitution of the United States of America preserves the use of a jury in federal common law suits that would have used a jury when the Seventh Amendment was adopted.  Although it would seem remarkable for the Supreme Court to preside over a jury trial today, the Supreme Court historically impaneled juries at the beginning of every term.  The Supreme Court even heard at least three cases with juries in the 1790s.  <u>Georgia v. Brailsford</u> is, however, the only case that was reported.  The Supreme Court has shifted its practice in modern times by delegating any fact finding to a special master.  The Supreme Court, moreover, when exercising its original jurisdiction hears mostly equitable cases, which do not require a jury.  <u>See</u> Lochlan F. Shelfer, <u>Special Juries in the Supreme Court</u>, 123 Yale L.J. 208, 210-11 (2013).

The jury was instructed that the defendant's intent -- the element requiring that the defendant intended the statements to be libelous -- was a matter of law exclusively for the court.  See 3 Johns. Cas. at 341-42.  Mr. Hamilton argued:

> The Chief Justice misdirected the jury, in saying they had no right to judge of the intent and of the law.  In criminal cases, the defendant does not spread upon the record the merits of the defence, but consolidates the whole in the plea of not guilty.  This plea embraces the whole matter of law and fact involved in the charge, and the jury have an undoubted right to give a general verdict, which decides both the law and the fact. . . .  All the cases agree that the jury have the power to decide the law as well as the fact; and if the law gives them the power, it gives them the right also.  Power and right are convertible terms, when the law authorizes the doing of an act which shall be final, and for the doing of which the agent is not responsible.
>
> The intent constitutes crime.  To deny, then, to the jury the right to judge of the intent, and yet to require them to find a general verdict of guilty, is requiring them to commit perjury.  The particular intent constitutes the crime, in cases of libel, beca[us]e the act is not, of itself, unlawful; and where the particular intent alone constitutes the guilt, the court cannot judge of that intent, and the jury must find it. . . .
>
> It is admitted to be the duty of the court to direct the jury as to the law, and it is advisable for the jury in most cases, to receive the law from the court; and in all cases, they ought to pay respectful attention to the opinion of the court.  But, it is also their duty to exercise their judgments upon the law, as well as the fact; and if they have a clear conviction that the law is different from what it is stated to be by the court, the jury are bound, in such cases, by the superior obligations of conscience, to follow their own convictions.  It is essential to the security of personal rights and public liberty, that the jury should have and exercise the power to judge both of the law and of the criminal intent.

2 Johns. Cas. at 345-46 (emphasis omitted).   The prosecution countered that the sound administration of court business requires that juries be permitted to determine the facts only:

> The jury have, undoubtedly, the power, in criminal cases, to decide the law as well as the fact, if they will take upon themselves the exercise of it; but we must distinguish, in this case, between power and right.  It is the right of the jury to decide the fact, and only the fact; and it is the exclusive province of the court to decide the law in all cases, criminal as well as civil.  A jury is wholly incompetent, and

- 33 -

necessarily must be, from the nature of their institution, to decide questions of law; and if they were invested with this right, it would be attended with mischievous and fatal effects.  The law, instead of being a fixed rule, would become uncertain and capricious, and there would not remain any stability or uniformity of decision, or certainty of principle, in the administration of justice. . . .

If the jury were to judge of the law in the case of libels, why not of the effect of writings in civil cases, and of the law in all cases where the plea is the general issue?  Surely the counsel on the other side are not prepared to carry their doctrine to this extent.

3 Johns. Cas. 350-51.  Mr. Hamilton replied:

But it is not only the province of the jury, in all criminal cases, to judge of the intent with which the act was done, as being parcel of the fact; they are also authorized to judge of the law as connected with the fact.  In civil cases, the court are the exclusive judges of the law, and this arose from the nature of pleadings in civil suits; for, anciently, matters of law arising in the defence, were required to be spread upon the record, by a special plea, and the jury were liable to an attaint for finding a verdict contrary to law.  But in criminal cases, the law and fact are necessarily blended by the general issue, and a general verdict was always final and conclusive, both upon the law and the fact.  Nor were the jury ever exposed to an attaint for a verdict in a criminal case; and this is decisive to prove that they had a concurrent jurisdiction with the court on questions of law; for where the law allows an act to be valid and definitive, it presupposes a legal and rightful authority to do it.  This is a sure and infallible test of a legal power.

In England, trial by jury has always been cherished, as the great security of the subject against the oppression of government; but it never could have been a solid refuge and security, unless the jury had the right to judge of the intent and the law.

The jury ought, undoubtedly, to pay every respectful regard to the opinion of the court; but suppose a trial in a capital case, and the jury are satisfied from the arguments of counsel, the law authorities that are read, and their own judgment, upon the application of the law to the facts, (for the criminal law consists in general of plain principles,) that the law arising in the case is different from that which the court advances, are they not bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions?  To oblige them, in such a case, to follow implicitly the direction of the court, is to make them commit perjury, and homicide, under the forms of law.  Their error is fatal and cannot be corrected.  The victim is sacrificed; he is executed; he perishes without redress.  Was he a juror, in such a case, he would endure the rack rather than surrender his

own convictions on the altar of power, rather than obey the judicial mandate.

People v. Croswell, 3 Johns. Cas. at 355-56 (citations omitted).

The Supreme Court of New York was equally split, with two justices agreeing with Mr. Hamilton and two justices siding with the prosecution.  The Honorable James Kent, then-Associate Justice of the Supreme Court of New York, wrote in agreement with Mr. Hamilton that "[t]here is nothing peculiar in the law of libels, to withdraw it from the jurisdiction of the jury" by requiring a special verdict.  3 Johns. Cas. at 365-66.  Justice Kent reasoned that, in all other areas of criminal law, the jury is charged with finding intent:

> The jury are called to try, in the case of a traitor, not only whether he committed the act charged, but whether he did it traitorously; and in the case of a felon, not only whether he killed such a one, or took such a person's property, but whether he killed with malice prepense, or took the property feloniously.  So in the case of a public libeller, the jury are to try, not only whether he published such a writing, but whether he published it seditiously.  In all these cases, from the nature of the issue, the jury are to try not only the fact, but the crime, and in doing so, they must judge of the intent, in order to determine whether the charge be true, as set forth in the indictment.  The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict.

3 Johns. Cas. at 366-67 (emphasis omitted).  He thus concluded:

> [U]pon every indictment or information for a libel, where the defendant puts himself upon the country, by a plea of not guilty, the jury have a right to judge, not only of the fact of the publication, and the truth of the innuendoes, but of the intent and tendency of the paper, and whether it be a libel or not; and, in short, of "the whole matter put in issue upon such indictment or information."  That in this, as in other criminal cases, it is the duty of the court, "according to their discretion, to give their opinion and direction to the jury on the matter in issue;" and it is the duty of the jury to receive the same with respectful deference and attention, and, unless they choose to find a special verdict, they are then to exercise their own judgments on the matter in issue, with discretion and integrity.

3 Johns. Cas. at 376-77 (internal citation omitted).

The Honorable Morgan Lewis, then-Chief Justice of the Supreme Court of New York, disagreed with Mr. Hamilton and Justice Kent, and concluded that the policies behind not constricting a jury to deciding matters of law are not present in the United States as they were in England:

> It has been urged, that to deny a jury the right of deciding on the law and the fact, in all cases of criminal prosecution, is contrary to the spirit and genius of our government.  But how, has not been attempted to be shown.  In England, where the judges are appointed by the crown, and juries form a substantial barrier between the prerogatives of that crown and the liberties of the people, the reasons for extending the powers of the latter are certainly much stronger than with us, where the judges are, in effect, appointed by the people themselves, and amenable to them for any misconduct.

People v. Croswell, 3 Johns. Cas. at 409.

As Judge Weinstein notes in United States v. Polouizzi, the negative connotations surrounding nullification "ignore history and the meaning of the Sixth Amendment."  549 F. Supp. 2d at 405.  The history to which Judge Weinstein refers is the dual roles that the common-law jury played at the Founders' time: its primary role was as factfinder, but its secondary role was to also find the law, often by acquitting if the jury found the law unjust.  See I. Horowitz, supra, at 427 ("While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not.").

The jury's nullification power was well-known and used during the Founders' time, as common-law juries during the seventeenth and eighteenth century saw the development of the jury's power to acquit against the facts, or, as it was referenced in the time, to find the law in addition to the facts.  See United States v. Courtney, 960 F. Supp. 2d at 1189-90.  In the late-

seventeenth century, Edward Bushell, who had been imprisoned for his role in acquitting -- against the court's direction to convict -- two Quakers of the offenses of unlawful assembly and breaching the peace resulting from their preaching, petitioned for a writ of habeas corpus.  See United States v. Polouizzi, F. Supp 2d at 405; C. Conrad, supra, at 24.  When the judge instructed the jury about the facts which the prosecution needed to prove to convict, the judge instructed the jury that the prosecution had proved those facts and instructed the jury it was their job to find as fact that the defendants had committed the crimes.  See C. Conrad, supra, at 26 (quoting The Tryal of Wm. Penn and Wm. Mead for Causing a Tumult . . . , How. St. Tr. at 6:951 (1670)).  When the jury refused to convict, and Bushell was imprisoned for his failure thereafter to pay a fine, the Honorable John Vaughn, then-Chief Justice of the Court of Common Pleas, held that to require a jury to find guilt because the court believed that all elements of the law were proven is to make the use of a jury superfluous.  See C. Conrad, supra, at 27.  As one scholar notes, Chief Justice Vaughn's decision "ushered in . . . 'the heroic age of the English jury,' during which 'trial by jury emerged as the principle defense of English liberties,'" C. Conrad, supra, at 28 (quoting J.M. Beattie, London Juries in the 1690's 214, in J. S. Cockburn & Thomas A. Green, eds., Twelve Good Men and True (1988)), and which influenced the common-law jury to the point that, at the Founders' time, "jury [nullification] [w]as an accepted part of the American law for the next several generations," C. Conrad, supra, at 32.

The Supreme Court in its recent sentencing opinions has not only discussed that the Sixth Amendment jury trial right guarantees the "historical foundation" of the jury as "guard[ing] against a spirit of oppression and tyranny on the part of rulers, and as the great bulwark of our civil and political liberties," Booker, 543 U.S. at 239 (internal quotations and alterations omitted)(quoting

Apprendi v. New Jersey, 530 U.S. at 477), but has specifically pointed out the jury's nullification power at common law.  The Supreme Court referenced the jury's power to find against the facts that the evidence establishes in both Apprendi v. New Jersey and Jones v. United States, noting that "juries devised extralegal ways of avoiding jury verdicts . . . ."  Apprendi v. New Jersey, 530 U.S. at 479 n.5.  In Jones v. United States, the Supreme Court similarly noted that "[t]his power to thwart Parliament and Crown took the form . . . of flat-out acquittals in the face of guilt . . . ."  526 U.S. at 245 (quoting 4 W. Blackstone, supra, at 238-39).  The authorities suggest that the common-law jury at the Founders' time had the ability to nullify by acquitting the defendant against the facts that the evidence establishes at trial, or -- as it was referred to at the time -- to determine the law.

There is, therefore, a tension between the historical authority about the common-law jury's role and the Supreme Court's finding in Sparf v. United States "that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court." 156 U.S. at 90.  Justice Harlan's inclusion of the word "rightfully" before "refuse" leaves this statement open to interpretation that, although the nullification power was part of the common-law jury's role, it was nevertheless wrongful to exercise it.  Such an argument is, however, irreconcilable with the recent Supreme Court decisions' recognition of the crucial importance of the common-law jury's mitigation power to the Sixth Amendment's preservation of the jury trial right.

2.      **The Evolution of the Jury's Role and Sparf v. United States.**

The Honorable Joseph Story, then-Associate Justice of the Supreme Court of the United States, riding circuit in Massachusetts, issued the first American opinion explicitly limiting the role of jurors in United States v. Battiste, 24 F. Cas. 1042 (C.C.D. Mass. 1835).  See United States v. Polouizzi, 687 F. Supp. 2d 133, 190 (E.D.N.Y. 2010)(Weinstein, J.)(noting that the first of "[t]wo major Supreme Court Justices' opinions in the nineteenth century . . . restricting the Sixth Amendment's jury" right to decide the law is "Justice Story's in . . . United States v. Battiste . . ."), vacated, 393 F. App'x 784 (2d Cir. 2010)(Miner, J., joined by Leval and Wesley, JJ.)(unpublished); C. Conrad, supra, at 65 (noting that 160 years had passed since the introduction of jury nullification, or jurors as deciders of the law, "before Supreme Court Justice Joseph Story, riding circuit in Massachusetts, rendered the first major American court opinion limiting the role of juries . . .").  In United States v. Battiste, the defendant was on trial for violating a newly enacted law punishing human trafficking in slaves, and Justice Story was concerned that, because Massachusetts was the first state to abolish slavery and was home to much of the abolitionist movement, the jury would convict him based on their beliefs about slavery rather than on the facts. See United States v. Polouizzi, 687 F. Supp. 2d at 190-91 ("Justice Story's statement was made in the context of *preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a person technically guilty*." (emphasis in original)); C. Conrad, supra, at 66.  Justice Story instructed the jury as to his opinion that the jury determining guilt based on the jurors' own beliefs, rather than on the law as the court told them -- jury nullification -- is inconsistent with the notion of a fair trial:

Before I proceed to the merits of this case, I wish to say a few words upon a point,

- 39 -

suggested by the argument of the learned counsel for the prisoner upon which I have had a decided opinion during my whole professional life. It is, that in criminal cases, and especially in capital cases, the jury are the judges of the law, as well as of the fact. My opinion is, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case, tried upon the general issue. In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact. In each, they have the physical power to disregard the law, as laid down to them by the court. But I deny, that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions, or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court. This is the right of every citizen; and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury. Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was. On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may require. Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it. If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial. But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion. It is not, indeed, an occasion, on which there is any reason to doubt, that an intelligent jury can understand the principles of law applicable to the subject, as well as the court; for they are the principles of common sense. And as little reason is there, in my view, to suppose, that they can operate injuriously to the real merits of the case of the prisoner.

24 F. Cas. at 1043.

In Pierce v. State, 13 N.H. 536 (1843), the Supreme Court of New Hampshire cited United

States v. Battiste in holding that the right to return a verdict based on a finding that the law is

otherwise than the court gives it to the jury is inconsistent with the proposition that the Constitution

is the supreme law of the land:

> [T]he result at which we have arrived is that the juries have not the right to decide
> the law in any case; that this accords with the best authorities in the common law,
> and with other legal rights which must be surrendered if they may decide the law;
> and that they are bound by the law, as laid down to them by the court. . . .
>
> The constitution of the United States, and the acts of Congress made in pursuance
> thereof, are the supreme law of the land, and the judges in every state are bound
> thereby.  If juries are not bound also, the question can never be settled whether a
> law be in pursuance of the constitution, and the courts must suspend their judgments
> until a sufficient number of verdicts has been returned, one way or the other, to
> render it probable that juries generally in future will return their verdicts the same
> way, -- for no nearer approach to certainty could be made.
>
> We cannot believe that impartial and reflecting men, of whatever profession they
> may be, can advocate doctrines which may lead to such results as the right of the
> jury to decide the law may end in.  We cannot think that the people or their
> representatives would be content with an exposition of the constitution which
> would cause the constitutionality of the license law to remain an open question,
> until it could be settled by the verdict of a jury; of a body admirably adapted to the
> decision of questions of fact, but irresponsible, giving no reasons for their decisions,
> not subject to impeachment or attaint, without access to the sources of the law, and
> therefore unfitted for the investigation of legal rights.  No reflecting man in the jury
> box would be willing to take upon himself this responsibility.  He would feel that
> the question could not be examined with the deliberation it required; that the law
> could not be expounded with quite so much facility as it could be made, -- and that
> there was no such inspiration in the jury box as would enable twelve men to
> determine, per saltum, grave questions which, elsewhere, require care, and thought,
> and patient study, and time for undisturbed reflection.  And it is the opinion of the
> court, that it is inconsistent with the spirit of the constitution that questions of law,
> and still less, questions of constitutional law, should be decided by the verdict of
> the jury, contrary to the instructions of the court.

Pierce v. State, 13 N.H. at 551-54 (internal citations omitted).  Courts around the country began to

follow suit and adhere to the proposition that allowing juries to decide the law in a case, and to

decide against the law as the court gave it to them, is inconsistent with the constitutional right for

a fair trial.  See, e.g., Commonwealth v. Porter, 51 Mass. 263, 263, 10 Metcalf 263, 263

(1845)("[I]t is the duty of the court to give instructions to the jury on all questions of law which arise in a cause tried by them; and it is the duty of the jury to receive the law from the court, and to conform their . . . decision to such instructions . . . ."); State v. Burpee, 65 Vt. 1, 25 A. 964, 973 (1892)("The doctrine that jurors are judges of the law in criminal cases is repugnant to . . . the constitution of Vermont, which guaranty to every person within this state 'a certain remedy' for all wrongs, conformably to the laws . . . .")(quoting Vt. Const. art. 4, 10).

Sixty years after United States v. Battiste, the Honorable John Marshall Harlan, then-Associate Justice of the Supreme Court of the United States, writing for the majority in Sparf v. United States, decided whether a district court could find that manslaughter did not apply as a matter of law and the jury had to follow that instruction, or whether it was wholly the jury's determination.  See United States v. Courtney, 960 F. Supp. 2d at 1170.  The defendants in Sparf v. United States, tried jointly for murder, asserted on appeal that the court invaded the jury's province to determine the law and the facts in criminal cases, where the judge instructed the jury on manslaughter and murder, but also instructed the jury:

> I do not consider it necessary, gentlemen, to explain [manslaughter] further, for if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder.  In other words, it may be in the power of the jury, under the indictment by which these defendants are accused and tried, of finding them guilty of a less crime than murder, to wit, manslaughter, or an attempt to commit murder; yet, as I have said in this case, if a felonious homicide has been committed at all, of which I repeat you are the judges, there is nothing to reduce it below the grade of murder.

156 U.S. at 60.  The judge additionally instructed the jury: "[A]s one of the tribunals of the country, a jury is expected to be governed by law, and the law it should receive from the court."  156 U.S. at 63.  The Supreme Court held that the district court did not err in giving these instructions:

We are of opinion that the court below did not err in saying to the jury that they could not, consistently with the law arising from the evidence, find the defendants guilty of manslaughter, or of any offense less than the one charged; that if the defendants were not guilty of the offense charged, the duty of the jury was to return a verdict of not guilty.  No instruction was given that questioned the right of the jury to determine whether the witnesses were to be believed or not, nor whether the defendant was guilty or not guilty of the offense charged.  On the contrary, the court was careful to say that the jury were the exclusive judges of the facts, and that they were to determine -- applying to the facts the principles of law announced by the court -- whether the evidence established the guilt or innocence of the defendants of the charge set out in the indictment.

The trial was thus conducted upon the theory that it was the duty of the court to expound the law, and that of the jury to apply the law as thus declared to the facts as ascertained by them.  In this separation of the functions of court and jury is found the chief value, as well as safety, of the jury system.  Those functions cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights.

156 U.S. at 106.

Justice Harlan notes the varied opinions of jurists and court decisions dating back to Georgia v. Brailsford, which had recognized that juries necessarily have the right to determine matters of law in addition to fact, but concludes: "We are of the opinion that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court."  Sparf v. United States, 156 U.S. at 90.  Justice Harlan reasoned that the incorrect belief about the jury's ability to depart from the law which the court gives to it arises from the jury's ultimate ability to decide guilt or innocence in rendering a general verdict: "The contrary view rests, as we think, in large part, upon expressions of certain judges and writers, enforcing the principle that when the question is compounded of law and fact a general verdict, ex necessitate, disposes of the case in hand, both as to law and fact."  156 U.S. at 90.  He determined, therefore,

that "the general common-law rule in criminal cases" at the time of the Sixth Amendment's

ratification was

> the right of the court to decide the law, and the duty of the jury to apply the law
> thus given to the facts, subject to the condition, inseparable from the jury system,
> that the jury, by a general verdict, of necessity determined in the particular case
> both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98.  Justice Harlan thus rejected the defendants' contention that the district judge's

instructing the jury that it was to follow the law that he gave to them was improper, reasoning:

> We must hold firmly to the doctrine that in the courts of the United States it is the
> duty of juries in criminal cases to take the law from the court, and apply that law to
> the facts as they find them to be from the evidence.  Upon the court rests the
> responsibility of declaring the law; upon the jury, the responsibility of applying the
> law so declared to the facts as they, upon their conscience, believe them to be.

156 U.S. at 102.  Justice Harlan, articulating the policy behind the Supreme Court's holding, noted

that requiring juries to adhere to courts' instructions ensures that laws, even if they may be

unpopular, are enforced:

> "As long as the judges of the United States are obliged to express their opinions
> publicly, to give their reasons for them when called upon in the usual mode, and to
> stand responsible for them, not only to public opinion, but to a court of
> impeachment, I can apprehend very little danger of the laws being wrested to
> purposes of injustice.  But, on the other hand, I do consider that this power and
> corresponding duty of the court authoritatively to declare the law is one of the
> highest safeguards of the citizen.  The sole end of courts of justice is to enforce the
> laws uniformly and impartially, without respect of persons or times or the opinions
> of men.  To enforce popular laws is easy.  But when an unpopular cause is a just
> cause; when a law, unpopular in some locality, is to be enforced, -- there then comes
> the strain upon the administration of justice; and few unprejudiced men would
> hesitate as to where that strain would be most firmly borne."

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt. 62, 63 (C.C.D.

Mass. 1851)).

States quickly followed on the heels of the Supreme Court's decision in Sparf v. United

States to restrict the role of juries.  Pennsylvania, for instance, clarified its opposition to jury nullification in the case of Commonwealth v. Bryson, 120 A. 552 (1923), where the defendant challenged the district court's instruction, which provided: "[I]n this sort of case you are the judges of the law and the facts, the law as well as the facts, but you are to take the law from the court as the proper source of information."  120 A. at 554.  The Supreme Court of Pennsylvania noted that correctness of the instruction "is now settled in Pennsylvania," holding: "There is nothing in the instructions of which defendant can justly complain.  It is the duty of the jury to take the law from the court, to the same extent in a criminal case as in any other, and a trial judge can properly so instruct."  120 A. at 554.  Further, the Supreme Court of Illinois in 1931 held unconstitutional a statute which provided that juries in criminal cases are the judges of both fact and law, reasoning that the statute "abrogates an essential attribute of the trial of a criminal case by a jury as known to the common law, and results in the deprivation of a right which has been uniformly guaranteed by our successive Constitutions."  People v. Bruner, 175 N.E. 400, 404 (1931).  The Supreme Court of Illinois cites Sparf v. United States as authority for the proposition that, at common law, it is a jury's duty to take and apply the law as the judge gives it to the jury.  See People v. Bruner, 175 N.E. at 403 (noting that the Supreme Court in Sparf v. United States, "following the rule and practice at common law, [held that] it was the duty of the jury in every criminal case . . . to take the law from the court and to apply the law so received to the facts as they found them from the evidence").  The Supreme Court has not directly addressed nullification since Sparf v. United States.  See Col. Jeremy S. Weber, Court-Martial Nullification: Why Military Courts Needs a "Conscience of the Commander", 80 A.F. L. Rev. 1, 16-17 (2019).

**3.     The Jury's Current Role.**

- 45 -

"It is well-established that the court instructs the jury as to the rules of law and that the jury applies the facts as they find them to those rules."  United States v. Grismore, 546 F.2d 844, 849 (10th Cir. 1976)(citing Sparf v. United States, 156 U.S. at 51).  "One touchstone of a fair trial is an impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before it.'"  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)(quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  A juror meets the constitutional standard for impartiality where the juror "can lay aside his opinion and render a verdict based on the evidence presented in court."  Patton v. Young, 467 U.S. 1025, 1037 n.12 (1984).  As the Tenth Circuit has explained, a "defendant's right to an impartial jury does not include a right to a jury composed of persons who will disregard the district court's instructions."  United States v. James, 203 F.3d 836 (10th Cir. 2017)(table opinion).[2]  Cf. United States v. Fredette, 315 F.3d 1235, 1240-41 (10th Cir. 2003)("The instructions as a whole need not be flawless, but we must be satisfied that, upon

---

[2]United States v. James is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. James; United States v. Gehringer, 385 F. App'x 830 (10th Cir. 2010); Ferencich v. Merritt, 79 F. App'x 408 (10th Cir. 2003); and United States v. LaFlora, 146 F. App'x 973 (10th Cir. 2005) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.")(internal quotation marks omitted)(quoting Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).

The Tenth Circuit has held that "there is no right to jury nullification." Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999). Jury nullification is defined as a

> jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.

Jury Nullification, Black's Law Dictionary at 936 (9th ed. 2009). "While we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath." United States v. Gonzalez, 596 F.3d 1228, 1237 (10th Cir. 2010)(internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983)). "[W]e disapprove of the encouragement of jury nullification." United States v. Gonzalez, 596 F.3d at 1237. The Tenth Circuit in Crease v. McKune cited with approval the United States Court of Appeals for the Second Circuit's holding in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997), in which the Second Circuit stated that "the powers of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent." 116 F.3d at 615. Moreover, the Tenth Circuit has held that "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law." United States v. Rith, 164 F.3d at 1337. See United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992)(holding that criminal defendants are "not entitled to jury nullification

instructions").

In United States v. James, the Tenth Circuit upheld a district court judge's sua sponte dismissal of a potential juror who stated his belief that the juror had the power to disregard the judge's admonition on the law and acquit if the juror felt it just to do so. See 2000 WL 136816, at *4. The district court judge asked the juror, an emeritus professor of law at the University of Denver, whether he was "willing to accept the law from me as I give it in the instructions," to which the juror responded that his "inclination is to follow the judge's instructions." 2000 WL 136816, at *2. The juror noted, however, that he had one "qualm" and that was the view that "a jury always has the power to acquit . . . . [n]ot withstanding the evidence." 2000 WL 138816, at *2. The judge then, immediately, sua sponte dismissed the juror and provided the following explanation to the venire:

> Now, we were on the subject of experience with the law. I just excused the professor because he expressed a view that the jury can disregard the law. I'm surprised to hear that's being taught, if it is being taught. But at any rate, that's not the law. As I have explained patiently and carefully, the jury has to accept the law as it is, and it's up to the jury to decide on the evidence, you know, whether the evidence meets this high standard of proof, and can certainly decide on an acquittal, as he said, if the evidence doesn't persuade or convince you beyond a reasonable doubt. But the jury can't make up the law, and that's the little exchange that we had there, and I'm sure you followed along with that, but I wanted to make it plain why it was that I excused this teacher.

2000 WL 138816, at *2. When the defendant appealed, asserting that the judge's sua sponte dismissal of the juror and instruction to the venire violated his Sixth Amendment jury trial rights, the Tenth Circuit affirmed, holding:

> In light of his responses to questions during voir dire, the district court did not abuse its discretion or commit plain error in sua sponte dismissing [the] prospective juror . . . . A person who is either unwilling or unable to follow the court's instructions is not qualified to be a juror. Nor did the district court commit any

error when it informed the jurors that it is their obligation to follow the law as it
instructs.  In short, the defendant was not deprived of his right to a fair trial.

2000 WL 138816, at *4.

The Tenth Circuit and the Supreme Court bind the Court, and the Court may not provide

the jury with an instruction inviting nullification.  See United States v. Courtney, 960 F. Supp. 2d

at 1189.  While in United States v. Courtney, the Court stated that the defendant

> perhaps should be afforded the opportunity to have the Court instruct the jury, or
> his counsel be allowed to tell the jury, that, if it finds "the law arising in the case is
> different from that which the court advances," the jurors are "bound by their oaths,
> by their duty to their creators and themselves, to pronounce according to their own
> convictions," rather than according to the dictates of the law,

960 F. Supp. 2d at 1196, the Court ultimately held that current Supreme Court and Tenth Circuit

controlling law required denial of the requested instruction.  See United States v. Courtney, 960 F.

Supp. 2d at 1196-97.  The defendant appealed the denial of the instruction, and the Tenth Circuit

responded:

> In a lengthy exposition, the district court correctly noted that the role of the Sixth
> Amendment, like many other portions of our Constitution, has changed over time.
> However, rather than embarking on a winding and uncertain[3] journey into the
> minds of the framers, we must follow Supreme Court and Tenth Circuit precedent.
> Therefore, we state once again that "a criminal defendant is not entitled to have the
> jury instructed that it can, despite finding the defendant guilty beyond a reasonable
> doubt, disregard the law."

United States v. Courtney, 816 F.3d 681, 681(10th Cir. 2016)(quoting United States v. Rith, 164

F.3d at 1338).  See United States v. Warwick, 16-CR-4572 MCA, 2017 WL 5027295 (D.N.M.

Oct. 30, 2017)(Armijo, C.J.)(concluding that the court's role to instruct the jury on the law and the

duty of the jury to obey the instructions have been clearly defined since 1895).  See also United

---

[3]With all due respect to the Tenth Circuit, the Court does not think it is "uncertain" what
was in the Framers' minds regarding jury nullification.

States v. Jensen, No. 17-CR-2566 WJ, 2018 WL 878963 (D.N.M. Feb. 13, 2018)(Johnson, J.)(stating that the Tenth Circuit has repeatedly affirmed that a defendant is not entitled to an instruction advising or encouraging the jury to exercise the power of nullification); United States v. Edwards, 266 F. Supp. 2d 1290, 1322 (D.N.M. Aug. 22, 2017)(Browning, J.)(concluding the same).

**4.      Withholding From the Jury Information About its Mitigation or Nullification Right Has Lessened the Jury's Control in Judicial Proceedings and Eroded the Common-Law Jury's Role.**

The Supreme Court has stated that not all changes to the jury's role implicate the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion.'" Apprendi v. New Jersey, 530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48). The question for the Court to decide is whether the judicial exertion of power has changed trial practices to the point where the jury trial right has been unconstitutionally eroded or denied. Requiring courts to keep information about the mitigation or nullification power from the jury has not wholly taken away a defendant's jury trial right. Given that: (i) the Founders contemplated the jury's role to include its right to be the ultimate decider of the law; and (ii) the mitigation power played such a large role in the common-law jury's resolution of a case, however, the contemporary judicially created requirement to keep all information from the jury about its "power" to nullify is inconsistent with the Sixth Amendment jury trial right at the Founders' time.

The Supreme Court has noted that "the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that

the claimed judicial power infringes on the province of the jury." Blakely v. Washington, 542 U.S. at 308. Even though an organic change leading to the courts' omissions of any information about the jury's nullification would perhaps not be sufficient to find a judicial exertion of power, such a small evolution is not what occurred. Sparf v. United States and its progeny effectively took away, by the exertion of judicial power, any possibility that the jury might be informed about its role including its nullification or mitigation power. The Supreme Court's decision in Sparf v. United States, which established that it is correct for courts to instruct the jury that the law is the court's determination to make and solely in its province, and that it is the jury's duty to apply the law as given, is inconsistent with the practices of the Supreme Court in Georgia v. Brailsford and of the New York Supreme Court in People v. Croswell. To stake out the position that the law is solely the court's province and that it is the jury's duty to apply the law as the Court gives it to the jury is in tension with the Supreme Court's direction that it is the jurors' "right to take upon yourselves to judge . . . both . . . the law as well as the fact in controversy," Georgia v. Brailsford, 3 U.S. at 4 (emphasis added), and that, when, in the jurors' eyes, "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law, People v. Croswell, 3 Johns. Cas. at 355-56. The question thus becomes whether this judicial power infringes on the jury's province.

Like the modern-day jury's lack of knowledge about sentencing information, it may be that any lack of the jury's knowledge about its nullification power does not implicate the Sixth Amendment's jury trial right, because even if the jurors' knowledge about nullification has receded, the jury's power to nullify still exists to the same extent that it did in the Founders' time.

See United States v. Courtney, 960 F. Supp. 2d at 1193-94.  As the Honorable Judge Learned

Hand, United States Circuit Judge for the United States Court of Appeals for the Second Circuit,

observed in Steckler v. United States, 7 F.2d 59 (2d Cir. 1925), however inconsistent jury

nullification may be with the jury's role as factfinder and duty to apply the law as given to its

findings of fact, the jury retains this nullification power and exercises this power when the jury

sees fit to do so regardless whether the court informs the jury about the power:

> The most that can be said in such cases is that the verdict shows that either in the
> acquittal or the conviction the jury did not speak their real conclusions, but that
> does not show that they were not convinced of the defendant's guilt.  We interpret
> the acquittal as no more than their assumption of a power which they had no right
> to exercise, but to which they were disposed through lenity.

7 F.2d at 60.

The Supreme Court and especially the Tenth Circuit have also concluded that this change

in practice -- affirmatively to instruct the jury to follow the law which the district court gives to

it -- has not unconstitutionally eroded the jury's role from the Founders' conception of that role.

This conclusion finds support in the policy considerations which Justice Harlan noted in Sparf v.

United States.  Justice Harlan noted that many of the concerns present in England and the colonies

in the Framers' era about the injustice that stems from judges as arms of the oppressive state

dissipated with the requirements in the United States that judges give their opinions publicly,

explain the reasoning behind their opinions, and the repercussion of impeachment guaranteed in

the United States Constitution:

> As long as the judges of the United States are obliged to express their opinions
> publicly, to give their reasons for them when called upon in the usual mode, and to
> stand responsible for them, not only to public opinion, but to a court of
> impeachment, I can apprehend very little danger of the laws being wrested to the
> purposes of injustice.

156 U.S. at 107 (quoting United States v. Morris, 1 Curt. at 63).  He reasoned, rather, that placing the duty to expound the law in the courts and requiring the citizens to follow them furthers the interests of justice by helping to ensure that laws which the democratic government enacts are enforced regardless of their popularity:

> I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen.  The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men.  To enforce popular laws is easy.  But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne.

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt. at 63).  As Judge Weinstein notes, Sparf v. United States produces a court system that can efficiently deal with the realities of the organic evolution of the American legal system and the jury pool:

> Justice Harlan's majority opinion was well designed to produce a more efficient court system calculated to deal with the growing complexity of the law; the much improved training and professionalism of bench and bar; a lay public increasingly out-of-touch with the law's details; and a desire to provide predictable rules protecting our growing national industry and commerce.

United States v. Polouizzi, 549 F. Supp. 2d at 421.  These courts have, therefore, been very clear about what a trial court should do when asked to inform the jury about its nullification power or to allow the lawyers to do so: "[N]either the court nor counsel should encourage jurors to violate their oath."   United States v. Gonzalez, 596 F.3d at 1237 (internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d at 106).  See United States v. Gonzalez, 596 F.3d 1237 ("[W]e disapprove of the encouragement of jury nullification.").

The Constitution was not designed, however, to be neat and efficient, but to protect

individual liberty against government despotism.  See United States v. Courtney, 960 F. Supp. 2d at 1195.  That the jurors' lack of knowledge stems at least in part from the judicial exertion of power, and that the jury's nullification power played an important role in criminal jury trials at the Founders' time, counsels in favor of finding this evolution unconstitutional.  In Blakely v. Washington, the State of Washington asserted that, although the jury did not find the aggravating fact supporting the enhancement that the sentencing judge applied, and the sentencing range based on the facts submitted to the jury corresponded with a 49 to 53-month range, the 90-month sentence imposed was nevertheless constitutional, because the statutory maximum for the crime was ten years, and the sentence imposed was under that statutory maximum.  See 542 U.S. at 303.  Justice Scalia, then-Associate Justice of the Supreme Court, noted, however, that "[o]ur precedents make clear that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict," 542 U.S. at 303 (emphasis omitted), noting that, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority," 542 U.S. at 304 (citations omitted).  Justice Scalia explained that Apprendi v. New Jersey and its progeny are based on commitment to the Framers' intention in providing the Sixth Amendment jury trial right: the people's ultimate control of the judiciary.

> Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial.  That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.  Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.  See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed.

1981)(describing the jury as "secur[ing] to the people at large, their just and rightful control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850)("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958)("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); Jones v. United States, 526 U.S. 227, 244-48 . . . (1999).  Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict.  Without that restriction, the jury would not exercise the control that the Framers intended.

Blakely v. Washington, 542 U.S. at 305-06.  To take away the defendant's ability to inform the contemporary jury about its nullification power, which was central to the common-law jury's role in ensuring that the people kept "ultimate control . . . in the judiciary," 542 U.S. at 306, effectively takes away the modern jury's ability to withhold a guilty verdict where it believes to do so is just. This situation is particularly the case when a court instructs the jury that it must follow the court's instructions on the law and set aside any beliefs it may have about what the law should be.  In such a case, because the jury did "not exercise the control that the Framers intended," the sentence that the court subsequently imposes on the defendant does not "derive[] wholly from the jury's verdict," as the Framers contemplated "jury," and therefore violates the Framers' intent in preserving the jury trial right in the Sixth Amendment.  Blakely v. Washington, 542 U.S. at 305-06.

Because the common-law jury at the Founders' time was in control of the judiciary by virtue of rendering the ultimate decision in its verdict, and because the courts at the time of the Founders told the jury that the jury was the master of the law and of the facts, the Supreme Court's and the Tenth Circuit's precedent that the trial court should not instruct the jury about nullification

is inconsistent with the Framers' intention in adopting the Sixth Amendment jury trial right. Moreover, the requirement that the court not allow the lawyers to encourage nullification is inconsistent with the practice at the time of the Framers, as Mr. Hamilton's conduct in People v. Croswell exhibits.  Even though it is messy to talk openly to the jury about jury nullification in the modern American judicial system, the Constitution is not structured solely to efficiently convict defendants.

The Court has made clear its belief that the jury has the power to put off the law as the Court gives it and to convict according to the jury's conscience.[4]  This power has been a long-standing bulwark against the threat of judicial despotism and congressional tyranny, yet the Court is left no choice but to deny defendants' motions requesting this right.  Despite the Supreme Court's possible receptiveness to reconsider the issue of jury nullification and the courts' role in

_____

[4]A potent criticism of the Court's position is that jury nullification might be misused for racial reasons.  For example, the fear may be that a white jury might engage in jury nullification when there is a white defendant officer accused of killing an African-American.  The Court would not take away jury nullification in these circumstances, because a prosecutor might be under political pressure to bring a case, and more importantly, because the jury may often have an African-American defendant, and the jury might want to take race into consideration in those circumstances.  See United States v. Lewis, 432 F. Supp. 3d 1237, 1296 (D.N.M. 2020)(Browning, J.)("Data abounds, however, that African Americans are far more likely to be arrested and sentenced than are whites"); Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 715-18 (1995)(arguing that African-American jurors should sometimes vote to acquit in criminal cases where African-American defendants are factually guilty, because the benefits of returning the defendant to the community may outweigh the harms caused by incarceration).  This country has fought a civil war and engaged in a long struggle to attempt to rid itself of racial divide.  See Pena-Rodriguez v. Colorado, 137 S. Ct. at 867.  Although the Court would not necessarily take away race-based nullification, the Court could also live with telling the jury that it cannot base jury nullification on race.  The jury could be told that race is an illegitimate factor on which to base nullification, just as it is an illegitimate factor on which to base a conviction.  See Pena-Rodrigez v. Colorado, 137 S. Ct. at 869.  Such an instruction might not be effective, but a court can never rule out all jury misconduct, and the Court's experience is that American juries work hard to follow the Court's instructions.

educating the jury of its power, the Supreme Court has not directly ruled on the issue.  The Court must defer, therefore, to the Supreme Court's guidance to district courts that, where a recent decision casts doubt about Supreme Court caselaw's precedential value, district courts must adhere to the established precedent until the Supreme Court explicitly reconsiders it.  See Hohn v. United States, 524 U.S 236, 252-53 (1998)("[O]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued validity."); United States v. Courtney, 960 F. Supp. 2d at 1199 ("Thus, although the recent Supreme Court case law discussing the Sixth Amendment jury trial right calls into question the language in this instruction, the Court cannot say that the Supreme Court has effectively ruled this instruction unconstitutional.").

## LAW REGARDING JURY KNOWLEDGE OF SENTENCING RAMIFICATIONS

In criminal cases, the United States and the defendant often work together to keep the jury ignorant of the ramifications of its determination of guilt.  The Supreme Court has consistently directed that, "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  Shannon v. United States, 512 U.S. 573, 579 (1994)(footnote omitted)(quoting Rogers v. United States, 422 U.S. 35, 40 (1975)).  It is doubtful that this ignorance was present at the time of the Sixth Amendment's ratification.

### 1.    Jury Knowledge of Sentencing Ramifications at the Founders' Time.

The common-law jury exercised its role as the conscience of the community by nullifying severe sentencing laws; the historical record suggests that the common-law jury not only used its nullification power, but also that jury nullification was a well-known, common jury power to guard against what it saw as unjust laws.  See United States v. Courtney, 960 F. Supp. 2d at 1191.  As

- 57 -

discussed above, the historical background also suggests that juries at the Framers' time did not have to be provided instructions about their ability to nullify.  See United States v. Courtney, 960 F. Supp. 2d at 1191.  The frequency with which juries mitigated the verdict or acquitted a guilty defendant, because they saw the law as unjust, suggests that jurors knew about their ability to nullify without any information from the courts about that ability and that this nullification power was essential "to ensure their control in the judiciary."  Blakely v. Washington, 542 U.S. at 305. Nevertheless, courts at the Founders' time, including the Supreme Court in 1794, instructed juries that it was their right to be the ultimate judge of both the facts and the law.  See United States v. Courtney, 960 F. Supp. 2d at 1191.

Colonial and British jurors at the Founders' time came to the courts from the same vicinity as the defendant, "were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments."  United States v. Polouizzi, 549 F. Supp. 2d at 406 (internal citations omitted).  Professor Jeffrey B. Abramson has noted that jurors at the Founders' time did not "come to the jury with minute skill in the laws," but rather the local knowledge jurors would have possessed included knowledge of the laws.  Jeffrey B. Abramson, We, The Jury: The Jury System and the Ideal of Democracy at 32 (1994).  Professor Abramson explains:

> Not only was formal legal training unnecessary, but jurors did not even need to rely on a judge's instructions to know the common law of the land, rooted as it was in fundamental principles of natural justice. . . .  Thus, members of a Massachusetts grand jury in 1759 were told that they "need no Explanation" as to most legal matters because "your Good Sence & understanding will Direct ye as to them."

Abramson, supra, at 32.  John Adams similarly noted that "in many cases judges gave the jury no instructions on the law."  1 The Legal Papers of John Adams at 230 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

Jurors' knowledge of the law can be seen in a case that the late Professor Julius Goebel,

Jr., chronicled, where he notes that, in 1702, a jury verdict was overturned based on the jurors'

lack of knowledge about the laws under which the defendant was convicted:

> After being tried in a well-publicized trial and found guilty of treason in 1702,
> Nicholas Bayard, a former commanding officer of the New York militia and mayor
> of New York under British rule, appealed to the British Crown based on
> irregularities in the jury composition -- i.e., the jurors' ignorance of the law:
>
> > In his petition and "appeal" to Queen Anne, Nicholas Bayard stated
> > among other things that he had been "convicted by an illegal petty
> > jury of Aliens and Dutch unduely returned and very ignorant of the
> > English Laws and Language". . . .  Among the affidavits taken by
> > John Bridges and Samson Shelton Broughton, under the Queen's
> > order of reference for the collection of evidence in connection with
> > the Bayard appeal, are statements of some of the petit jurors who
> > had joined in the verdict declaring Bayard guilty of high treason.
> > Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors,
> > made oral statements as follows, confirming the allegations made by
> > Bayard in his petition: ". . . these [depend on] their great Ignorance
> > of the Laws of England at that time not knowing what was High
> > Treason . . . the Foreman . . . Did assert it was High Treason . . . to
> > disturb the peace good and quiet of this Government and that
> > Colonell Bayard had disturbed the peace by the addresses and eight
> > or nine jurors were for clearing . . . Bayard but were perswaded by
> > the foreman."

Julius Goebel, Jr. & T. Raymond Naughton, Law Enforcement in Colonial New York 604 n.7

(1944).  Professor Goebel notes that New York jurors in revolutionary times often mitigated crimes

based on their knowledge of the potential sentences that the defendants faced if the jurors found

them guilty of the greater crime:

> We have spoken of the grooves in which the jury might exercise its charity: the
> verdict in thefts for amounts under the 12d. boundary between grand and petit
> larceny, and the privilege of finding manslaughter, self-defense or accident upon
> indictments for murder.  These prerogatives the juries in New York did not hesitate
> to assert, and to these old and established powers of mitigation may be added,
> perhaps, the avoidance in New York of the incidents of felony judgment by the
> persistent finding of no goods or tenements.  Of considerably greater significance

than these possible interferences of the jury, but connected therewith in the case of
verdicts for crimes of a less degree when murder, burglary, arson, highway robbery
and certain others were charged, is the mitigation obtained by benefit of clergy.

Goebel & Naughton, supra, at 751 (emphasis added)(footnote omitted). "[T]he benefit of the
clergy" was a system of mitigation in which a first-time offender convicted of a lesser crime would
be branded on the thumb rather than sentenced to death. United States v. Polouizzi, 549 F. Supp.
2d at 411 (quoting John H. Langbein, The Origins of the Adversary Criminal Trial at 193 (2003)).
See 1 Sir William Blackstone, Commentaries on the Laws of England: In Four Books at 1753
(William D. Lewis ed., 2007)(noting that "the benefit of the clergy at present stand[s] . . .
considerably different from its original institution . . . [,] what was at first an unreasonable
exemption of particular popish ecclesiastics into a merciful mitigation of the general law with
respect to capital punishment").

Sir Dudley Ryder, who served as a trial judge for the trial judiciary of the Old Bailey[5] from
1754 to 1756, at least in one case, instructed the jury on the possible ramifications of a guilty
verdict at trial and documented his belief that the jury determined the verdict based on availability
of the benefit of the clergy:

> Ryder sometimes found time to jot down a little of what he was telling the jury.
> John Taplin was tried before Ryder in October 1754 on an indictment charging theft
> from a dwelling house of a watch, valued at forty shillings, and of more than twenty
> guineas in money. The [Old Bailey] report of the outcome is as curt as possible,
> "Guilty 39s.," meaning that the jury convicted him but determined the combined
> value of what was stolen to be thirty-nine shillings (less than two guineas, hence
> well below the value charged in the indictment). Ryder's notes explain why. "The
> jury found him guilty to the value of 39s., which they did after I told them that 40s.
> was necessary to make him guilty of felony that was without benefit of clergy. It
> is by Act of 12 Ann." Ryder thus records his own role in guiding the jury's
> prerogative of 'valuing' the loot. Because the statute of 1713 to which Ryder refers

_____
[5]Old Bailey was London, England's central criminal court from 1674 to 1913. See The
Proceedings of the Old Bailey, https://www.oldbaileyonline.org// (last visited June 6, 2020).

withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense. The convention of the day, immortalized in Blackstone's phrase as the jury's "pious perjury," was that the jury could "downvalue" the goods, in this instance to thirty-nine shillings, in order to consign the convict to the lesser sanction of transportation for seven years.

John H. Langbein, Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources, 50 U. Chi. L. Rev. 1, 22 (1983)(footnotes omitted)("Ryder Sources"). Professor John H. Langbein concludes from Ryder's notebook chronicling many of his trials during his tenure on the Old Bailey bench that the paramount, if not only, purpose of the jury was to determine the sentence:

> Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings. The main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping. . . .

> The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict. Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, sentence is what was at stake when these cases were "contested."

Ryder Sources, supra, at 41, 55 (footnotes omitted). Professor Langbein notes that, in Ryder's two years on the bench at Old Bailey, although he tried over one-hundred and seventy-one cases, there were only sixteen different crimes with which the defendants were charged. See Langbein, supra, at 42. Professor Langbein, in addition to reviewing Ryder's notebook, also reviewed a group of reports called the Old Bailey Session Papers ("OBSP") from the 1670s to the 1730s, concluding:

> [T]he jury of that time had a large role in what we think of as sentencing, that is, in determining the sanction. In a significant fraction of the cases that went to trial, the real issue was whether the jury would choose to exercise its power to "value" stolen

goods in ways that would affect the applicable sanction.  It was understood that the
value that the jury assigned was fictional, and that the jury was in truth deciding
whether to rescue the culprit from the ordinary sanctions of transportation and death
by so characterizing the crime that only a lesser sanction could be invoked.  If the
goods were valued below 12 pence (in practice the Old Bailey juries used the figure
of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict
escaped with a whipping or a short jail term.  Under certain circumstances the jury
could, by valuing goods below other monetary ceilings, bring the culprit under the
rubric of benefit-of-clergy, for which the sanction was branding in the thumb.  The
decision between finding an accused guilty of murder or manslaughter, which also
belonged to the jury, can be seen as the choice between capital punishment and
branding.  It could be argued that in all these situations the jury was in reality
discharging a sentencing function, and even today we expect sentencing officers to
consult past conviction evidence.  But we have seen that the OBSP show that the
juries were using past conviction evidence to determine guilt, and with no constraint
from the bench.

John H. Langbein, The Criminal Trial Before the Lawyers, 45 U. Chi. L. Rev. 263, 303-04

(1978)(footnotes omitted).

In United States v. Battiste, the case in which Justice Story first intimated that it was the

jury's duty pursuant to the Sixth Amendment to follow the law as the judge provides it to the jury,

the judge read to the jury the indictment, which included the mandatory sentence for conviction.

See 24 F. Cas. at 1044.  The indictment included the statutory language for the law under which

the defendant was convicted, providing in relevant part: "[I]f any citizen . . . shall land  . . . on any

foreign shore, [and] seize any negro or mulatto . . . with intent to make such negro or mulatto a

slave . . . such citizen or person shall be adjudged a pirate, and on conviction thereof . . . shall

suffer death."  24 F. Cas. at 1044.

The caselaw from the Framers' era discussing whether courts should instruct juries about

their ability to determine the law in libel cases, on the one hand, does not necessarily lend support

to the position that courts should inform juries about the ability to nullify the verdict, because,

given the special verdict form provided to juries at this time, libel cases may be seen as unique.

- 62 -

See United States v. Courtney, 960 F. Supp. 2d at 1191.  Although Mr. Hamilton in People v. Croswell used broad and sweeping language to advocate for the jury's role to decide the law in addition to the facts -- and thus to allow them to nullify even if they believed the defendant had factually committed the crime -- Mr. Hamilton was arguing that it was unconstitutional to take away the jury's power to find that the defendant had the required intent for libel.  See United States v. Courtney, 960 F. Supp. 2d at 1191.  In essence, he was arguing for the jury's power to reach a verdict, because all that the district court allowed the jury to return in People v. Croswell was a special verdict, limited only to finding whether there was publication and whether the statement's inference was true.  See 3 Johns. Cas. at 342.  Even though Justice Kent's language in People v. Croswell is, therefore, subject to, and often cited for, a reading that it embraces the jury's role as being able to disregard the law given to them by the court as "the jury are under an indispensible necessity to decide both [the law and the fact]," 3 Johns. Cas. at 366, the court's otherwise unsurprising conclusion is that, in a libel case, "the jury have a right to judge . . . whether it be a libel or not . . . in short, . . . 'the whole matter put in issue . . . .'" 3 Johns. Cas. at 376-77.

The Founders nevertheless believed it proper for the court to instruct the jury on the law. In People v. Croswell, while Justice Kent writes that the jury should decide the whole of the matter, he still notes that it is the court's duty to instruct the jury about the law: "[A]s in other criminal cases, it is the duty of the court, 'according to their discretion, to give their opinion and direction to the jury on the matter in issue,' and it is the duty of the jury to receive the same with respectful deference and attention . . . ."  3 Johns. Cas. at 377.  Justice Kent did not hold that the court had the affirmative obligation to instruct the jury that it was to find the facts as well as the law but held merely that it was error to deny the jury the ability to exercise its power to, at that time, do both in

reaching the ultimate conclusion of guilt or innocence.  People v. Croswell appears, therefore, to

go only as far as to recognize the longstanding proposition that the jury has the power to nullify,

or to decide the ultimate issue of guilt, regardless whether the evidence establishes guilt, but does

not stand for the proposition that the defendant has the right to demand instruction from the court

about the jury's ability to exercise its nullification power.  Rather, it falls in line with Justice

Harlan's conclusion about the common-law jury's role that he articulated in Sparf v. United States:

> [T]he general common-law rule in criminal cases . . . [is that it is] the right of the
> court to decide the law, and the duty of the jury to apply the law thus given to the
> facts, subject to the condition, inseparable from the jury system, that the jury, by a
> general verdict, of necessity determined in the particular case both law and fact, as
> compounded in the issue submitted to them.

156 U.S. at 98.

Regardless whether libel cases are viewed as unique, however, the historical authority

shows that the Founders viewed the jury's role to return a verdict based on its conscience,

notwithstanding the court's instructions about the law.  See United States v. Courtney, 960 F. Supp.

2d at 1192.  To say that libel cases are unique cannot account for Chief Justice Day's charge to the

jury in Georgia v. Brailsford -- not a libel case -- "that by the same law, which recognizes th[e]

reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to

judge of both, and to determine the law as well as the fact in controversy."  3 U.S. at 4.  Rather,

dictionaries at the Founders' time included in the definition of jury: "Juries are . . . not finable for

giving their verdict contrary to the evidence, or against the direction of the court . . . and they may

not only find things of their own knowledge, but they go according to their conscience."  Jacob's

Law Dictionary (1782)(quoted in C. Conrad, supra, at 46-47).

Changes in juror qualifications have resulted in a situation in which, at the time that the

Founders ratified the Sixth Amendment, the common-law juries were vastly different from our contemporary juries.  See United States v. Courtney, 960 F. Supp. 2d at 1180.  Whereas Professor Goebel notes that New York juries had a "high property qualification . . . , which rested upon the presumed higher responsibility and intelligence of propertied persons," courts today do not require property ownership, let alone a high property value qualification, as a prerequisite for juror qualification.  New Mexico state courts do not get their jury pool from property ownership records, but rather from the Department of Motor Vehicles, or, in the United States District Court for the District of New Mexico, from the state of New Mexico's voter registration list.  See Misc. No. 08-00004-40, Order Adopting Modified Jury Plan ¶ 4, at 2, filed December 2, 2008.  Similarly, whereas Judge Weinstein notes that colonial and British jurors at the Founders' time "were from the vicinage, were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments," United States v. Polouizzi, 549 F. Supp. 2d at 406 (citations omitted), the juries today do not have those same requirements and jurors do not often have those same qualities, see J. Goebel & T. Naughton, supra, at 603 (noting that "[t]he [New York] Judicature Act of 1691 and 1692 also contained provisions that no man's rights or property should be determined . . . unless the facts be found by verdict of twelve men of the neighborhood" (emphasis added)).  Although the jury pools contain only persons who are registered to vote in a certain New Mexico county, or licensed to drive in the state, especially in a large state like New Mexico with a smaller population density, jurors may not hail from within what in the eighteenth century would have been considered the defendant's vicinity.

The twenty-first century American jury pool has less knowledge about the law than the common-law jury pool of the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at

1180.  As Professor Langbein notes in looking at Ryder's personal notebook from 1754 to 1756, in two years on the bench at the central criminal court in London, trying over 170 cases, there were only sixteen laws with which a mid-eighteenth-century Londoner may have been charged, and with which the freeholder jury pool would thus likely have been familiar.  See Ryder Sources, supra, at 42.  In modern times, however, "[f]or decades, the task of counting the total number of federal criminal laws" has been attempted by "lawyers, academics and government officials," largely without success: a 1982 United States Department of Justice study attempting to count the number of federal criminal laws as part of an effort to persuade Congress to revise it, "produced only an educated estimate: about 3,000 criminal offenses."  Gary Fields & John R. Emshwiller, Many Failed Efforts to Count Nation's Federal Laws, Wall St. J., July 23, 2011.  Thus, while Professor Abramson notes that jurors in the late-eighteenth century American colonies did not "come to the jury with minute skill in the laws," the local knowledge jurors would have possessed included knowledge of the laws.  Abramson, supra at 32.  The same cannot be said for contemporary juries in federal courts.  The extent of colonial juries' knowledge of the law is exemplified by the 1702 trial of Nicholas Bayard, a New York mayor while under British rule, who appealed his conviction on grounds that the trial was improper, because two of the jurors did not have their own independent knowledge of treason's elements, "but were perswaded [sic] by the foreman."  Goebel & Naughton, supra, at 603.

At the time of the Sixth Amendment's ratification, juries knew what the ramifications of a guilty verdict would be, because of the limited sentences available.  Importantly, of the sixteen offenses at issue in the Old Bailey trials, only two of those sixteen laws were misdemeanors, while the rest were felonies.  Ryder Sources, supra, at 42.  At that time, juries knew well the repercussions

of a guilty verdict for felonies.  See United States v. Courtney, 960 F. Supp. 2d at 1181.

Punishment for the first offense was the "benefit of the clergy," which meant the judge would

choose between seven years' banishment or immediate release with a branding on the thumb.  See

United States v. Courtney, 960 F. Supp. 2d at 1181.  Punishment for the second offense was death.

See Ryder Sources, supra, at 39.  For misdemeanors, although the judge had more discretion, it

was almost invariably lashings.  See Ryder Sources, supra, at 53.  Juries at the Founders' time

likely knew a substantial amount more about the law with which the defendant was charged and

almost certainly knew the repercussions of a guilty verdict.

The Supreme Court, in its recent sentencing decisions discussing the Sixth Amendment

jury trial right as it existed at the Founders' time, has similarly noted both the vicinity tenet and

that offenses were sanction-specific when the Sixth Amendment was ratified in 1791.  See United

States v. Courtney, 960 F. Supp. 2d at 1181.  In Blakely v. Washington, the Supreme Court noted

that a tenet of the Sixth Amendment jury trial right at the Founders' time was "that the 'truth of

every accusation' against a defendant should afterwards be confirmed by unanimous suffrage of

twelve of his equals and neighbours . . . ."  542 U.S. at 301 (quoting 4 W. Blackstone, supra, at

343).  The Supreme Court in Apprendi v. New Jersey recognized that, at least with respect to

felonious conduct, "the English trial judge of the later eighteenth century had very little explicit

discretion in sentencing.  The substantive criminal law tended to be sanction-specific; it prescribed

a particular sentence for each offense."  530 U.S. at 479.  Cf. id. 530 U.S. at 481 (noting that there

was a "19th-century shift in this country from statutes providing fixed-term sentences to those

providing judges discretion within a permissible range").  The Supreme Court has noted the very

limited sentences available to American judges at the Founders' time and the nature of mandatory

sentencing in contrast to its recent sentencing opinions: "In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature.  Each crime had its defined punishment."  United States v. Grayson, 438 U.S. 41, 45 (1978).

Even if the Court instructed modern-day juries that the crime with which the defendant in the case is charged is a felony or a misdemeanor, given the multiple crimes with specific statutory minimum and maximum sentences, those juries likely would not know the possible sentences the defendants face if found guilty.  Whereas the Supreme Court noted in Apprendi v. New Jersey that the nineteenth century saw a shift from mandatory, definite sentences to a system in which the court could impose a sentence at the court's discretion, because courts today are not permitted to inform the modern-day jury about the possible sentencing range flowing from the defendants' guilty verdicts, and given the complexity of the United States Sentencing Guidelines, the modern-day jury is likely without knowledge of the possible sentencing ramifications of their guilty verdict. The Court, in its experience on the bench, has found that present-day jurors, beyond lacking knowledge about sentencing ramifications for felonies or misdemeanors, often do not recognize the difference between criminal and civil jury trials.  Numerous times conducting voir dire, when the Court inquired about a potential juror's past experience on a civil or criminal jury trial, the juror's answers show that what the juror believes was a criminal trial was actually civil and vice versa. Judge Weinstein has similarly noted that the vast difference between late-eighteenth century juries' knowledge about criminal law and sentencing ramifications of guilty verdicts, and contemporary juries' knowledge, is not surprising given the vast difference in criminal law as it

then existed compared with the law today: "Criminal law then was much simpler than today, now requiring tomes of highly abstruse, convoluted definitions and extraordinary combinations of statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms, treatment for mental health and other problems in and out of prison, sentencing guidelines, case law and local practice." United States v. Polouizzi, 549 F. Supp. 2d at 407.  Considering the small number of offenses in the late-seventeenth century and eighteenth century, and that there were only two sanctions available for a felony conviction, support for withholding sentencing information from the jury and the jury's resulting lack of knowledge cannot be found in the historical reality of the common-law jury known to the Founders at the time of the Sixth Amendment's ratification.

**2.      Jurors on Common-Law Juries Used Their Knowledge of Their Verdict's Sentencing Ramifications in Reaching Their Verdict.**

Juries at the Founders' time not only knew about the sentencing ramifications of their verdicts, but historical evidence shows that juries weighed heavily the defendant's sentence in reaching their verdicts.  In looking at jury verdicts throughout the eighteenth century in colonial New York, Professor Goebel concludes:

> The verdicts . . . are illustrative of one of the most important aspects of the jury's prerogative -- the power to effect a mitigation in the severity of the law by verdicts which would let off an obvious offender with penalties less than the worst of the charges against him would make inevitable.  This power was not confined to the selection of a relatively innocuous count on which to return a conviction, but extended, as indicated above, to a finding of an offense less in degree than that charged in the indictment.  The importance of this rule in the case of felonies was obvious, since it was possible thus for the defendant to pray clergy and escape the rigor of the otherwise inevitable judgment of life and limb.

J. Goebel & T. Naughton, supra, at 673 (footnotes omitted).  The eighteenth-century jury in

England also consistently exercised its power to effect a mitigation of the defendant's sentence. Professor Langbein notes that "only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence . . . . To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings." Ryder Sources, supra, at 41.

The Supreme Court has twice noted the common-law jury's mitigation power stemming from their knowledge of the repercussion of guilty verdicts. In Jones v. United States, the Supreme Court noted that "competition developed between judge and jury," and provided the jury's mitigation power as an example: "The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences." Jones v. United States, 526 U.S. at 245. In Apprendi v. New Jersey, the Supreme Court again referenced this mitigation power, noting that, at the Founders' time:

> [J]uries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant. [Jones v. United States, 526 U.S.] at 245 . . . ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part. 4 Blackstone 238-239").

Apprendi v. New Jersey, 530 U.S. at 480 n.5. It is thus clear that the Supreme Court's conception of the common-law jury which the Sixth Amendment protects includes a jury with knowledge of the sentences a guilty defendant faces and a jury that uses this knowledge to reach its verdict.

That there was knowledge germane to common-law jurors does not clearly suggest that withholding knowledge about sentencing ramifications is inconsistent with the Sixth Amendment's jury trial right.  If, for instance, a juror at the Founders' time knew the sentence that a guilty defendant faced only because there existed a very limited number of laws and a much more limited class of potential sentences, the courts' refusal today to institute a change to affirmatively provide to the jury this information does not clearly violate the defendant's Sixth Amendment right.  It seems tenuous to argue that knowledge lost because the jury pool has enlarged since the Sixth Amendment's ratification or that knowledge lost because the jurors in the jury pool are less educated about the criminal law, without any affirmative conduct on the courts' behalf -- and without more -- implicates the Sixth Amendment.  The Supreme Court has recognized that the Sixth Amendment "limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury," Blakely v. Washington, 542 U.S. at 308; a change resulting from the inclusion of a broader base of citizens in the jury pool, or from an evolution of the jurors in the jury pool, without courts' affirmative exertion of power, may not implicate the Sixth Amendment jury trial right.  On the other hand, however, even if the jury's lack of knowledge about the sentence that the defendant faces is diminished, because the modern-day jury is left without information that appears to have been important to the common-law jury's verdict and its power to mitigate the defendant's sentence, the substance of the defendant's Sixth Amendment jury trial right appears to have deteriorated substantially.  See Booker, 543 U.S. at 237 (stating that the Supreme Court's holding that the Sentencing Guidelines are unconstitutional if mandatory "is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance").  To be consistent with what the Framers thought a jury was at the time

of the Bill of Rights' adoption, it may no longer be defensible to keep the jury so ignorant of the verdict's sentencing ramifications.

3.      **Jury Knowledge of Sentencing Ramifications in Modern Times.**

"It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  Shannon v. United States, 512 U.S. at 579 (quoting Rogers v. United States, 422 U.S. at 40).  The Supreme Court explains that its reasoning is to avoid confusion and keep separate the jury's factfinding role from the judge's role in determining the sentence the law requires:

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged.  The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict.  Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.  Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

Shannon v. United States, 512 U.S. at 579.  In support of this proposition, the Supreme Court cites Rogers v. United States, in which the Supreme Court held that the district court erred when, without notice to the defendant and out of the defendant's presence, it answered in the affirmative a communication which the jurors sent during their deliberations inquiring whether the court would accept a verdict of guilty as charged "with extreme mercy of the Court."  422 U.S. at 37, 40.  The Supreme Court concluded that the district court's statements to the jurors irreparably prejudiced the defendant, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five

> minutes "after being told unconditionally and unequivocally that it could
> recommend leniency," strongly suggests that the trial judge's response may have
> induced unanimity by giving members of the jury who had previously hesitated
> about reaching a guilty verdict the impression that the recommendation might be
> an acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (internal citations omitted)(quoting United States v. Glick, 463 F.2d 491, 495 (2d Cir. 1972)).

The Tenth Circuit has stated: "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.  Breach of this standard has often been grounds for reversal."  United States v. Greer, 620 F.2d at 1384.  The Tenth Circuit has held specifically that an instruction on possible minimum sentences is not required absent a jury's required participation in sentencing and that a district court has no discretion to instruct the jury on sentencing ramifications.  See United States v. Parrish, 925 F.2d 1293, 1299 (10th Cir. 1991)("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation in sentencing."); United States v. Gehringer, 385 F. App'x 830, 834 (10th Cir. 2010)(unpublished)("In light of established Tenth Circuit and Supreme Court authorities, the district court had no discretion to instruct the jury on the sentencing penalties, and therefore did not abuse its discretion in denying the defendant's request.").

4.     **Withholding Knowledge About Sentencing From The Modern-Day Jury Leaves The Jury Without Knowledge That It Would Have Had At The Framers' Time.**

Judicial power as it relates to sentencing in the modern criminal court system appears to infringe on the Sixth Amendment's reservation of jury power in two interrelated areas.  The first is that the Sentencing Guidelines have caused, at least in part, the modern-day jury's ignorance of

the ramifications of a guilty verdict.  Although, at the Framers' time, judges had discretion regarding sentences for misdemeanors -- largely between corporal punishment and banishment -- for felonies, judges until the nineteenth century had no discretion in relation to sentencing.  See Apprendi v. New Jersey, 530 U.S. at 481 (noting "the 19th-century shift in this country from statutes providing fixed-term sentences to those providing judges with discretion within a permissible range"); 530 U.S. at 482 (noting "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties . . . .");  Ryder Sources, supra, at 41 (noting the mandatory sentences for felonies were either transportation/banishment if the benefit of the clergy was available, or death if not, and, for misdemeanors, was transportation or whipping).  While Congress' power to make law includes "the power to fix the sentence for a federal crime," Mistretta v. United States, 488 U.S. 361, 364 (1989), Congress' creation of over 3,000 federal laws presents significant problems for jurors who may wish to educate themselves about sentencing repercussions for certain criminal offenses, and the federal Sentencing Guidelines have made self-education of potential sentences virtually impossible.  Although a juror may be educated about statutory minimums and maximums, a juror likely cannot educate him or herself about a defendant's potential sentence, as the Guidelines take into account the defendant and the crime's circumstances, and, after Booker, allow a judge to depart from a Guidelines sentence.  The Sentencing Guidelines, enacted pursuant to Congress' power to make laws and to delegate that power, see Mistretta v. United States, 488 U.S. at 361, therefore have necessarily eroded the jury's ability to take into consideration the potential sentence that the defendant faces and eroded its ability to use its mitigation power, see Apprendi v. New Jersey, 530 U.S. at 483 (noting "the Framers' fears 'that the jury right could be lost not only by

- 74 -

gross denial, but by erosion'" (quoting <u>Jones v. United States</u>, 526 U.S. at 247-48)).

Second, even though the Sentencing Guidelines find some support in the judges' discretion at the Framers' time to sentence within a prescribed range -- even if it applied only in the limited situations of misdemeanors -- the prohibition on any mention to the jury of a guilty verdict's sentencing implications does not find the same support.  Ryder in the 1750s, at least, was not required to keep information about the jury's verdict's sentencing implications from the jury. <u>Ryder Sources</u>, <u>supra</u>, at 22.  Similarly, in <u>United States v. Battiste</u>, Justice Story in 1835 read to the jury the statute pursuant to which the defendant was charged, which included the sentencing ramification: "Death."  24 F. Cas. at 1044.  Judges therefore were not precluded from informing juries about the verdict's sentencing implications.

> **5.** **<u>Where the Verdict Does Not Alter the Minimum and/or Maximum Sentence Imposed on the Defendant, the Court is Not Free to Give the Jury Sentencing Information.</u>**

Neither Supreme Court nor Tenth Circuit precedent prohibits, wholesale, any mention of possible sentences.  <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1185.  Rather, the modern-day principle is limited to those situations in which "a jury has no sentencing function."  <u>Shannon v. United States</u>, 512 U.S. at 579.  The Supreme Court in <u>Apprendi v. New Jersey</u> held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490, and the jury is therefore required to participate in finding a fact that, by changing the mandatory maximum, changes substantially the nature of the sentence.  Similarly, in <u>Jones v. United States</u>, the Supreme Court construed 18 U.S.C. § 2119 to constitute three separate offenses, rather than one sentence with three factual considerations for sentencing, because it reasoned that,

to leave to a judge factual findings which would mean the difference between a sentence of up to fifteen years, up to twenty-five years, or up to life, implicates the defendant's Sixth Amendment jury trial right.  See United States v. Courtney, 960 F. Supp. 2d at 1185.  On the one hand, the Supreme Court's constitutional requirement that a jury participate in factfinding where the fact is necessary to a sentence with a substantially different punishment is analogous to the factual finding required in the case which Ryder notes, where the jury was to determine whether the total value of stolen goods was forty shillings or more, as a finding of forty shillings makes mandatory a death sentence and precludes the possibility of the benefit of the clergy.  See United States v. Courtney, 960 F. Supp. 2d at 1185.  Similarly, whereas Justice Story in United States v. Battiste instructed the jury by reading them the statute which included the punishment, see United States v. Courtney, 960 F. Supp. 2d at 1185 -- courts instruct contemporary juries if the death sentence is a possible punishment for their potential jury's return of a guilty verdict, see United States v. Courtney, 960 F. Supp. 2d at 1185.  Moreover, it is possible that modern-day juries know whether the return of a guilty verdict in a capital case -- such as first-degree murder -- in their jurisdiction puts at issue a possible death sentence.  On the other hand, in Ryder's example, he appears not only to have required the jury to find a fact upon which an enhanced sentence depends, but to have gone further and instructed the jury specifically about the implications of finding the particular fact.  Ryder notes that "I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy," Ryder Sources, supra, at 22; by telling the jury that fact, he instructed it specifically that the implications of the factual finding meant an increased maximum sentence, or, rather, the preclusion of anything except for the maximum sentence, see United States v. Courtney, 960 F. Supp. 2d at 1186.

Even when a juror's participation is required to enhance a mandatory minimum sentence, modern-day courts do not instruct the jury on the sentencing implications of the factual findings that they make.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  In the case of drug-trafficking, for example, where the amount of the drugs in which the defendant traffics determines the statutory maximum and minimum, the jury is not told, as Ryder told the jury in another context, the line at which the possible relief from the death sentence becomes impossible or that there is a line at which the statutory maximum and minimum sentence changes.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  Requiring courts to withhold from jury instructions a guilty verdict's ramifications therefore violates the defendant's Sixth Amendment jury trial right as the Founders thought of that right.

Current Supreme Court and Tenth Circuit law makes clear, however, that withholding sentencing information from juries not directly participating in sentencing does not unconstitutionally invade the province of the jury.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  The Supreme Court, in the majority opinion that the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court of the United States, authored in Apprendi v. New Jersey, recognizes that there are organic changes which take place in trial practices without violating the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost only by gross denial, but by erosion.'"  530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48).  The Supreme Court has thought that the evolution of courts' practice to prohibit instructions about sentencing ramifications where the jury's factfinding does not fundamentally affect the defendant's sentencing ramifications to avoid "distract[ing] them from

their factfinding responsibilities, and creat[ing] a strong possibility of confusion," Shannon v.

United States, 512 U.S. at 579, is such a constitutional change in trial practice.  The Supreme

Court's recent sentencing opinions, moreover, are susceptible to a narrow construction of the Sixth

Amendment's jury trial right.  The Supreme Court in Booker held that the Sentencing Guidelines'

mandatory nature is unconstitutional, in part because the Guidelines, in taking into consideration

the defendant's relevant conduct, often produced a sentencing range higher than the mandatory

maximum allowed based on facts which the jury found.  See United States v. Courtney, 960 F.

Supp. 2d at 1186.  The Supreme Court construed the Sentencing Guidelines as advisory rather than

mandatory, because requiring a sentence imposed beyond the maximum sentence that the jury's

verdict allowed violated the defendant's Sixth Amendment jury trial right to "in a meaningful way

guarantee[] that the jury would still stand between the individual and the power of the government

under the new sentencing regime."  Booker, 543 U.S. at 237.  The Supreme Court noted that this

construction "is an answer not motivated by Sixth Amendment formalism, but by the need to

preserve Sixth Amendment substance."  543 U.S. at 237.  In Apprendi v. New Jersey, the Supreme

Court quoted its recognition in Jones v. United States that the Sixth Amendment's substance, as

the Founders saw it, is its protection against substituting new methods of trial in place of the jury

trial:

> As we stated in Jones: "One contributor to the ratification debates, for example,
> commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in
> warning of the need 'to guard with the most jealous circumspection against the
> introduction of new, and arbitrary methods of trial, which, under a variety of
> plausible pretenses, may in time, imperceptibly undermine this best preservative of
> LIBERTY.' A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The
> Complete Bill of Rights 477 (N. Cogan ed. 1997)."

Apprendi v. New Jersey, 530 U.S. at 484 n.11 (emphasis added)(quoting Jones v. United States,

526 U.S. at 248).  See Booker, 543 U.S. at 238-39 ("The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury in criminal cases." (quoting The Federalist No. 83 at 499 (C. Rossiter ed. 1961))).  Whereas the Supreme Court has held that certain facts necessary to impose a greater mandatory maximum statutory sentence require jury participation in finding those facts, substituting a court's finding of those facts, especially where the standard of proof is a preponderance of the evidence rather than beyond a reasonable doubt, would effectively introduce a new method of trial.  The Supreme Court's recent sentencing decisions requiring jury participation in this factfinding and precluding a court's substitution of facts for the jury's, therefore, preserves the jury's factfinding role as it existed at the Founders' times.  Presumably the Supreme Court justifies the contemporary practice to withhold sentencing ramifications from the jury at trial where its factfinding does not substantially affect the sentence imposed -- i.e., does not affect the range in which the judge can exercise discretion -- does not effectively introduce a new arbitrary method of trial as a substitute for a jury trial, but rather continues the practice of allowing the judge to exercise discretion in sentencing.  See Apprendi v. New Jersey, 530 U.S. at 482 n.9 (noting that, "[u]nder the common-law procedure, the court determines in each case what within the limits of the law shall be the punishment -- the question being one of discretion" (emphasis in original)(quoting 1 J. Bishop, Criminal Law §§ 933-34(1) (9th ed. 1923))).  The Supreme Court in Booker noted that, as Mr. Hamilton wrote in The Federalist No. 83, the Framers' intent in ratifying the Sixth Amendment was to protect from judicial despotism by mandating a jury trial in criminal cases; the Supreme Court has apparently concluded that to withhold instruction about sentencing ramifications from a jury whose facts do not affect the defendant's possible mandatory maximum

sentence does not change that the criminal jury trial right is exercised, and fully protected and satisfied, when the jury finds as fact whether the defendant committed the crime.  Moreover, the Supreme Court has apparently decided that, in a contemporary society in which Congress has enacted over three thousand federal criminal laws and substituted mandatory criminal sentences for the Sentencing Guidelines, the requirement to withhold jury instruction about possible sentences stems from the concern that their knowledge of sentencing ramifications "distracts them from their factfinding responsibilities, and creates a strong possibility of confusion," Shannon v. United States, 512 U.S. at 579, and that keeping the jurors ignorant preserves the defendant's criminal jury trial right.

The Supreme Court's conclusion that withholding sentencing information may help protect the defendant's Sixth Amendment jury trial right finds support in the Supreme Court's decision in Rogers v. United States, in which the Supreme Court held that the district court erred when it told the jury that it would accept a guilty verdict "with extreme mercy of the Court."  422 U.S. at 40. The Supreme Court reasoned that the district court's statements to the jurors prejudiced the defendant, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (internal citations omitted)(quoting United States v. Glick, 463 F.2d at 495).  Were district courts to instruct the jury about the defendant's possible sentence,

there is then the issue of what the Court would say.  The Court could likely give only statutory

minimum and maximum or instruct the jury about the Sentencing Guidelines and their advisory

nature.  The Sentencing Guidelines are often difficult for those with legal training to understand,

and the Supreme Court's concern for instructions about sentencing possibilities leading to jury

confusion could come to fruition rather quickly.[6]  Moreover, defendants may find that, as the jury

in Rogers v. United States quickly decided to convict after they learned that the court may be

lenient toward the defendant, knowledge about the Sentencing Guidelines range the defendant

faces, and the possibility that a court may vary downward from the guidelines sentence, may result

in a guilty verdict where a jury might not otherwise reach one.  Even though the discretion to

inform the jury about possible sentences would likely be left to the defendant's wishes whether to

so instruct the jury, the defendant may learn to be careful about what he or she wishes.

---

[6]There are not as many federal criminal trials as there used to be.  See [The Honorable] Robert J. Conrad Jr., [United States District Judge for the Western District of North Carolina; Member of the Executive Committee of the U.S. Judicial Conference], and Katy L. Clements, The Vanishing Criminal Jury Trial: From Trial Judges to Sentencing Judges, 86 Geo. Wash. L. Rev. 99, 99 (2018)(stating that "Federal criminal jury trials are dying.  Surely, but not slowly.  Within the ten-year span from 2006 to 2016, the absolute number of cases disposed of by jury trial declined by forty-seven percent").  The United States Probation Office ("USPO") could generate a Form 13 for the relatively few defendants that go to trial.  A Form 13 is a pre-plea Presentence Investigation Report,  see United States v. Vasquez, No. CR 09-3613 JB, 2011 WL 5238817, at *2 (D.N.M. Oct. 24, 2011)(Browning, J.), that the USPO prepares for many defendants who need to know what the guideline range will be if they plea or go to trial.  If there are no objections to the Form 13, the parties could tell the jury that the guidelines calculation will be the one the judge will likely use.  If there is an objection, the Court can deal with it pre-trial or, if that is not possible, tell the jury that there is an objection to an enhancement and what impact that objection may have on the sentencing guidelines range.

The Court does not minimize, therefore, the difficulties that fully informing juries about the sentencing ramifications that its verdicts would present.[7]  There are good prudential reasons why the modern American court system has decided to tell the jury not to think about sentencing. See United States v. Courtney, 960 F. Supp. 2d at 1188.  The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism. To keep the jury ignorant of sentencing ramifications is not consistent with the concept of a jury trial at the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1188.  To fully protect the defendant's right to a jury trial, it appears necessary to allow him or her to advise the jury about the sentencing ramifications of its verdict.

Nevertheless, the Court is obligated to follow controlling Supreme Court and Tenth Circuit precedent.  See, e.g., Zamora v. Wells Fargo Home Mortg., 831 F. Supp. 2d 1284, 1305 (D.N.M. 2011)(Browning, J.)("While the Court realizes that its decision . . . may in some ways be unfair and unduly harsh . . . , the Court is bound to follow binding precedent from the Tenth Circuit."). These courts have been very clear about what a trial court should do: the trial court is not to present any information about possible sentencing unless the jury's participation in sentencing is required. See Shannon v. United States, 512 U.S. at 579 ("It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting Rogers v. United States, 422 U.S. at 40)); United States v. Parrish,

---

[7]The fear of juries often comes from appellate courts that do not deal with juries often, if ever, in their careers.  Juries are, however, quite capable.  After Blakely v. Washington and before Booker, the Court and the Honorable Bruce D. Black, then-United States District Judge for the District of New Mexico, submitted guidelines enhancements to the jury, out of concern that an enhancement without the jury finding the underlying conduct as fact, would render the Court's enhancement unconstitutional.  More jury inclusion can, therefore, be done.

925 F.2d at 1299 ("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation."); United States v. Greer, 620 F.2d at 1384 ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.  Breach of this standard has often been grounds for reversal.").

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.  As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible. See Fed. R. Evid. 402.  The standard for relevance is very liberal.  See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998), partially abrogated on other grounds by Hooks v. Ward, 184 F.3d 1206, 1227 (10th Cir. 1999)).  The evidence need have only "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it need only to have "any tendency" to do so.  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651.  Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence." United States v. Jordan, 485 F.3d at 1218.

## LAW REGARDING RULE 403

Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United

States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997)(Souter, J.).  "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged."  Old Chief v. United States, 519 U.S. at 180-81.  In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence."  Old Chief v. United States, 519 U.S. at 182.

## LAW REGARDING RULE 412 IN CRIMINAL CASES

Rule 412 of the Federal Rules of Evidence states, in relevant part:

**(a) Prohibited Uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:

> **(1)** evidence offered to prove that a victim engaged in other sexual behavior; or

> **(2)** evidence offered to prove a victim's sexual predisposition.

**(b) Exceptions.**

> **(1) Criminal Cases.** The court may admit the following evidence in a criminal case:

>> **(A)**    Evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was a source of semen, injury, or other physical evidence;

>> **(B)**    evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

>> **(C)**    evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412.  The rule also requires the following procedure before evidence may be admitted under rule 412(b): (i) the party seeking to introduce the evidence must file a motion fourteen days before trial that specifically describes the evidence and states the party's purpose for offering the evidence; (ii) the party must notify the victim, or the victim's guardian or representative; and (iii) the court must hold a hearing in camera to assess admissibility.  See Fed. R. Evid. 412(c).  Rule 412 was amended in 1994 to apply to civil cases as well.[8]

---

[8]Until 1994, rule 412 was applicable only in criminal proceedings; plaintiffs in civil sexual-harassment suits had to rely on rule 404 if they sought to exclude evidence of past sexual behavior,

As the Advisory Committee, and Professors Charles Wright and Kenneth Graham, recognize, the rule has at least two underlying functions.  The first function is to promote the reporting of sexual assaults and other sexual misconduct by vitiating the victim's fear that, by reporting the incident, he or she will be opening up his or her private life to be put on display through the course of discovery and at trial.

> The manifest function of Rule 412 is protection of the privacy of the rape victim; this is justified in terms of fairness to her and by the instrumental argument that this will further the interests of the state by encouraging victims to report the crime and to cooperate with the prosecution of rapists.

23 Charles Alan Wright & Kenneth W. Graham, Fed. Prac. & Proc. Evid. § 5384, at 543 (1st ed. 1980).  See Fed. R. Evid. 412 advisory committee's note to the 1994 amendments ("By affording victims protection in most instances, the rule . . . encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.").  The rule's second function is more subtle: to combat the sexual stereotyping of victims, "i.e., to prevent the jury from subverting the substantive law of rape by making the guilt of the defendant turn on the jury's assessment of the moral worth of the victim."  Wright & Graham, supra § 5384, at 544.  See Fed.

---

arguing that it was being offered as evidence of propensity.  See Ferencich v. Merritt, 79 F. App'x. 408, 414 (10th Cir. 2003)(unpublished).  With the passage of the 1994 amendment, however, the Committee recognized

> [t]he need to protect alleged victims against invasions of privacy, potential embarrassment, and unwarranted sexual stereotyping, and the wish to encourage victims to come forward when they have been sexually molested do not disappear because the context has shifted from a criminal prosecution to a claim for damages or injunctive relief.

Fed. R. Evid. 412 advisory committee's note to the 1994 amendments.  "As amended in 1994, Rule 412 generally precludes evidence of an alleged victim's 'sexual behavior' or 'sexual predisposition' in civil and criminal proceedings involving allegations of sexual misconduct."  Ferencich v. Merritt, 79 F. App'x. at 414.

R. Evid. 412 advisory committee's note to the 1994 amendments ("The rule aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process."). It is with these two goals in mind that courts should analyze rule 412 questions.

Rule 412 is a rule of evidence, meaning that it primarily controls admissibility, as distinguished from discoverability, of certain information. Compare Fed. R. Evid. 101 (defining the scope of the Rules of Evidence), with Fed. R. Civ. P. 26(b)(defining the scope of discovery). Rule 26(b)(1) of the Federal Rules of Civil Procedure generally governs the scope of discovery, and it allows discovery of any admissible evidence and discovery of anything "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). See In re Cooper Tire & Rubber Co., 568 F.3d 1180, 1189 (10th Cir. 2009); Fed. R. Evid. 412 advisory committee's note to the 1994 amendments ("The procedures set forth in subdivision (c) do not apply to discovery of a victim's past sexual conduct or predisposition in civil cases, which will be continued to be governed by Fed. R. Civ. P. 26."). One might therefore conclude that rule 412 restricts discovery only insofar as a court predicts that certain discovery would uncover evidence excludable under rule 412, and thus that such discovery is not "reasonably calculated to lead to the discovery of admissible evidence." The Advisory Committee, however, indicated that the policies underlying rule 412 will often justify a court in issuing a protective order limiting discovery of information that may fall within rule 412's protections. See Fed. R. Civ. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.").

> In order not to undermine the rationale of Rule 412 . . . courts should enter appropriate orders pursuant to Fed. R. Civ. P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality.  Courts should presumptively issue protective orders barring discovery unless the party seeking discovery makes a showing that the evidence sought to be discovered would be relevant under the facts and theories of the particular case, and cannot be obtained except through discovery. . . .  Confidentiality orders should be presumptively granted as well.

Fed. R. Evid. 412 advisory committee's note.  See United States v. Bd. of Cty. Comm'rs of the Cty. of Dona Ana, No. CIV 08-0501 JB/ACT, 2010 WL 1141361, at *5-6 (D.N.M. Mar. 8, 2010)(Browning, J.)(limiting a party's scope of discovery in a Title VII civil rights matter, because the party discovery requested failed rule 412(b)(2)'s balancing test); Giron v. Corr. Corp., 981 F. Supp. 1406, 1407 (D.N.M. 1997)(Hansen, J.)("In recognition of the policy rationale for the rule, the Court will impose certain restrictions on discovery to preclude inquiry into areas which will clearly fail to satisfy Rule 412(b)(2)'s balancing test, even though this Court will later decide what evidence is ultimately admitted.").

The Advisory Committee's notes explain specific forms of evidence that rule 412 governs. Under rule 412(a)(1)'s prohibition, the Advisory Committee explains that other sexual behavior "connotes all activities that involve actual physical conduct, i.e. sexual intercourse or sexual contact."  Fed. R. Evid. 412 advisory committee's note.  Furthermore, rule 412(a)(2) prohibits "evidence . . . relating to the alleged victim's mode of dress, speech, or life-style," unless the matter is civil and rule (b)(2)'s balancing test is satisfied.  Fed. R. Evid. 412 advisory committee's note. See Ferencich v. Merritt, 79 F. App'x 408, 415 (10th Cir. 2003)(allowing evidence in a Title VII civil matter that a plaintiff showed her tongue ring to her supervisor, and that the supervisor interpreted the display as "flirting, because of its perceived sexual use," because the evidence "was relevant to both the issue of whether his sexual conduct was 'unwelcome'" and whether the

plaintiff's employer knew that she was being harassed, and because the evidence's probative value substantially outweighed its prejudicial effect).   Additionally, prohibited "behavior" includes "activities of the mind, such as fantasies or dreams."  Fed. R. Evid. 412 advisory committee's note. On the other hand, under rule 412(b)(1)(B), a defendant may introduce "evidence of prior instances of sexual activities between the alleged victim and the accused, as well as statements in which the alleged victim expresses an intent to engage in sexual intercourse with the accused, or voiced sexual fantasies involving that specific accused" to prove that an alleged victim consented to sex with the accused.  Fed. R. Evid. 412, advisory committee's note.  See United States v. Ramone, 218 F.3d 1229, 1234-35(10th Cir. 2000)(finding that evidence that a victim engaged in sexual acts with inanimate objects with a defendant accused of aggravated sexual abuse of the victim involving the use of inanimate objects "squarely fits within" rule 412(b)(1)(B)'s scope of admissible evidence).   Under rule 412(b)(1)(C), a court may properly admit "statements in which the victim has expressed an intent to have sex with the first person encountered on a particular occasion," so as to protect an accused's due-process and Confrontation Clause rights.  Fed. R. Evid 412, advisory committee's note (citing Olden v. Kentucky, 488 U.S. 227 (1988)).

Applying these principles, the Tenth Circuit has found that a district court did not abuse its discretion or commit plain error in a rape case by excluding evidence that a victim was partially undressed in the presence of two other men, who were not defendants in the case.  See United States v. Pablo, 696 F.3d 1280, 1299 (10th Cir. 2012).  In United States v. Pablo, the defendant and his co-defendant were both accused of raping the victim several hours after a dance, which the three of them attended, at which the defendant asserted the victim was partially undressed with two other men.  See 696 F.3d at 1298-99.  The defendant asserted that the evidence was admissible

- 90 -

for two purposes: (i) to demonstrate that someone other than the defendant caused the victim's physical injuries; and (ii) to demonstrate the victim's level of intoxication at the time.  See 696 F.3d at 1299.  The Tenth Circuit explained that the evidence did not fall within rule 412(b)(1)(A)'s exception, because the defendant did not proffer that the victim engaged in non-consensual or otherwise "extremely violent sex" with other men on the night of the alleged rape, and only non-consensual or extremely violent sex could have caused the victim's vaginal injuries.  696 F.3d at 1299.  Because the defendant could proffer only that the evidence would demonstrate that the victim had consensual sex with other men on the night in question, the Tenth Circuit held that the evidence was not admissible under rule 412(b)(1)(A).  See 696 F.3d at 1299.  Additionally, to the extent that the defendant argued that the evidence was admissible to demonstrate the victim's level of intoxication on the night of the incident, the Tenth Circuit held that the district court properly excluded the evidence under rule 412(a).  See 696 F.3d at 1299.  The Tenth Circuit explained that the district court had "legitimate reasons to perceive that [Defendant] Pablo sought to introduce this evidence for . . . impermissible purposes, arguing apparently that her intoxication enhanced her predisposition toward casual sex."  696 F.3d at 1299."

In United States v. Pablo, the district court also excluded the defendant's evidence that, on the night of the rape, the victim made sexual advances toward his co-defendant, "namely, caressing his leg and penis through his pants and trying to kiss him."  696 F.3d at 1299-1300.  The defendant asserted that the victim made a sexual advance on the co-defendant "a significant period of time before the rape occurred," while the victim and the co-defendant were riding in a car with others on the night in question.  696 F.3d at 1299-1300, 1300 n.22.  The defendant and co-defendant were accused of kidnapping the victim and raping her, in a separate car, later that night.  See 696 F.3d

at 1284-86.  On appeal, the defendant argued that the exclusion of this evidence violated his due-process right to present a defense.  Although the Tenth Circuit reviewed the district court's exclusion of the evidence under a plain error standard, because the defendant had not raised a 412(b)(1)(C) argument before the district court, the Tenth Circuit determined that the evidence had little probative value regarding the victim's consent, because the alleged sexual advances occurred "some time before the alleged rape and in a different location from where the rape occurred."  696 F.3d at 1300-01.  Additionally, the defendant was allowed to present other evidence at trial regarding the victim's consent, including that the victim's boyfriend became jealous of the co-defendant when the victim and the co-defendant spoke at the dance.  See 696 F.3d at 1301.

The Court has previously allowed, in accordance with rule 412, limited discovery regarding victims' social history in a Title VII civil rights matter.  In United States v. Board of County Commissioners of the County of Dona Ana, the Court allowed defendants accused of discrimination and sexual harassment to question the victims whether they had dated co-workers, and if so, which co-workers the victims had dated.  See 2010 WL 1141362, at *6.  The Court did not allow the defendants to inquire into the victims' sexual relationships.  See 2010 WL 1141362, at **6-7.  The Court explained that a limited line of questioning regarding the victims' dating history would not violate the policy rationales underlying rule 412 and would not implicate the victims' sexual predisposition, because a dating relationship is not necessarily equated with a sexual relationship.  See 2010 WL 1141362, at *5-6.

In United States v. Harry, No. CR 10-1915 JB, 2013 WL 3270986 (D.N.M. June 3, 2013)(Browning, J.), the Court excluded evidence that the victim was seen sitting beside, touching,

and hugging the defendant throughout the night of her alleged rape, as well as evidence of the victim's dress.  <u>See</u> 2013 WL 3260986, at *13.  The Court concluded that this evidence's sole relevance was "to demonstrate that Doe had a sexual predisposition towards casual sex."  2013 WL 3260986, at *13.  The Court also excluded a text message sent from Harry the morning after the incident that "would inform the jury of nothing more than that Doe was flirting with Harry the night of the incident."  2013 WL 3260986, at *16.  More recently, in <u>United States v. Begay</u>, No. CR 14-0747 JB, 2020 WL 2514661 (D.N.M. May 15, 2020)(Browning, J.), the United States sought to prohibit evidence concerning two minor victim's sexual behavior or predisposition.  <u>See</u> 2020 WL 2514661,  at *26.  The Court concluded that, because the victims were too young to legally consent, evidence of their sexual behavior with regard to the defendant was irrelevant and inadmissible.  <u>See</u> 2020 WL 2514661, at *26.

## <u>LAW REGARDING RULES 413 AND 403 OF THE FEDERAL RULES OF EVIDENCE</u>

Rule 413 provides that, in cases where a defendant is charged with a sexual assault offense, "evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant."  Fed. R. Evid. 413(a).  <u>See</u> Fed. R. Evid. 414 (permitting the admission of evidence of the defendant's commission of similar crimes of child molestation when the defendant is charged with child molestation); Fed. R. Evid. 415 (permitting the admission of evidence of the defendant's commission of similar acts of sexual assault or child molestation in civil cases concerning sexual assault or child molestation).  Evidence is admissible under rule 413 when: (i) the defendant is on trial for a sexual assault offense; (ii) the proffered evidence relates to another sexual assault; and (iii) the evidence is relevant.  <u>See</u> <u>United States v. Fred</u>, No. CR 05-801 JB, 2006 WL 4079618,

at *2 (D.N.M. Dec. 1, 2006)(Browning, J.)(citing Seeley v. Chase, 443 F.3d 1290, 1294 (10th Cir.

2006)).  For rule 413's purposes, an "offense of sexual assault" includes any crime under federal

law that involved:

> (1)     any conduct proscribed by chapter 109A of title 18, United States Code;
>
> (2)     contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person;
>
> (3)     contact, without consent, between the genitals or anus of the defendant and any part of another person's body;
>
> (4)     deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person; or
>
> (5)     an attempt or conspiracy to engage in conduct described in paragraphs (1)-(4).

Fed. R. Evid. 413(d)(1)-(5).  For evidence admissible under rule 413, the person need not have

been convicted of or charged with a previous assault for it to be admissible.  See United States v.

Benally, 500 F.3d 1085, 1092-93 (10th Cir. 2007).  The similar acts must be established, however,

by "sufficient evidence to support a finding by the jury that the defendant committed the similar

act."  See United States v. Wilson, No. CR 09-1465 JB, 2010 WL 2954562, at *4 (D.N.M. June

18, 2010)(Browning, J.)(citing United States v. Enjady, 134 F.3d at 1433).  In other words, the

district court "must make a preliminary finding that a jury could reasonably find by a

preponderance of the evidence that the 'other act' occurred."  United States v. Wilson, 2010 WL

2954562, at *4 (citing United States v. Enjady, 134 F.3d at 1433).  This is another way to state the

relevance requirement.  See Huddleston v. United States, 485 U.S. 681, 689 (1988).

Evidence is more likely to overcome the threshold question -- relevancy -- when it provides

detail and specifics about the similar acts.  See, e.g., United States v. Fred, 2006 WL 4079618, at

- 94 -

*1-2 (allowing rule 413 evidence of similar acts documented in an FBI form that provided a detailed account of the alleged similar act).  See also United States v. Wilson, 2010 WL 2954562, at *1-2, *6 (allowing rule 414 evidence of similar acts when the witness described uncharged sexual assaults in detail).  For example, in United States v. Fred, the witness described similar acts of sexual assault including references to time, date, and specific conduct, including where the defendant touched her, and specific circumstances surrounding the sexual assault.  See United States v. Fred, 2006 WL 4079618, at *1-2.  The Court found that the evidence overcame the threshold question of relevancy.  See United States v. Fred, 2006 WL 4079618, at *1, *4-5.

The Tenth Circuit has held that, when evidence falls within rule 413's scope, there is a presumption that the evidence is admissible.  See United States v. Fred, 2006 WL 4079618, at *3 (citing United States v. Enjady, 134 F.3d at 1431).  Rule 413 reflects Congress' belief that it is "necessary to lower the obstacles to admission of propensity evidence in . . . sexual assault cases [because of] the assistance it provides in assessing credibility."  United States v. Enjady, 134 F.3d at 1431.

Despite rule 413's language, and the presumption in favor of admission, the Tenth Circuit has held that, consistent with rule 403, district courts still must weigh the probative value of evidence introduced pursuant to rule 413 against its prejudicial impact.  See United States v. Fred, 2006 WL 4079618, at *3 (citing United States v. Guardia, 135 F.3d at 1330)("We hold that a court must perform the same 403 analysis that it does in any other context, but with careful attention to both the significant probative value and the strong prejudicial qualities inherent in all evidence submitted under 413.").  In applying rule 403 to the proffered evidence, the Court should consider:

1) how clearly the prior act has been proved; 2) how probative the evidence is of

the material fact it is admitted to prove; 3) how seriously disputed the material fact
is; and 4) whether the government can avail itself of any less prejudicial evidence.
When analyzing the probative dangers, a court considers: 1) how likely is it such
evidence will contribute to an improperly-based jury verdict; 2) the extent to which
such evidence will distract the jury from the central issues of the trial; and 3) how
time consuming it will be to prove the prior conduct.

Seeley v. Chase, 443 F.3d at 1295 (quoting United States v. Enjady, 134 F.3d at 1433).  Finally,

while the Tenth Circuit has acknowledged that propensity evidence has "indisputable probative

value," its worth in any particular case is based on multiple factors, including "the similarity of the

prior acts to the acts charged, the closeness in time of the prior acts to the charged acts, the

frequency of the prior acts, the presence or lack of intervening events, and the need for evidence

beyond the testimony of the defendant and alleged victim."  United States v. Fred, 2006 WL

4079618, at *3 (citing United States v. Guardia, 135 F.3d at 1331).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534

JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802).

Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made

by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted." Fed. R. Evid. 801(c).  The rules against hearsay bar a party from presenting its

own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made

at the time of his arrest without subjecting himself to cross-examination."  United States v.

Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.).  A statement that is otherwise

hearsay, however, may be offered for a permissible purpose other than to prove the truth of the

matter asserted, including impeaching a witness.  See United States v. Caraway, 534 F.3d 1290,

1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if

used substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however, it is not hearsay.").  Statements, including written assertions and nonverbal conduct, are included within the rule 801(c)'s definition of hearsay so long as the speaker intended the statement as an assertion.  See Fed. R. Evid. 801(a).  Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  See United States v. DeLeon, 287 F. Supp. 3d 1187, 1235-36 (D.N.M. 2018)(Browning, J.).

## LAW REGARDING 803(4)

Hearsay testimony is generally inadmissible.  See Fed. R. Evid. 802.  The Federal Rules of Evidence contain a number of exceptions, however, to the hearsay prohibition.  See Fed. R. Evid. 803, 804.  One of these exceptions, rule 803(4), excepts from the general bar on hearsay "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  Fed. R. Evid. 803(4).

1.     **Rationale for the 803(4) Exception.**

This exception is premised on the rationale that a patient's statements to his or her physician are likely to be particularly reliable because the patient has a self-interested motive to be truthful.  The patient knows that the efficacy of his or her medical treatment depends upon the accuracy of the information that he or she provides to the doctor.  See United States v. Joe, 8 F.3d at 1493.  Stated differently, "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special

guarantees of credibility."  White v. Illinois, 502 U.S. 346, 356 (1992).

The selfish-interest/treatment rationale, therefore, supports the exception.  In United States

v. Joe, the Tenth Circuit stated

> The Rule 803(4) exception to the hearsay rule is founded on a theory of reliability
> that emanates from the patient's own selfish motive -- her understanding "that the
> effectiveness of the treatment received will depend upon the accuracy of the
> information provided to the physician."  2 McCormick on Evidence § 277, at 246-
> 47 (John W. Strong ed., 4th ed. 1992).

United States v. Joe, 8 F.3d at 1493-94.  It is the patient's self-interest in furnishing accurate

information that provides the guarantee of trustworthiness which justifies exempting these out-of-

court statements from the general hearsay prohibition.  See White v. Illinois, 502 U.S. at 356 ("[A]

statement made in the course of procuring medical services, where the declarant knows that a false

statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a

trier of fact may not think replicated by courtroom testimony.").

In United States v. Joe, the Tenth Circuit observed that the United States Courts of Appeals

for the Fourth and Eighth Circuits have applied a two-part test to determine a statement's

admissibility under rule 803(4).  See 8 F.3d at 1494 n.5 (citing United States v. Renville, 779 F.2d

430, 436 (8th Cir. 1985)).  Under the first half of the test, "the declarant's motive in making the

statement must be consistent with the purposes of promoting treatment."  8 F.3d at 1494 n.5.

Second, "the content of the statement must be such as is reasonably relied on by a physician in

treatment or diagnosis."  8 F.3d at 1494 n.5.

In United States v. White, 11 F.3d 1446 (8th Cir. 1993), the defendant was convicted of

sexually abusing his wife's two grandsons, R.H. and L.H., who were nine and seven years old,

respectively, at the time of the defendant's trial.  On appeal, the defendant argued that statements

which R.H. made to a social worker were not admissible under rule 803(4).  The Eighth Circuit

noted that, for the statements to be admissible under rule 803(4), the government "must show that

R.H. understood that he was speaking to a trained professional for the purposes of obtaining

diagnosis of, or providing treatment for, emotional or psychological injuries."  11 F.3d at 1449.

The Eighth Circuit concluded: "There is nothing in the record to suggest that R.H. appreciated that

it was in his best interests to tell the truth and was therefore unlikely to lie."  11 F.3d at 1450.

"How [the social worker] explained her role and purpose to R.H., how she asked him questions,

and how and where she conducted the interview are matters that can provide evidence 'that the

child understood the physician's [or therapist's] role in order to trigger the motivation to provide

truthful information.'"  11 F.3d at 1450 (quoting United States v. Barrett, 8 F.3d 1296, 1300 (8th

Cir. 1993)).

The Eighth Circuit in United States v. White also relied on Ring v. Erickson, 983 F.2d 818

(8th Cir. 1992), a habeas case which held that the admission at trial, under rule 803(4) of

Minnesota's Rules of Evidence, of out-of-court statements that a three-year-old child, C.R., to a

physician, violated the petitioner's confrontation rights.  Minnesota's rule 803(4) was identical to

federal rule 803(4).  In so holding, the Eighth Circuit said:

> C.R.'s mother, not C.R., sought the "medical treatment," and there was no evidence
> suggesting that at the time of the interview C.R. even knew Dr. Levitt was a doctor.
> C.R. was three years old at the time.  The principal reason why 803(4) is a
> traditional hearsay exception automatically carrying the indicia-of-reliability label
> is because of the selfish-motive doctrine.  This exception is based on the belief that
> a person seeking medical treatment is unlikely to lie to a doctor she wants to treat
> her, since it is in her best interest to tell the truth.  White [v. Illinois], [502] U.S. at
> [354]-[58] . . . .

983 F.2d at 820.  See People of Territory of Guam v. Ignacio, 10 F.3d 608, 613 n.3 (9th Cir. 1993)

- 99 -

("[W]hether a statement is admissible under the medical treatment exception does not depend solely on the intent of the questions, but also on whether the respondent understands herself to be providing information for purposes of medical treatment.").

In Morgan v. Foretich, 846 F.2d 941 (4th Cir. 1988), retired Associate Justice Lewis F. Powell Jr., sitting by designation on the United States Court of Appeals for the Fourth Circuit, concurred in part and dissented in part, stating:

> [T]here is no evidence in the record that [the girl's] frame of mind was comparable to a patient seeking treatment. . . . [T]here is no evidence that Dr. Harrison ever explained to [the child] that his questions and relationship with her arose, at least in part, from a desire to treat her. . . . Absent a finding that [the child] made her statements believing they would be used by Dr. Harrison to help her, I am reluctant to rest my decision on the cases relied on by the court.

846 F.2d at 951-52.  See Oldsen v. People, 732 P.2d 1132, 1135-36 (Colo. 1986)(holding statements inadmissible under Colo. R. Evid. 803(4) -- which was identical to the federal rule -- because there was no evidence that the five-year-old child "was capable of recognizing, at the time the challenged statements were made, the need to provide accurate information for purposes of medical diagnosis or treatment within the meaning of Fed. R. Evid. 803(4)").  The Supreme Court of Colorado in Oldsen v. People held that the prosecution, as proponent of the hearsay statements, had the burden of establishing the foundation for admitting them under an exception to the hearsay rule.  See 732 P.2d at 1135 n.7.  The court in Oldsen v. People upheld the conviction, however, because the challenged testimony was admitted properly on an alternative ground.  See 732 P.2d at 1137.  But see United States v. George, 960 F.2d 97, 100 (9th Cir. 1992)("As a general matter, the age of the child and her other personal characteristics go to the weight of the hearsay statements rather than their admissibility.").  In State v. Robinson, 153 Ariz. 191, 735 P.2d 801 (1987), the

Supreme Court of Arizona upheld the admission of statements under rule 803(4) of the Arizona

Rules of Evidence -- which also was identical to the federal rule -- concluding:

> The record is not clear regarding [the child's] motive in making the challenged statements. The record does indicate, however, that [the] statements were elicited in the course of treatment. And nothing in the record indicates that [the child victim's] motive in making these statements was other than as a patient seeking [or at least needing] treatment.

State v. Robinson, 153 Ariz. at 199, 735 P.2d at 809 (internal quotation marks and citations

omitted).

### 2.     The Tenth Circuit's Test for Admissibility Under Rule 803(4).

"[T]he test for admissibility under rule 803(4) is whether the subject matter of the

statements is reasonably pertinent to diagnosis or treatment." United States v. Tome, 61 F.3d at

1451. Accordingly, the Tenth Circuit has rejected the two-part test that the Fourth and the Eighth

Circuits have used to evaluate evidence proffered under rule 803(4), stating:

> The Fourth and Eighth Circuits . . . have employed the following two-part test to determine a statement's admissibility under Rule 803(4): "first, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." Renville, 779 F.2d at 436; Morgan, 846 F.2d at 949 (quoting Renville). This two-part test is not contemplated by the rule and is not necessary to ensure that the rule's purpose is carried out.

United States v. Joe, 8 F.3d at 1494 n.5. As the Tenth Circuit explained in United States v. Joe:

"[T]he plain language of Rule 803(4) should guide us in determining the admissibility of

statements made for purposes of medical diagnosis or treatment." 8 F.3d at 1494 n.5. Moreover,

because it follows the plain language of rule 803(4), the Tenth Circuit has rejected any

presumptions against admission of hearsay evidence under the exception in the case of children.

See United States v. Edward J., 224 F.3d 1216, 1219 (10th Cir. 2000)("Edward encourages us

to . . . establish a presumption that Rule 803(4) does not apply to statements given by young children to their doctors identifying their abusers unless the physician first explains to the child such information is important for their treatment.  We decline to do so.").

For a hearsay statement to be admissible under rule 803(4), the declarant need not have necessarily made the statement to a physician.  As the advisory committee's note to the rule explains, "[s]tatements to hospital attendants, ambulance drivers, or even members of the family might be included."  Fed. R. Evid. 803(4) advisory committee's note.

### 3.    Identification of the Assailant in Sexual-Abuse Cases.

A declarant's statement to a physician that identifies the person responsible for the declarant's injuries is ordinarily inadmissible under rule 803(4), because the assailant's identity is usually unnecessary either for accurate diagnosis or effective treatment.  See United States v. Joe, 8 F.3d at 1494.  The Tenth Circuit held in United States v. Joe, however, that a hearsay statement revealing the identity of a sexual abuser who is a member of the victim's family or household "is admissible under rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes 'reasonably pertinent' to the victim's proper treatment."  8 F.3d at 1495.  See United States v. Durham, 902 F.3d 1180, 1234 (10th Cir. 2018), cert. denied, 139 S. Ct. 849 (2019)(reiterating that this rule is "valid").  In so holding, the Tenth Circuit reasoned:

> All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser.  The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household.  In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere.

8 F.3d at 1494-95 (footnote omitted).  Although the victim in United States v. Joe was an adult, the Tenth Circuit stated that "the identity of the abuser is reasonably pertinent in virtually every domestic sexual assault case," including "statements made by a child to a physician which identify the sexual abuser as a member of the family or household."  8 F.3d at 1494.  Thus, when a victim of domestic sexual abuse identifies her assailant to her physician, the physician's recounting of the identification is admissible under rule 803(4) when it is "reasonably pertinent" to the victim's treatment or diagnosis.  United States v. Joe, 8 F.3d at 1495.  See 2 John William Strong, McCormick on Evidence § 277, at 248 (4th ed. 1992).

In Tome v. United States, 513 U.S. 150, 153 (1995), the defendant was convicted in the United States District Court for the District Court of New Mexico of sexual abuse of a child.  The Tenth Circuit originally affirmed the admission of testimony from six witnesses relaying the child's statements as non-hearsay under rule 801(d)(1)(B), see United States v. Tome, 3 F.3d 342, 344 (10th Cir. 1993), and the defendant appealed.  The Supreme Court reversed and remanded to the Tenth Circuit, because the statements were not "made before the charged recent fabrication or improper influence or motive."  Tome v. United States, 513 U.S. at 167.  On remand, the Tenth Circuit "determine[d] whether the challenged evidence could have been admitted under another rule of evidence."  United States v. Tome, 61 F.3d at 1449.

The Tenth Circuit first addressed the testimony of three pediatricians who examined the child.  In their trial testimony, the three doctors relayed statements that the child made either before or during the doctors' physical examinations.  The Tenth Circuit held that all of the testimony was admissible under rule 803(4).

- 103 -

1. Testimony of Karen Kuper

Kae Ecklebarger of Child Protection Services referred A.T. to Dr. Karen Kuper, a board certified pediatrician, for a physical examination.  Kuper testified that she examined A.T. on two occasions, in September and October 1990.  Prior to the first examination, Kuper interviewed A.T.  Kuper testified that the purpose of the interview was "to ascertain exactly what injuries had occurred."  In response to Kuper's questions, A.T. told Kuper about the sexual abuse, at times pointing to the appropriate areas of dolls to answer Kuper's questions.  A.T. also identified defendant as her abuser.  After the interview, Kuper performed a complete physical examination of A.T.

We find it clear that A.T.'s statement to Kuper was reasonably pertinent to Kuper's proper diagnosis and treatment of A.T.  The information contained in the statement was important to Kuper's determination of A.T.'s condition.  This statement was therefore admissible under Rule 803(4).

2. Testimony of Laura Reich

A.T. saw Dr. Laura Reich on September 21, 1990, for treatment of a skin rash in the vaginal area that was unrelated to any sexual abuse.  At the time of Reich's examination of A.T., Reich was aware of the allegations of sexual abuse. Reich testified that, prior to conducting the physical examination, she asked A.T. several personal questions.  One of these questions was whether "anybody had ever touched her in her private area."  According to Reich's testimony, A.T. replied "that her father had put his thing in her."  The remainder of Reich's testimony concerned her findings and conclusions from the physical examination.

Reich testified that the reason she had conducted a preexamination interview with A.T. was "that the child needs to be comfortable with me before I examine her."  Because the adequacy of Reich's examination in part depended on the child's comfort with her, we find that A.T.'s statement was reasonably pertinent to Reich's diagnosis or treatment. It consequently was admissible under Rule 803(4).

3. Testimony of Jean Spiegel

Dr. Jean Spiegel, an assistant professor of pediatrics at the University of New Mexico, testified that she examined A.T. for the purpose of offering a second opinion as to whether the child had been sexually abused.  Spiegel had extensive training in the area of child sexual abuse, and teaches other doctors how to examine children to detect molestation.  Most of Spiegel's testimony focused on the technical aspects of her examination of A.T. and her conclusion that A.T. had experienced chronic vaginal penetration.

On redirect examination, Spiegel testified that A.T. told her where on her

> body she had been touched during the abuse.  Spiegel did not ask, nor did A.T.
> volunteer, who had touched her.  Clearly, A.T.'s statement regarding where she had
> been touched was pertinent to Spiegel's diagnosis of A.T.  The district court
> therefore properly admitted the statement under Rule 803(4).

61 F.3d at 1450-51.

The Tenth Circuit also held that the victim's statements to a caseworker and babysitter were not admissible under rule 803(4).  The relevant portions of the Tenth Circuit's decision on remand involve the testimony of Kae Ecklebarger of Colorado Springs Child Protection Services. Ecklebarger, a caseworker, interviewed A.T. on August 29, 1990.  Ecklebarger testified that, during the interview, A.T. gave Ecklebarger a detailed account of the alleged abuse, at times using anatomically accurate dolls to demonstrate what had occurred.  See 61 F.3d at 1451.  Ecklebarger also testified that A.T. alleged she had told her grandmother and aunt of the abuse.  The United States argued that Ecklebarger's testimony was admissible under either rule 803(4) and then-rule 803(24), the residual exception.  See 61 F.3d at 1451-52.  The United States argued that A.T.'s statement to Ecklebarger was admissible, because the job of a Child Protection Services caseworker "was equivalent to that of a doctor under Fed. R. Evid. 803(4)," and because A.T. understood that Ecklebarger's role was to "help kids." 61 F.3d at 1451.  The Tenth Circuit rejected the United States' proffer, noting:

> Ecklebarger neither diagnosed nor treated A.T.  She described her role as "the initial
> short-term investigat[or]." Ecklebarger spoke to A.T. two times, after which "[t]he
> case was sent on to an ongoing protection worker."  Clearly, Ecklebarger did not
> treat A.T. in any way.
>
> Nor did Ecklebarger diagnose A.T.  Indeed, Ecklebarger referred the child
> to Dr. Kuper for a medical opinion regarding the allegations of abuse.  Moreover,
> Ecklebarger testified that she interviewed A.T. only to the extent necessary to make
> a decision whether a protective order was appropriate.  Because Ecklebarger did
> not diagnose or treat A.T., the child's statement to Ecklebarger could not have been
> for the "purpose[ ] of medical diagnosis or treatment," and thus was not properly
> admitted under Rule 803(4).

61 F.3d at 1451 (alterations in original).

Ecklebarger testified that she interviewed A.T. only to the extent necessary to decide whether a protective order was appropriate.  See 61 F.3d at 1451.  The Tenth Circuit stated that, because Ecklebarger did not diagnose or treat A.T., the child's statement to Ecklebarger could not have been for the "purpose[] of medical diagnosis or treatment," and thus was not properly admitted under rule 803(4).  61 F.3d at 1451.

Applying these principles, the Court, in United States v. Chaco, allowed the Plaintiff United States of America to introduce a victim's statements made during a SANE examination to a treating doctor.  See 801 F. Supp. 2d at 1210-1213.  The Court noted that the purpose of the SANE examination was to assess the victim's "physical and psychological condition," and to determine whether the victim was "in a safe environment or remained at risk of further abuse." 801 F. Supp. 2d at 1213.  The Court found that the victim's statements regarding the alleged abuse were relevant to the doctor's determination of "where signs of abuse may be found and deciding for where to test for sexually transmitted diseases."  801 F. Supp. 2d at 1213.  The Court also found that the victim's statements about who abused her and when she was abused were relevant in determining the identity of the abuser, and whether the victim was in a safe environment.  Based on these findings, the Court held that the victim's statements "about who touched her, where he touched her, and when he touched her were reasonably pertinent to . . . [a] proper diagnosis and treatment of [the victim], and are therefore admissible pursuant to rule 803(4)."  801 F. Supp. 2d at 1213.  Similarly, in United States v. Jim, No. CR 10-2653, 2012 WL 2053683 (D.N.M. Jan. 7, 2012)(Browning, J.), the Court allowed the United States to introduce statements a victim made to a SANE nurse during the victim's SANE examination.  See 2012 WL 205683, at *1.  The defendant in United States v. Jim did not object to the introduction of the SANE nurse's statements.

See 2012 WL 2053683, at *1.

### LAW REGARDING STATEMENTS AGAINST INTEREST UNDER RULE 804(B)(3)

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest." United States v. Lozado, 776 F.3d 1119, 1125 (10th Cir. 2015)(citing Fed. R. Evid. 804(b)(3)(A)).  A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true."  Fed. R. Evid. 804(b)(3)(A).  Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  United States v. Smalls, 605 F.3d 765, 780-81 (10th Cir. 2010)(internal quotation marks omitted)(quoting Williamson v. United States, 512 U.S. 594, 599 (1994)).  The Tenth Circuit has said: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."  United States v. Smalls, 605 F.3d at 783.  That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability."  Williamson v. United States, 512 U.S. at 600.  See United States v. Baca, _ F. Supp. 3d _, 2020 WL 1325139, *42-43 (D.N.M. 2020)(Browning, J.); United States v. DeLeon, 287 F. Supp. 3d 1240.

**LAW REGARDING RULE 807 AND THE RESIDUAL HEARSAY EXCEPTION**

Rule 807 provides:

Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

> (1)    the statement has equivalent circumstantial guarantees of trustworthiness;

> (2)    it is offered as evidence of a material fact;

> (3)    it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4)    admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). This rule provides further that "the statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b).[9] The United States Court of Appeals for the First Circuit has summarized the policies that the residual hearsay exception serves: (i) "[t]o provide sufficient flexibility to permit the courts to deal with new and unanticipated situations"; (ii) "[t]o preserve the integrity of the specifically enumerated exceptions"; and (iii) "[t]o facilitate the basic purpose of the Federal Rules of Evidence: truth ascertainment and fair adjudication of controversies." United States v. Sposito, 106 F.3d 1042, 1048 (1st Cir. 1997)(citing 11 Moore's Federal Practice § 803(24)[7] (2d ed. 1994 & Supp. 1996-97)). These purposes are consistent with

---

[9]Rule 807 was added to the Federal Rules of Evidence in 1997, and it represents a combination of the virtually identical former rules 803(24) and 804(b)(5). See 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 807.02, at 807-4 (Mark S. Brodin ed., 2d ed. 2018)(citing Fed. R. Evid. 807 advisory committee's note).

many leading evidence scholars' suggestions over the past century and further rule 807's objective to make relevant evidence admissible.  See United States v. Moore, 824 F.3d 620, 624 (7th Cir. 2016)("The purpose of Rule 807 is to make sure that reliable, material hearsay evidence is admitted, regardless of whether it fits neatly into one of the exceptions enumerated in the Rules of Evidence.").

Given that rule 807 authorizes the admission of hearsay evidence outside the confines of a precise exception, courts interpret the residual exception to allow, in individual situations, for the admission of evidence of high probative value, but not for the creation of new categorical exceptions.  See United States v. Doe, 860 F.2d 488, 491 (1st Cir. 1988)(concluding that the residual exception criteria "involve considerations which are very trial-specific, such as the relative probative value of the hearsay statement and whether admitting the statement will best serve 'the interests of justice'" (quoting  Fed. R. Evid. 803(24))).  But cf. Garner v. United States, 439 U.S. 936, 939 n.3 (1978)(Stewart, J., dissenting)("It seems to me open to serious doubt whether [the residual exception] was intended to provide case-by-case hearsay exceptions, or rather only to permit expansion of the hearsay exceptions by categories.").  The residual hearsay exception is "meant to be reserved for exceptional cases," and is "not intended to confer 'a broad license' on trial judges 'to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b).'"  Conoco Inc., v. Dep't of Energy, 99 F.3d 387, 392 (Fed. Cir. 1996)(quoting S. Rep. No. 94-199, at 20 (1975)).  See United States v. Trujillo, 136 F.3d at 1395-96 (stating that, because the residual hearsay exception is intended for "exceptional circumstances," proponents of such evidence bear a "heavy burden" when presenting the trial court with sufficient indicia of trustworthiness).  Hence, evidence admitted pursuant to rule 807 must have "circumstantial guarantees of trustworthiness" comparable to those of the rule 803

exceptions.[10]   United States v. Harrison, 296 F.3d at 1004-07 (holding that child sexual abuse

victim's statement to Federal Bureau of Investigation ("FBI") agent had circumstantial guarantees

of trustworthiness, even though victim recanted her statement, because the statement was

consistent with her earlier statements and was specific, and victim was old enough to have the

ability to remember the events).  See United States v. Trujillo, 136 F.3d at 1395-96; United States

v. Tome, 61 F.3d at 1453 (concluding that child's statement to caseworker identifying abuser,

---

[10]Categories of information addressed in the rule 803's specific hearsay exceptions "have
attributes of trustworthiness not possessed by the general run of hearsay statements that tip the
balance in favor of introducing the information" despite its hearsay character.  United States v.
Fernandez, 892 F.2d 976, 981 (11th Cir. 1989).  Moreover, several Courts of Appeals have
concluded that guarantees of trustworthiness must be equivalent to statements made subject to
cross-examination, statements made under a belief of impending death, statements against interest,
and statements of personal or family history.  See United States v. Banks, 514 F.3d 769, 777-78
(8th Cir. 2008)(observing that one way to approach rule 807 analysis is to compare circumstances
of statement at issue to "'the closest hearsay exception'" (quoting 2 Broun, supra,§ 324); United
States v. Fernandez, 892 F.2d at 981 (considering "those statements that are similar though not
identical to hearsay clearly falling under one of the four codified exceptions, if the statements
otherwise bear indicia of trustworthiness equivalent to those exceptions").  The trial judge has
broad discretion in this regard.  See United States v. Harwood, 998 F.2d 91, 98 (2d Cir.
1993)(concluding that the residual exception applies only in rare cases and that a trial court's
decision not to apply it can be reversed only for abuse of discretion); United States v. Mokol, 939
F.2d 436, 438 (7th Cir. 1991)(concluding that the judge has significant discretion in ruling upon
admissibility); S.E.C. v. First City Fin. Corp., 890 F.2d 1215, 1225 (D.C. Cir. 1989)(stating that
particular deference should be given to a trial court's determination, because the exception depends
so heavily on judgment of reliability).  The United States Court of Appeals for the Second Circuit
considers the trustworthiness of hearsay offered under the residual hearsay exception in terms of
the extent to which the statement is prone to the four classic hearsay risks -- (i) insincerity,
(ii) faulty perception, (iii) faulty memory, and (iv) faulty narration.  See Schering Corp. v. Pfizer,
Inc., 189 F.3d 218, 232-33 (2d Cir. 1999)(identifying an additional class of risk of methodological
error for survey evidence); Headley v. Tilghman, 53 F.3d 472, 477 (2d Cir. 1995)(referring to
classic hearsay "risks of insincerity, distorted perception, imperfect memory, and ambiguity of
utterance").

made a year after attack, lacked guarantees of trustworthiness); United States v. Farley, 992 F.2d 1122, 1126 (10th Cir. 1993).  In United States v. Farley, for example, the Tenth Circuit admitted, pursuant to rule 807, a child sexual abuse victim's assault account, as given to the victim's mother, even though some statements were made the morning after the assault, because the victim was still suffering pain and distress from the assault, the victim employed childish terminology, and the victim's youth reduced the likelihood that the statements were fabricated.  See 992 F.2d at 1126.

In determining the trustworthiness of hearsay offered under the residual exception, the Tenth Circuit considers such facts as: (i) the statement's character; (ii) whether the statement is written or oral; (iii) the parties' relationship; (iv) the declarant's probable motivation in making the statement; and (v) the circumstances under which the statement is made.  See United States v. Lawrence, 405 F.3d 888, 902 (10th Cir. 2005)(concluding that a physician's statements to FBI agents at the defendant's clinic, including that the physician did not believe he was legally required to be at the clinic to supervise medical work, were not admissible under rule 807 in the defendant's Medicare fraud trial, because the statements had no circumstantial guarantees of trustworthiness, they were taken shortly after FBI executed search warrant on clinic, and the physician was the subject of the same investigation that eventually led to charges against the defendant); F.T.C. v. Kuykendall, 312 F.3d 1329, 1343 (10th Cir. 2002)(concluding that consumer declarations and complaints had sufficient circumstantial guarantees of trustworthiness to warrant admission under rule 807 in a civil contempt proceeding arising from the defendants' violation of a permanent injunction, because they were made under oath and subject to penalty of perjury).  For admissibility under rule 807, a statement must be "more probative on the point for which it is offered than any

other evidence that the proponent can obtain through reasonable efforts."[11]   Fed. R. Evid. 807(a)(3).  See F.T.C. v. Kuykendall, 312 F.3d at 1343 (concluding that consumer declarations and complaints were trustworthy, and most probative evidence available, and therefore admissible under rule 807, provided defendants had adequate notice); United States v. Zamora, 784 F.2d 1025, 1031 (10th Cir. 1986)(concluding that hearsay statements were properly excluded in absence of showing of statement's probative value or any effort to obtain information from other sources). The Tenth Circuit considers a statement "more probative" if the district court determines that the hearsay is relevant and reliable, and that no other evidence, or little other evidence, is available on the same point.   See Marsee v. U.S. Tobacco Co., 866 F.2d 319, 324-25 (10th Cir. 1989)(concluding that reports were not admissible, because much of their contents were already admitted through expert testimony).

Rule 807 requires the district court to consider the availability, through reasonable efforts, of other admissible evidence, and courts consider matters such as the importance of the evidence and the proponent's ability to provide it.  See Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d 384, 391 (5th Cir. 1989)(concluding that answers to interrogatories were admissible pursuant to rule 807, because relevant records were lost or destroyed, trial was held several years after violations took place, and witnesses were illiterate).   Courts must consider the need for the evidence in light of the basic assumption underlying the rule against hearsay -- that statements made directly in the courtroom are more reliable than hearsay; in other words, courts must balance need against trustworthiness.  See United States v. Harrison, 296 F.3d 994, 1004-07 (10th Cir.

---

[11]The "more probative" requirement, however, is not interpreted "with cast iron rigidity." United States v. Harrison, 296 F.3d 994, 1006-07 (10th Cir. 2002)(concluding that district court could properly rule that child sexual abuse victim's statement to FBI agent was most probative available evidence with respect to details not disclosed in other statements (quoting Weinstein's Federal Evidence, supra, § 807.3[3][a], at 807-21)).

2002).  Admission of evidence under the residual exception must accord with "the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a)(4).  See New England Mut. Life Ins. v. Anderson, 888 F.2d 646, 650-51 (10th Cir. 1989)(concluding that district court properly excluded statements reported in newspaper article, because district court found no guarantees of trustworthiness and plaintiff failed to show that admission of the article without opportunity to cross-examine witness would serve interests of justice).

## LAW REGARDING THE RULE OF COMPLETENESS

Rule 106 -- otherwise known as the rule of completeness -- states:

If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time.

Fed. R. Evid. 106.  By allowing the other party to present the remainder of the writing or recorded statement immediately rather than later on cross-examination, this rule avoids the situation where a statement taken out of context "creates such prejudice that it is impossible to repair by a subsequent presentation of additional material."  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171 n.14 (1988).  Accord United States v. Oseby, 148 F.3d 1016, 1025 (8th Cir. 1998)("The advisory committee notes to Rule 106 state that one of the considerations for this rule is to avoid the misleading impression created by taking matters out of context."); United States v. Rubin, 609 F.2d 51, 63 (2d Cir. 1979)("The notes had been used extensively and quoted from copiously by Rubin's counsel on his cross-examination of Cox, possibly leaving a confusing or misleading impression that the portions quoted out of context were typical of the balance."); United States v. Young, No. CR-09-140-B-W, 2010 WL 1461558, at *3 (D. Me. Apr. 9, 2010)(Woodcock, J.). "Rule 106 by its terms does not apply to oral conversations, but only to writings and recorded statements." United States v. Christy, 2011 WL 5223024, at *3 (citing Fed. R. Evid. 106).  The

Tenth Circuit has stated: "The rule of completeness, however, does not necessarily require admission of [an entire statement, writing or recording].  Rather, only those portions which are relevant to an issue in the case and necessary to clarify or explain the portion already received need to be admitted."  United States v. Lopez-Medina, 596 F.3d 716, 735 (10th Cir. 2010)(internal quotation marks omitted)(quoting United States v. Zamudio, 141 F.3d 1186, 1998 WL 166600, at *6 (10th Cir. 1998)(unpublished table opinion)).

Courts have provided guidance on when the rule of completeness applies.  See, e.g., United States v. Velasco, 953 F.2d 1467, 1475 (7th Cir. 1992); United States v. Castro-Cabrera, 534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008)(Pregerson, J.).  The United States Court of Appeals for the Seventh Circuit has applied a four-part test to determine whether to allow evidence under rule 106: "(1) does [the evidence] explain the admitted evidence, (2) does it place the admitted evidence in context, (3) will admitting it avoid misleading the trier of fact, and (4) will admitting it insure a fair and impartial understanding of all of the evidence."  United States v. Velasco, 953 F.2d at 1475.  The United District Court for the Central District of California has explained:

> The Rule of Completeness warrants admission of statements in their entirety when the Government introduces only a portion of inextricably intertwined statements.
>
> Statements are inextricably intertwined when the meaning of a statement, if divorced from the context provided by the other statement, is different than the meaning the statement has when read within the context provided by the other statement.  Under those circumstances, a court must take care to avoid distortion or misrepresentation of the speaker's meaning, by requiring that the statements be admitted in their entirety and allowing the jury to determine their meaning.

United States v. Castro-Cabrera, 534 F. Supp. 2d at 1160.  Accord United States v. Coughlin, 821 F. Supp. 2d 8, 30 (D.D.C. 2011)(Lamberth, C.J.)("Coughlin is correct, however, that regardless of whether this evidence is inadmissible hearsay or not, he can introduce it under the rule of completeness."); United States v. Peeples, 2003 WL 57030, No. 01 CR 496, at *3 (N.D. Ill. Jan.

7, 2003)(Guzman, J.).  See also, Walker v. Spina, No. CIV 17-0991 JB\SCY, 2019 WL 538458, at *18 (D.N.M. Feb. 11, 2019)(Browning, J.); Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d 1115, 1143 (D.N.M. 2018)(Browning, J.).

## ANALYSIS

Upon reviewing the various pre-trial motions, the Court will impose some limits on the parties' evidence.  The United States may not present statements by Jane Doe 1's father to her doctor at trial, hearsay from Jane Doe 1's family concerning her October 29, 2016, statements, evidence from FBI witnesses that it looked like Woody "had a lot on his shoulders," and evidence concerning his Jane Doe 1's father's property crimes against Woody.  The United States may, however, present evidence concerning Woody's past sexual abuse.   Although the Court is sympathetic to Woody's sentencing arguments, Tenth Circuit precedent requires the Court to prohibit him from introducing evidence concerning the punishment he faces upon conviction. Further, Woody may not introduce evidence concerning Jane Doe 1 and Jane Doe 2's sexual history, and he may not introduce his own self-exculpatory hearsay statements.  Finally, the Court will hold a Lafler-Frye hearing and the United States may use a transcript as a demonstrative aid.

**I.   WOODY MAY NOT PUT ON EVIDENCE CONCERNING THE SENTENCING CONSEQUNCES THAT HE FACES AS A RESULT OF A GUILTY VERDICT.**

Whether to permit a defendant to present evidence concerning sentencing ramifications has confronted the Court numerous times, including in several recent cases.  See, e.g., United States v. Young, 403 F. Supp. 3d 1131 (D.N.M. 2019)(Browning, J.); United States v. Baker, 342 F. Supp. 3d 1189 (D.N.M. 2018)(Browning, J.); United States v. Edwards, 266 F. Supp. 3d 1290 (D.N.M. 2017)(Browning, J.); United States v. Folse, No. CR 15-2485 JB, 2015 WL 10383584 (D.N.M. Nov. 9, 2015); United States v. Courtney, 960 F. Supp. 2d 1152; United States v. Jim, 2012 WL 119607.  While the Court is sympathetic to defendants' arguments that not permitting

juries to hear about the sentencing ramifications of their verdicts is contrary to the juries' role at the country's founding, see, e.g., United States v. Courtney, 960 F. Supp. 2d at 1154, the Court is bound to follow clear precedent from the Tenth Circuit and the Supreme Court, which currently hold that juries may not hear this information.  See Rogers v. United States, 422 U.S. 35, 40 (1975); United States v. Courtney, 816 F.3d 681 (10th Cir. 2016).  Accordingly, the Court grants the Sentencing MIL.

**II.      THE COURT WILL CONDUCT A LAFLER-FRYE HEARING.**

The United States requests that the Court hold a hearing to ensure that Woody's counsel has communicated the United States' plea offers to Woody.  See Lafler-Frye Motion at 1.  The United States contends that such a hearing is necessary, "[s]o that a clear record will exist in the event Defendant is convicted at trial and subsequently brings a claim under 28 U.S.C. § 2255 alleging that his attorney failed to effectively convey the United States' plea offer to him."  Lafler-Frye Motion at 1.

In Lafler v. Cooper, the Supreme Court held that, "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  566 U.S. at 168.  In Missouri v. Frye, the Supreme Court held that, "[w]hen defense counsel allowed [a plea] offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires."  566 U.S. at 145.  In that case, the defendant's counsel did not communicate a plea offer before the offer had expired, and the defendant later brought a claim for ineffective assistance of counsel, arguing that he would have accepted the plea offer had he known about it.  See Missouri v. Frye, 566 U.S. at 138-39.  In Lafler v. Cooper, the defendant's counsel told him about a plea offer, but the defendant rejected the offer on his counsel's advice.  See 566 U.S. at 160.  The defendant was convicted and received

a more severe sentence than he would have received had he accepted the plea offer, and the defendant brought a post-conviction ineffective-assistance claim.  See 566 U.S. at 160.  The Supreme Court concluded that the defendant stated a valid ineffective-assistance claim, "where ineffective assistance results in a rejection of a plea offer and the defendant is convicted at the ensuing trial."  566 U.S. at 163.

Here, the United States requests a pretrial motion for a hearing to inquire whether Woody's counsel informed him of the United States' plea offer.  See Lafler-Frye Motion at 1.  As discussed, Lafler v. Cooper and Missouri v. Frye involved post-conviction ineffective-assistance claims, whereas here the United States seeks to hold a pretrial hearing, "[s]o that a clear record will exist in the event Defendant is convicted at trial and subsequently brings a claim under 28 U.S.C. § 2255 alleging that his attorney failed to effectively convey the United States' plea offer to him."  Lafler-Frye Motion at 1.  In Missouri v. Frye, the Supreme Court noted that "[t]he prosecution and the trial courts may adopt some measures to help ensure against late, frivolous, or fabricated claims after a later, less advantageous plea offer has been accepted or after a trial leading to conviction with resulting harsh consequences."  566 U.S. at 146.

The Court notes, however, that the Court's authority regarding plea negotiations is constrained.  Rule 11(c)(1) of the Federal Rules of Criminal Procedure prohibits courts from participating in plea negotiations.  See Fed. R. Crim. P. 11(c)(1) ("An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement.  The court must not participate in these discussions.").  The Tenth Circuit has concluded, however, that "[n]ot all judicial comments relating to plea agreements violate the rule."  United States v. Cano-Varela, 497 F.3d 1122, 1132 (10th Cir. 2007).  "This rule is in place because such discussion 'inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement

and plead guilty.'" United States v. Paul, 634 F.3d 668, 671 (2d Cir. 2011)(quoting United States v. Bruce, 976 F.2d 552, 556 (9th Cir. 1992)).   Further, the attorney-client privilege protects "'confidential communications by a client to an attorney made in order to obtain legal assistance' from the attorney in his capacity as a legal advisor." In re Grand Jury Proceedings, 616 F.3d 1172, 1182 (10th Cir. 2010)(quoting In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, 697 F.2d 277, 278 (10th Cir. 1983)).   Other courts have concluded, however, that the attorney-client privilege does not prohibit pretrial hearings to determine whether defense counsel has communicated a plea offer to the defendant.  See United States v. Morgan, 294 F. Supp. 3d 1218, 1224 (D.N.M. 2018)(Johnson, C.J.); United States v. Mayer, No. 19-CR-0096 (WMW/HB), 2020 WL 1444964, at *4 (D. Minn. March 25, 2020)(Wright, J.).   Further, not all communications between an attorney and his or her client are privileged, and, "[w]here questions only request information regarding communications where the attorney was acting as a 'conduit' for non-confidential information, the client may not invoke the attorney-client privilege." In re Grand Jury Proceedings, 616 F.3d at 1182-83 (quoting United States v. Defazio, 899 F.2d 626, 635 (7th Cir. 1990)).   The attorney-client privilege thus prohibits courts from inquiring into attorney-client communication's substance, but it does not prevent simple yes-or-no inquiry into communications that do not involve legal advice.  See United States v. Defazio, 899 F.2d at 635.   Accordingly, a simple colloquy inquiring whether Woody's counsel acted as a conduit for the United States' plea offer would not elicit privileged information.   Similarly, the Fifth Amendment provides that "[n]o person . . . shall be compelled in a criminal case to be a witness against himself."  U.S. Const. amend. V.   To qualify for the Fifth Amendment privilege, however, the "communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Ct., 542 U.S. 177, 189 (2004).   A simple colloquy asking Woody whether his counsel communicated the United States'

plea offer to Woody is unlikely to elicit an incriminating statement.

There does not appear to be any guidance from the Tenth Circuit on district courts' authority to order a pretrial hearing to determine whether a defense attorney has communicated a plea offer to the defendant, and district courts considering the matter have disagreed.  See, e.g., United States v. Morgan, 294 F. Supp. 3d at 1226-27 (granting the United States' motion for such a hearing over the defendant's objection); United States v. Pirk, 236 F. Supp. 3d 796, 799-801 (W.D.N.Y. 2017)(Wolford, J.)(same); United States v. Broombaugh, No. 14-40005-10, 2014 WL 3107963, at *3-4 (D. Kan. July 8, 2014)(Crabtree, J.)(denying the United States motion for such a hearing), amended in part by sub nom. United States v. Reulet, No. 14-40005, 2016 WL 126355, at *11 (D. Kan. Jan. 11, 2016)(granting the United States motion).  The Court notes that Woody does not object or otherwise respond to the United States' request.  Additionally, the Court is obligated to ensure that Wooy receives effective assistance of counsel.  See Garcia v. Teitler, 443 F.3d 202, 209 (2d Cir. 2006)("[A] district court must . . . protect a defendant's Sixth Amendment right to effective assistance of counsel"); United States v. Gonzalez-Lopez, 399 F.3d 924, 928-29 (8th Cir. 2005)(balancing a defendant's right to choose his counsel against the court's need to administer justice).

The Court concludes that it may hold a hearing to ascertain whether Woody's counsel communicated the United States' plea offer.  The Court will not inquire as to the substance of those communications, but rather to determine the simple factual question whether Woody's counsel communicated the United States' plea offer.  See United States v. Slane, No. 11-81, 2015 WL 728481, at *20 n.14 (W.D. Pa. Feb. 19, 2015)(Fischer, J.)("[T]he Court is careful to elicit only factual information from the parties and the defendant rather than soliciting any advice provided by defense counsel to the defendant and protected by the attorney-client privilege.").  The Court

will also conduct this hearing in open court, in the United States' presence.  See, e.g., United States v. Draper, 882 F.3d 210, 217-18 (5th Cir. 2018)(noting that all parties were present).  Such a procedure enables the parties to establish with certainty that all parties share the same understanding of the plea agreement, and it enables the United States to remedy any miscommunication or issue under Lafler v. Cooper or Missouri v. Frye.  See Lafler v. Cooper, 566 U.S. at 171-72 (noting that it is "difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea offer").  The Court will further decline to hold an ex parte hearing to inquire into Woody's rationale for rejecting the United States' plea offer:

> Nor, contrary to the government's suggestion, does *Frye* require a district court to satisfy itself of the intelligence of a defendant's decision to exercise his right to trial instead of accepting a plea offer.  *Frye* and its companion case, *Lafler v. Cooper*, concern the duty of *defense counsel* to advise their clients regarding formal plea offers; they do not obligate or permit judges to give advice to defendants on whether to accept such agreements. . . .  [T]he district court, as described above, fulfilled its role under *Frye* by memorializing the offer on the record at the government's request . . . .  Nothing more was required or justified by *Frye*.

United States v. Braxton, 784 F.3d 240, 247 (4th Cir. 2015).  Similarly, the Court will note the offer's terms in the record to better inform any post-conviction collateral attack about which the United States is concerned, but the Court may seal the record should the parties identify "'some significant interest that outweighs the presumption' in favor of open access to judicial records." United States v. Pickard, 733 F.3d 1297, 1300 (10th Cir. 2013)(quoting Colony Ins. Co. v. Burke, 698 F.3d 1222, 1241 (10th Cir. 2012)).  See United States v. Morgan, 294 F. Supp. 3d at 1226 (choosing to hold the hearing in open court, but inviting the parties to justify a sealed exhibit containing the plea offer should they desire).  Accordingly, the Court will hold a hearing to identify the terms of the United States' plea offer and to confirm that Woody's counsel communicated the

offer to Woody.  See United States v. Pirk, 236 F. Supp. 3d at 801 ("Faced with these competing principles and obligations, the Court elected to engage in part in the colloquy requested by the Government -- namely to memorialize the terms of any plea offer on the record to ensure that the defendant was aware of the offer and understood its terms.").

## III.   UNDER RULE 803(4), THE UNITED STATES MAY NOT PRESENT STATEMENTS BY JANE DOE 1'S FATHER TO JANE DOE 1'S DOCTOR.

The United States seeks to admit Jane Doe 1's statements to Dr. Pilon, as well as statements from Jane Doe 1's father and stepmother.  See Medical MIL at 1.  The United States asserts that Jane Doe 1 told Dr. Pilon that Woody was "touching her genitals and kissing her frequently." Medical MIL at 1-2.  The United States also says that Dr. Pilon "was informed" that Jane Doe 1 had recently resided with her mother and Woody.  Medical MIL at 1.  Woody argues that Jane Doe 1's identification of her abuser is inadmissible under rule 803(4), because she was no longer living with him, and because Dr. Pilon therefore did not need this information to treat her.  See Medical MIL Response at 4-5.

The Court will admit Jane Doe 1's statements to Dr. Pilon, but it will not admit statements from Jane Doe 1's father and stepmother under Rule 803(4)'s hearsay exception, which provides: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  Fed. R. Evid. 803(4).  "The Rule 803(4) exception to the hearsay rule is founded on a theory of reliability that emanates from the patient's own selfish motive -- her understanding 'that the effectiveness of the treatment received will depend upon the accuracy of the information provided to the physician.'" United States v. Joe, 8 F.3d at 1493-94 (quoting 2 McCormick on Evidence § 277, at 246-47). While "the patient's strong motivation to be truthful . . . extends to statements as to causation,"

Fed. R. Evid. 803(4) advisory committee's note, "it does not ordinarily extend to statements regarding fault," United States v. Joe, 8 F.3d at 1494.  Nonetheless, the Tenth Circuit has joined the United States Courts of Appeals for the Fourth, Eighth, and Ninth Circuits in holding that "statements made by a child to a physician which identify the sexual abuser as a member of the family or household are 'reasonably pertinent to diagnosis or treatment' and may therefore be admissible." United States v. Joe, 8 F.3d at 1493-94 (quoting Fed. R. Evid. 803(4) and citing United States v. Balfany, 965 F.2d 575, 579 (8th Cir. 1992); United States v. George, 960 F.2d at 99-100; Morgan v. Foretich, 846 F.2d at 949).

Understanding the abuse's nature and scope is pertinent to deciding what treatment and counseling may be necessary.  See United States v. Tome, 61 F.3d at 1450-51 (admitting statements explaining "where on her body she had been touched during the abuse").  Like the statements in United States v. Tome, Jane Doe 1's statements to Dr. Pilon were made during the course of a sexual assault examination as part of an investigation into allegations of sexual abuse well after the abuse was alleged to have occurred.  See United States v. Tome, 61 F.3d at 1449. Like the statements in United States v. Tome, Jane Doe 1's statements were also reasonably pertinent to diagnosis or treatment, because "the identity of the abuser is necessary to determine if an abuse victim is in a safe environment or in danger of being abused again." United States v. Chaco, 801 F. Supp. 2d 1200, 1213 (D.N.M. 2011)(Browning, J.)(concluding that the child sex-abuse victim's identification of her abuser is admissible under rule 803(4)). See United States v. Harry, 20 F. Supp. 3d 1196, 1237-38 (D.N.M 2014)(Browning, J.)(not permitting testimony on sexual assailant's identity, because he was not part of the victim's household; United States v. Jim, 2012 WL 2053683, at *1.

The Court will not, however, admit statement from Jane Doe 1's father and stepmother to Dr. Pilon.  The United States wants to admit the statements of Jane Doe 1's parents to provide context surrounding her examination, such as why she was taken to the hospital for evaluation, and not for the truth of the matter asserted.  See Tr. at 21:17-23 (Ruiz-Velez); Medical MIL Reply at 2.  It does not argue that any hearsay exception excuses Jane Doe 1's statements to her family. The Court is concerned that limiting instructions would not limit effectively the prejudice that these statements would cause Woody -- especially when the probative information the United States seeks from these statements is of such limited value and can be acquired through less prejudicial means.  See Fed. R. Evid. 403.  The evidence as the United States seeks to present it and when not offered for its truth essentially serves to aid in telling a coherent story.  But while it fills in gaps that may arise in the jurors' minds, explaining why Jane Doe 1's parents took her in for medical examination barely surpasses the rule 401 test for relevancy.  Thus, the Court will prohibit its admission.  See Tr. at 25:25-26:6 (Court)("If it's just for purposes of why the father took the little girl in, I think we can finesse that by just simply saying, 'And based upon the conversation you had with the girl, you took her in,' and just leave it at that.").  Accordingly, the United States may present the context surrounding Jane Doe 1's father's and step-mother's statements, but it may not introduce the statements themselves.

## IV.   THE UNITED STATES MAY PRESENT EVIDENCE OF WOODY'S PAST SEXUAL ABUSE OF JANE DOE 1 AND OF JANE DOE 2.

The United States seeks to admit testimony regarding Woody's past abuse of Jane Doe 1 and Jane Doe 2, arguing that these past instances are admissible under rules 413 and 414.  See Past Conduct MIL at 6.  These rules permit the introduction of evidence of any other instance of past sexual assault or child molestation when the defendant is charged with sexual assault or child molestation.  See Fed. R. Evid. 413; Fed. R. Evid. 414.  There is no dispute that Woody is charged

with sexual assault and child molestation.  See Past Conduct MIL Response at 3.  There is also no dispute that the United States seeks to introduce evidence concerning sexual assaults and child molestations.  See Past Conduct MIL Response at 3.  Woody instead argues that these past instances are not relevant to the crime charged and are unfairly prejudicial.  See Past Conduct MIL Response at 3-7.  The Court disagrees that the evidence is irrelevant and unfairly prejudicial, and it will admit the evidence of Woody's past sexual assaults and child molestations.

First, the evidence that the United States seeks to admit is relevant in that it "certainly indicates that defendant has a propensity to sexually abuse young girls."  United States v. McHorse, 179 F.3d 889, 898 (10th Cir. 1999).  The evidence is also relevant in that it: (i) demonstrates that Woody abused Jane Doe 1 and Jane Doe 2 in similar ways on multiple occasions, see, e.g., Fed. R. Evid. 413 advisory committee notes; 140 Cong. Rec. 23603 (daily ed. Aug. 21, 1994)(statement of Rep. Susan Molinari)("In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant -- a sexual or sadosexual interest in children -- that simply does not exist in ordinary people."); United States v. McHorse, 179 F.3d at 898 ("The Rule 414(a) testimony . . . certainly indicates that Defendant has a propensity to sexually abuse young girls."); and (ii) corroborates Jane Doe 1 and Jane Doe 2's accusations, see, e.g., Fed. R. Evid. 413 advisory committee notes (statement of Rep. Susan Molinari)("[Child molestation cases] require reliance on child victims whose credibility can readily be attacked in the absence of substantial corroboration.  In such cases, there is a compelling public interest in admitting all significant evidence that will illumine the credibility of the charge and any denial by the defense."); United States v. Charley, 189 F.3d at 1260 (holding that a district court's reliance on the reasoning in rule 413 advisory committee notes was "sufficient to explain the district court's reasoning in admitting the statement").

Second, the evidence of past conduct is admissible under the liberal rule 403 balancing test for past acts of sexual abuse and child molestation.  That Woody disputes that he sexually abused Doe 1 and Doe 2 does not mean that the Court must or should exclude the evidence under rules 403, 413, and 414.  The United States cannot reasonably avail itself of any less prejudicial evidence regarding the fact that Woody engaged in repeated sexual acts with Jane Doe 1 and Jane Doe 2.  See United States v. Mann, 193 F.3d at 1175 (affirming the district court's admission of rule 414 evidence to show that the defendant: "(1) wanted to engage in sexual acts, including vaginal intercourse, with girls around the ages of the charged offense victims; (2) regarded his great nieces as suitable objects of his sexual aggression; and (3) lacked effective inhibitions to control this aggression").  Further, to the extent that the evidence will prejudice Woody, an appropriate jury instruction,[12] like that used in United States v. McHorse,[13] minimizes the chances of an improperly based jury verdict.  "Such an instruction will also focus the jury so that the rule 414 evidence will

---

[12]Woody should prepare and submit a limiting instruction if he would like the Court to give it, although he may not want the Court to highlight this damaging evidence.  That is Woody's choice.

[13]The district court in United States v. McHorse gave this limiting instruction:

> In a criminal case in which the defendant is accused of . . . an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible and may be considered for its bearing on any matter to which it is relevant.  However, evidence of a prior offense on its own is not sufficient to prove the defendant guilty of the crimes charged in the indictment.  Bear in mind as you consider this evidence at all times, the government has the burden of proving that the defendant committed each of the elements of the offense charged in the indictment.  I remind you that the defendant is not on trial for any act, conduct, or offense not charged in the indictment.

United States v. McHorse, 179 F.3d at 903 ("The instruction is proper.").

not distract the jury from the central issues of the trial."  United States v. Chaco, 2011 WL 3503303, at *7.

The special factors that the Court must weigh in its rule 403 analysis when addressing rule 414 evidence also counsel in favor of allowing Jane Doe 1 and Jane Doe 2 to testify about the uncharged conduct.  Those factors are: "'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence.'" United States v. McHorse, 179 F.3d at 898 (quoting United States v. Enjady, 134 F.3d at 1433). First, the United States likely can prove the uncharged conduct by a preponderance of the evidence, as Jane Doe 1 and Jane Doe 2's testimony regarding the charged conduct will corroborate her testimony regarding the uncharged conduct.  As discussed, the uncharged conduct is also relevant and highly probative -- the key disputed issue is whether Woody abused Jane Doe 1 and Jane Doe 2, and evidence that Woody repeatedly abused them in a similar manner on other occasions makes the charged acts more likely to have occurred.  Further, the other available evidence -- Jane Doe 1 and Jane Doe 2's testimony regarding the similar charged acts -- is not any less prejudicial than the proposed other acts evidence.  The Court accordingly concludes that the factors favor allowing Doe 1 and Doe 2's testimony under rule 414.  Finally, Woody cannot complain, as a legal argument, that the United States has some constitutional obligation to charge him with all crimes or acts rather than attempt to use the other instances as evidence under the Federal Rule of Evidence; otherwise, there would be no application for rules 404(b) and 414.

The uncharged acts are admissible under rule 404(b).  This point may be more academic than practical -- as discussed, the United States may admit the prior acts as rule 414 evidence, which, in contrast to rule 404(b), allows the United States to use the prior acts to demonstrate a

propensity to commit the charged crime.  See United States v. Romine, 377 F. Supp. 2d at 1132.

The Court concludes that the prior acts evidence is admissible under rule 404(b) to show Woody's

pattern of behavior.  See Fed. R. Evid. 412, 1994 Amendment advisory committee notes ("In a

prosecution for child sexual abuse, for example, evidence of uncharged sexual activity between

the accused and the alleged victim offered by the prosecution may be admissible pursuant to Rule

404(b) to show a pattern of behavior.").  Rule 404(b) is a rule of inclusion rather than a rule of

exclusion.     See United States v. Romine, 377 F. Supp. 2d 1129, 1131-32 (D.N.M.

2005)(Browning, J.)(citing Huddleston v. United States, 485 U.S. at 688).  Rule 404(b) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in

order to show action in conformity therewith.  It may, however, be admissible for other purposes,

such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident[.]"  Fed. R. Evid. 404.  The Tenth Circuit has also "consistently held that

evidence of 'modus operandi' or a common plan or scheme may be properly submitted under

404(b)."  United States v. LaFlora, 146 F. App'x 973, 975 (10th Cir. 2005)(unpublished).  See

United States v. Isabella, 918 F.3d 816, 840 (10th Cir. 2019).  Thus, the rule generally provides

for the admission of all evidence of other acts relevant to an issue in the trial, unless the evidence

is introduced to prove criminal propensity or is unfairly prejudicial.  See United States v. Romine,

377 F. Supp. 2d at 1132 (citing United States v. Segien, 114 F.3d 1014, 1022 (10th Cir. 1997),

overruled on other grounds by Jones v. United States, 526 U.S. 227, 227 (1999)).  Additionally,

the rule 404(b) evidence must be extrinsic to the charged crime.  "'An uncharged act [is not]

extrinsic if it was part of the scheme for which a defendant is being prosecuted, or if it was

'inextricably intertwined' with the charged crime such that witness' testimony 'would have been

confusing and incomplete without mention of the prior act.'"  United States v. DeLuna, 10 F.3d

1529, 1532 (10th Cir. 1993)(quoting United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)).  See United States v. Begay, 2020 WL 2514661, at *25.

The prior acts' prejudice does not outweigh their probativeness.  "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged."  United States v. Henthorn, 864 F.3d 1241, 1256 (10th Cir. 2017).  Further, rule 403 directs evidence's exclusion not merely when the evidence's prejudice is greater than its probative value, but rather "the danger of that prejudice must substantially outweigh the evidence's probative value."  United States v. Cerno, 529 F.3d 926, 935 (10th Cir. 2008).  The Court must also "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  United States v. Cerno, 529 F.3d at 935.  Here, the prior acts evidence is admissible, because its probative value is substantial.  It tends to rebut one of the only defenses available to Woody -- that he did not commit the charged acts.

## V.   JANE DOE 1 AND JANE DOE 2'S SEXUAL HISTORY IS INADMISSIBLE.

In the Victim MIL, the United States requests that the Court prohibit Woody from "seeking to elicit, from any witness, evidence of the victims' sexual behavior or evidence of the victims' alleged sexual predisposition, with the limited exception of the victims' alleged sexual contact with Defendant as offered by the prosecution."  Victim MIL at 1.  Woody says that he has no plans to introduce evidence of the alleged victims' sexual history.  See Victim MIL Response at 1.  The Court concludes that there is no permissible reason for Woody to admit evidence of Jane Doe 1 and Jane Doe 2's sexual predisposition.  See Fed. R. Evid. 412(a)(2) and (b)(1)(B).  Rule 412(b)(1)(B) is an exception to Rule 412(a), but a limited one; rule 412(a)(2) excludes evidence

of a victim's sexual behavior and sexual disposition, while rule 412(b)(1)(B) allows only evidence of the victim's sexual behavior "with respect to" the victim's consent to the alleged act.  Fed. R. Evid 412(b)(1)(B).  See Fed. R. Evid. 412, advisory committee note to the 1994 amendment ("Evidence relating to the victim's alleged sexual predisposition is not admissible pursuant to this exception.").

Further, Woody may not admit evidence of Jane Doe 1 and Jane Doe 2's "other sexual behavior," because such evidence is not relevant to a material fact.  Fed. R. Evid. 412(a)(1).  See Fed. R. Evid. 401.  To the extent that Woody denies that any sexual activity took place, evidence of Jane Doe 1 and Jane Doe 2's prior sexual behavior with regard to Woody is of limited relevancy, because it does not go to a consequential fact.  See Sera v. State, 341 Ark. 415, 17 S.W.3d 61, 78 (2000)(holding that the defendant's earlier sexual encounters with the victim were not relevant, because the defendant denied that the sexual acts with which he was charged took place); State v. Jackson, 216 Wis. 2d 646, 575 N.W.2d 475, 481 (1998).  Second, rule 412 also permits evidence of the victim's "other" sexual behavior when the prosecutor offers the evidence.  Fed. R. Evid. 412(b)(1)(B).  Similarly, rule 412(a) restricts evidence of a victim's "other sexual behavior," i.e., not the behavior that an indictment charges, so evidence of the charged conduct is admissible.  Fed. R. Evid. 412(a)(1).  Most importantly, however, the United States alleges that the charged acts occurred when Jane Doe 1 and Jane Doe 2 were children.  Because each alleged act happened when Jane Doe 1 and Jane Doe 2 were too young to consent, evidence of their "other sexual behavior," Fed. R. Evid. 412(a)(1), with respect to Woody is irrelevant, Fed. R. Evid. 412(b)(1)(B). See Davis v. DeKalb Cty. Sch. Dist., 233 F.3d 1367 (11th Cir. 2000); United States v. Torres, 937 F.2d 1469, 1473 (9th Cir. 1991)(holding that the rule 412(b)(1)(B) exception does not apply where the victim is too young to consent).

## VI.   WOODY MAY NOT PRESENT HIS OWN SELF-EXCULPATORY STATEMENTS WITHOUT FACING CROSS-EXAMINATION.

The United States requests that the Court prohibit Woody from introducing evidence of self-exculpatory statements which he made in his April 25, 2018, and October 23, 2018, interviews with FBI agents.  See Interview MIL at 1.  The Court will not allow Woody to bring his own prior words into evidence.  Woody's out-of-court statements -- when offered to prove the truth of their assertions -- are hearsay when Woody offers them, see Fed. R. Evid. 801(a)-(c), and thus inadmissible, see Fed. R. Evid. 802, but they are not hearsay when the United States offers them, see Fed. R. Evid. 801(d)(2).  See also United States v. Rodriguez, 122 F. Supp. 3d 1258, 1265-66 (D.N.M. 2015)(Browning, J.); United States v. Goxcon-Chagal, No. CR 11-2002 JB, 2012 WL 3249473, at *5-7 (D.N.M. Aug. 4, 2012)(Browning, J.).  Woody argues that, under the rule of completeness, the jury should consider his self-exculpatory statements in conjunction with his self-inculpatory statements from the same interview.  See Interview MIL Response at 6 (citing Fed. R. Evid. 106).  Woody's reliance on the rule of completeness is misplaced.

The rule of completeness -- which has been codified as rule 106 -- provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  "When a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible."  Tanberg v. Sholtis, 401 F.3d 1151, 1166 (10th Cir. 2005).  "Permissible does not mean mandatory, however; the decision to admit or exclude rebuttal testimony remains within the trial court's sound discretion."  Tanberg v. Sholtis, 401 F.3d at 1166.  This principle reflects the general proposition that "[c]ross examination 'may embrace any matter germane to the direct examination, qualifying or destroying, or tending to elucidate, modify, explain, contradict, or rebut testimony given in chief

by the witness.'"  United States v. Burch, 153 F.3d 1140, 1144 (10th Cir. 1998).  "[W]hether or

not rebuttal evidence is admissible depends on whether the initial proof might affect the case and

whether the rebuttal evidence fairly meets the initial proof."  Richie v. Mullin, 417 F.3d 1117,

1138 (10th Cir. 2005)(alteration in original).  The Tenth Circuit has recognized that, when the

rebuttal evidence is "otherwise inadmissible," two conditions must be satisfied before it can be

introduced under this principle: (i) the inadmissible evidence must "be reasonably tailored to the

evidence it seeks to refute"; and (ii) "[t]here must be a nexus between the purported rebuttal

evidence and the evidence that the purported rebuttal evidence seeks to rebut."  Richie v. Mullin,

417 F.3d at 1138 (quoting United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001))(internal

quotation marks omitted).  See United States v. Castro-Cabrera, 534 F. Supp. 2d 1156, 1160 (C.D.

Cal. 2008)(Pregerson, J.).

> At the hearing, the Court stated:
>
>> I guess I didn't see any completeness problems with the statements here.  It
>> seemed to me that the Government doesn't have to introduce the statements of the
>> Defendant if they don't want to.  And I'm not sure that the statements of the
>> Defendant are very harmful to the Government, and it might be the Government
>> wants to think once, twice, three times before it slices this statement up, because
>> Mr. Hotchkiss is going to probably in cross-examination make a big deal of the fact
>> that you're only playing excerpts of it and you're keeping out other statements of
>> the Defendant and you're not playing it all to the jury.  And in the end, the jury does
>> have to determine the voluntariness of it.  I think there is enough there, having done
>> the suppression hearing and now rereviewed the transcript here, for the jury to make
>> a voluntariness determination when they consider this at trial.

Tr. at 39:19-40:11 (Court).  The Court concluded that "in the end, the Government is entitled to

not have Mr. Woody making statements in the courtroom without him taking the stand."  Tr. at

40:15-17 (Court).  If the United States seeks, however, to distort wildly the meaning of Woody's

statements, or suggests that Woody said nothing that was self-exculpatory, the Court would likely

allow Woody to introduce supplementary segments from the interview.  What the United States

seeks to admit, however, does not appear to require any of the context that Woody argues is necessary. See Tr. at 39:23-40:6 (Court). The Court thus grants the Hearsay MIL. The Court will not allow Woody to use cross-examination to elicit his own prior words, unless they are subject to a hearsay exception, such as the statement-against-interest exception,[14] see Fed. R. Evid. 804(b)(3), or unless Woody uses them for a reason other than to establish the truth of their assertions, see Fed. R. Evid. 801(c)(2).

## VII. THE UNITED STATES MAY USE THE INTERVIEW TRANSCRIPT AS A DEMONSTRATIVE AID.

The United States seeks to use transcripts of the FBI agents' April 25, 2018, and October 23, 2018, interviews with Woody as demonstrative aids. See Demonstrative MIL at 2. Woody does not oppose the United States' request. See Demonstrative MIL Response at 1. The Tenth Circuit has upheld the admission of transcripts for the purpose of assisting the jury in listening to portions of recorded conversations as within the trial court's sound discretion. See United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995); United States v. Mayes, 917 F.2d 457, 462-63 (10th Cir. 1990); United States v. Devous, 764 F.2d 1349, 1354 (10th Cir. 1985)("The admission of transcripts to assist the trier of fact, like the admission of tapes of marginal quality, lies within the discretion of the trial court."). The Court has frequently allowed parties to use transcripts of

---

[14]This exception "cover[s] only those declarations within [a larger self-inculpatory] confession that are individually self-inculpatory." United States v. Williamson, 512 U.S. 594, 598 (1994). Thus, if Woody's statements to law enforcement contain both inculpatory and exculpatory portions, the United States may introduce the inculpatory portions at trial while omitting the exculpatory portions, and Woody will be unable to introduce the exculpatory portions unless another basis for admissibility exists, e.g., if the United States introduces an inculpatory statement that is so inextricably intertwined with an exculpatory statement that Richie v. Mullin permits the latter's introduction, or if Woody uses the statement for impeachment purposes. See United States v. Williamson, 512 U.S. at 599 (rejecting the view that a defendant's "entire narrative, including non-self-inculpatory parts (but excluding the clearly self-serving parts), may be admissible if it is in the aggregate self-inculpatory" (citation omitted)).

recordings.  See Montoya v. Vill. of Cuba, No. CIV 11-0814 JB/SMV, 2013 WL 6504291, at *23 (D.N.M. Nov. 30, 2013); United States v. Hernandez-Mejia, No. CR 05-0469 JB, 2007 WL 1302632, at *3 (D.N.M. Apr. 25, 2007)(Browning, J.); United States v. Vigil, No. CR 05 2051 JB, 2006 WL 4109682, at *3 (D.N.M. Aug. 28, 2006).  But see United States v. Williams, No. CR 12-1675 JB, 2012 WL 6005739, at *2 (D.N.M. Oct. 31, 2012)(Browning, J.)(excluding a transcript where both parties agreed to the request).  At the hearing, the Court stated:

> [W]e'll use the standard Tenth Circuit jury instructions, and just like th trial I had this week, you'll play the tapes and the recorded statements, you'll give them the transcripts, they'll read them along.  They won't take them back to the jury room unless you all want them to go back there.  If you want to mark them as evidence and submit them, you can.  If you don't agree on that, then they'll remain in the courtroom and just the recorded statements will be evidence and they'll go back to trial.  But as far as using them as demonstrative aids, you may do so.

Tr. at 42:8-20 (Court).  Accordingly, Given the considerable benefits inherent in using transcripts at trial, and in light of Tenth Circuit caselaw approving such use, the Court will allow either party to use transcripts of these interviews at trial as demonstrative aids.

## VIII.  THE UNITED STATES MAY NOT PRESENT HEARSAY TESTIMONY FROM JANE DOE 1'S FAMILY.

Woody seeks to prohibit the United States from introducing hearsay evidence concerning what Jane Doe 1 told her family on October 29, 2016, about Woody's sexual abuse.  See Hearsay MIL at 1.  The United States argues that Jane Doe 1's comments were not hearsay, because the United States will not offer them for the truth of the matter asserted but rather to provide context for actions that the police and Jane Doe 1's family members took.  See Hearsay MIL Response at 4. Alternatively, the United States argues that the evidence is admissible under the residual hearsay exception in rule 807(a)(1).  See Hearsay MIL Response at 5-6.  The Court will limit testimony concerning Jane Doe 1's statements to her family on October 29, 2016, and allow her family members to testify to only what they saw and the actions they took in response to her statements.

Jane Doe 1's October 29, 2016, statements to her family concerning Woody's sexual abuse are out-of-court statements that implicate material, probative facts regarding Woody's charged conduct. Admitting these statements would require a limiting instruction to prevent the jury from using the hearsay for improper purposes. The Court is reluctant to introduce this confusion into the trial, because the United States can achieve its stated purpose of providing context surrounding the case's beginning with testimony that does not discuss hearsay. The Court will therefore limit the United States to introducing evidence concerning what Jane Doe 1's family members saw, the non-assertions they heard, and the actions they took in response, but it will not allow witnesses to repeat Jane Doe 1's out-of-court statements. See Tr. at 58:22-59:5 (Court, Ruiz-Velez).

The United States does not argue that any regular hearsay exception, such as the exceptions for excited utterances in rule 803(2) and statements of then-existing mental, emotional, or physical conditions in rule 803(3), allows it to introduce this evidence. Instead, it relies on the residual hearsay exception. See Hearsay MIL Response at 5-6. The United States' argument that the Court should admit this information under the residual hearsay clause also does not convince the Court to alter its initial oral opinion. "The residual exception should only be used 'in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice.'" United States v. Hammers, 942 F.3d 1001, 1011 (10th Cir. 2019)(quoting United States v. Dalton, 918 F.3d 1117, 1133 (10th Cir. 2019)). This case does not present such circumstances. To argue otherwise, the United States cites United States v. Farley, 992 F.2d 1122 (10th Cir. 1993). In United States v. Farley, the Tenth Circuit concluded that admitting an eight-year-old sexual-assault victim's statements to her mother under the residual hearsay clause was not an abuse of the trial court's discretion. See 992 F.3d at 1126. It noted that the sexual assault occurred within eight hours of the victim's statements and

"would have been admissible as excited utterances."  992 F.3d at 1126.  The statements were also "made relatively quickly after the child had an opportunity to speak with her mother alone."  992 F.3d at 1126.  In this case, Jane Doe 1 spoke with her family at least twenty-five days after Woody's alleged sexual assault, and the United States does not argue that she was still under the stress of the assault.  See Hearsay MIL at 5-6.  Accordingly, the Court will not admit Jane Doe 1's comments under rule 807(a)(1).

## IX.   FBI AGENTS MAY NOT TESTIFY THAT IT "LOOKED LIKE [WOODY] HAD A LOT ON HIS SHOULDERS."

Woody seeks to prevent FBI Agents who interviewed him from testifying that "it looked like he had a lot on his shoulders."  FBI MIL at 1.  Under rule 701 of the Federal Rules of Evidence, lay witnesses may provide opinions which are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Lay witness testimony on another's state of mind "may be rejected if the quality and quantity of observations concerning that person's behavior are insufficient" to conclude that the observation was rationally formed.  Victor J. Gold, "Rationally Based on the Witness's Perception," 29 Wright & Miller Fed. Prac. & Proc. Evid. § 6254 (2d ed. 2020).  Further, the "closer the subject of the opinion approaches critical issues, the greater the likelihood the court will require more concrete expression from the witness either alone or prior to the offering of an opinion conveying the witness' overall impression."  Michael H. Graham, "Opinion testimony of lay witnesses," 5 Handbook of Fed. Evid. § 701:1 (8th ed. 2019).  In light of the restrictions the Federal Rules of Evidence place on witness testimony, the United States does not challenge the FBI MIL's request that the Court prevent witnesses who have had limited interactions with Woody from testifying to Woody's mental state.  See FBI MIL Response at 3.

At the hearing, the Court stated:

> Here's my thing on this.  I guess I don't mind a little demeanor testimony, but this statement bothers me.  "A lot on his shoulders."  If you weren't to use that phrase, what is he trying to say?  That he looked concerned?  Worried?  Nervous?  I don't know.  To me, "It looked like he has a lot on his shoulders" seems to me -- I don't know -- I don't like that phrase.  I don't like him saying that to the jury.

> Do you have another candidate for what he could say?  If he wants to describe what he saw, maybe that's the problem.  He's not describing what he saw.  He's characterizing what he saw.  Instead of saying, "He was nervous, his voice shook, he was shaking," it's almost like he's saying, "Yeah, he looked guilty."

> . . . I'd let him say, "His voice shook and he was nervous and his hands shook," but I wouldn't let him say, "He looked guilty or he acted guilty."

> So it seems to me maybe "Looking like he has a lot on his shoulders," falls over in that, you know, he acted like he was guilty.  But if he wants to describe what he saw, I might be receptive to that.

Tr. at 60:1-25 (Court).  The Court noted that "we've all looked like we have a lot on our shoulders, but that could mean a lot of different things.  It could mean somebody just lost a loved one, or has financial problems, or something like that.  So it kind of depends on the context."  Tr. at 62:21-63:1 (Court).  The Court concluded that stating that Woody looked like he had a lot on his shoulders would "convey to the jury that he looked guilty."  Tr. at 63:3-4.  The Court will permit witnesses to describe their personal observations, but it will not allow the United States' witnesses to testify, essentially, that Woody "looked guilty" during his interviews with FBI agents.  Tr. at 60:16 (Court).  Accordingly, the Court grants the FBI MIL.

## X.   THE UNITED STATES MAY NOT PRESENT EVIDENCE CONCERNING TRESPASSING AND PROPERTY DAMAGE BY JANE DOE 1'S FATHER.

Woody requests that the Court exclude evidence concerning trespassing and property damage by Jane Doe 1's father, because this evidence does not pass rule 401's relevancy test and is more prejudicial than probative.  See Trespassing MIL at 1-2.  The United States responded to

the Trespassing MIL and agrees that the trespassing incident is irrelevant, but it reserves the right to bring up the incident as rebuttal evidence if Woody "opens the door" to it.  Trespassing MIL Response at 1-2.  Trespassing by Jane Doe 1's father does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  Fed. R. Evid. 401.  Because trespassing by Jane Doe 1's father is not relevant to a material fact in this case, and because the United States agrees not to present this evidence, see Tr. at 66:9-11 (Ruiz-Velez), the Court grants the Trespassing MIL.

**IT IS ORDERED** that: (i) the United States' Motion in Limine To Prohibit Discussion of Sentencing or Punishment at Trial, filed May 14, 2019 (Doc. 40), is granted; (ii) the United States' Motion for a Lafler-Frye Hearing, filed May 14, 2019 (Doc. 41), is granted; (iii) the United States' Motion in Limine to Permit Statements Made for Medical Diagnosis and Treatment, filed May 14, 2019 (Doc. 42), is denied; (iv) the United States' Sealed Motion in Limine to Admit Evidence Pursuant to Rules 413, 414 and 404(b), filed May 14, 2019 (Doc. 43), is granted; (v) the United States' Sealed Motion in Limine to Exclude Evidence of the Victims' Sexual Behavior and Predisposition, filed May 16, 2019 (Doc. 48), is denied; (vi) the United States' Motion in Limine to Exclude Irrelevant, Prejudicial, Self-Serving and/or Hearsay Statements and Notice of Intent to Offer Defendant's Self-Inculpatory Statements in Evidence, filed May 20, 2019 (Doc. 49), is granted; (vii) the Plaintiff's Motion in Limine to Allow the United States to Use Transcripts as Demonstrative Aids, filed May 20, 2019 (Doc. 50), is granted; (viii) the Defendant's Motion in Limine to Exclude Admission of Hearsay Testimony of Jane Doe 1's Father, Step-Mother, and Sister, filed May 20, 2019 (Doc. 56), is granted; (ix) the Defendant's Motion in Limine Regarding Irrelevance and Speculation by FBI Agents Regarding Defendant Woody Looking Like He Has a Lot on His Shoulders, filed May 20, 2019 (Doc. 57), is granted; and (x) the Defendant's Motion

in Limine to Exclude Admission of Testimony About Property Damage and Trespassing in October of 2016 or 2017, filed May 20, 2019 (Doc. 58), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

John C. Anderson
  United States Attorney
Raquel Ruiz-Velez
David Patrick Cowen
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Todd B. Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

    *Attorney for the Defendant*