# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                         No. CR 18-3902 JB

FRANCIS WOODY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Suppress Statements by Defendant Made on April 25, 2018, filed May 20, 2019 (Doc. 51)("April 25 Motion"); and (ii) the Defendant's Motion to Suppress Statements by Defendant Made on October 23, 2018, filed May 20, 2019 (Doc. 53)("Oct. 23 Motion"). The Court held an evidentiary hearing on July 3, 2019. <u>See</u> Clerk's Minutes at 1, filed July 3, 2019 (Doc. 91). The primary issue is whether the Court should suppress Defendant Francis Woody's statements to FBI agents he made in two interviews, because they were improperly coerced and because Woody confessed in a custodial interrogation when officers had not read him his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)("<u>Miranda</u>").[1] The Court concludes that it will not suppress Woody's statements, because the officers did not unduly coerce Woody or subject him to custodial interrogations.

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting <u>Miranda v. Arizona</u>, 384 U.S. at 444). The Supreme Court of the United States provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to evidence's admissibility, including a search's or seizure's legality.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[2]("[T]he Supreme Court has made it clear hearsay is admissible in

---

voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

[2]United States v. Lopez-Carillo, 536 F. App'x 762 (10th Cir. 2013), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . And we have

suppression hearings. . . .  As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004))).

1.    Ross Zuercher is a special agent with the Federal Bureau of Investigation, and he previously worked in the violent crimes group in the FBI's Albuquerque division.  See Transcript of Motion to Suppress Proceedings at 8:17-9:3 (Ruiz-Velez, Zuercher)(taken July 3, 2019), filed August 12, 2019 (Doc. 107)("Tr.").

2.    Zuercher has received various specialized trainings concerning investigating crimes in Indian Country, including techniques for interviewing Indian Country residents.  See Tr. at 9:23-10:25 (Ruiz-Velez, Zuercher).

3.    Zuercher interviewed members of Navajo Nation as part of his work in Albuquerque.  See Tr. at 11:14-16 (Ruiz-Velez, Zuercher).

4.    Zuercher interviewed Woody on the early afternoon of April 25, 2018, at Woody's niece's home within the Navajo Nation Reservation between the Torreon and Ojo Encino Chapter Houses.  See Tr. at 15:2-9 (Ruiz-Velez, Zuercher); id. at 15:25-16:1 (Zuercher); United States'

---

generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo; United States v. Sierra-Estrada, 248 F. App'x 973 (10th Cir. 2007); United States v. Sanchez-Gallegos, 412 F. App'x 58 (10th Cir. 2011); and United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Response to Defendant's Motion to Suppress Statements by Defendant Made On April 25, 2018 at 2 (Docs. 51 and 52), filed June 3, 2019 (Doc. 71)("April 25 Response").

5.      Zuercher had previously spoken with Jane Doe 1, who said that Woody had molested her.  See Transcript of Woody's April 25, 2018, Interview at 34:13-35:3, admitted at Hearing as United States Ex. 2 ("April 25 Tr.")(Woody, Zuercher).

6.      Zuercher was dressed in plain clothes and neither his badge nor his gun was visible, although he was carrying a gun.  See Tr. at 16:13-25 (Ruiz-Velez, Zuercher); April 25 Motion ¶ 3, at 2.

7.      FBI Special Agent Thaddeus Clancy was with Zuercher for the interview, and he also was wearing plain clothes.  See Tr. at 17:1-11 (Ruiz-Velez, Zuercher).

8.      The two agents arrived in an unmarked, white 2018 Ford Explorer.  See Tr. at 17:16-17 (Zuercher).

9.      When Clancy and Zuercher arrived, Woody was underneath a car performing repairs.  See Tr. at 18:18-21 (Zuercher); April 25 Motion ¶ 2, at 2.

10.      After Woody came out from beneath the car, Zuercher introduced himself as an FBI agent, shook Woody's hand, and asked Woody if he would like to talk with Zuercher and Clancy.  See Tr. at 18:23-19:12 (Ruiz-Velez, Zuercher); April 25 Tr. at 2:14-16 (Woody, Zuercher).

11.      Woody agreed to speak with the agents.  See Tr. at 22:10-13 (Ruiz-Velez, Zuercher).

12.      Woody was not aware that the agents were recording the conversation.  See April 25 Motion ¶ 4, at 2.

13.     Zuercher did not inform Woody of his right to refuse to answer questions.  See Tr. at 34:22-35:9 (Hotchkiss, Zuercher); April 25 Motion ¶ 5, at 2.

14.     Woody's girlfriend was sitting in a car to Zuercher's left without the engine running.  See Tr. at 19:14-20 (Ruiz-Velez, Zuercher).

15.     Woody did not appear intoxicated or under the influence of any drugs, but it is possible that he was.  See Tr. at 21:17-23 (Ruiz-Velez, Zuercher); id. at 37:16-18 (Hotchkiss, Zuercher).

16.     Woody appeared to have and had a firm understanding of the English language.  See Tr. at 21:24-22:7 (Ruiz-Velez, Zuercher).

17.     Zuercher suggested that the men speak inside, and Woody agreed.  See Tr. at 22:15-23 (Zuercher); April 25 Tr. at 1-3 (Woody, Zuercher).

18.     Woody led Zuercher and Clancy to the house's front entrance, opened the door for the agents, and led them inside the house.  See Tr. at 23:1-4 (Zuercher).

19.     Zuercher and Clancy sat on one couch, while Woody sat on another at a right angle to the first.  See Tr. at 23:6-20 (Zuercher).

20.     Before the interview, Zuercher asked Woody for his telephone number and date of birth, and Woody provided the requested information.  See Tr. at 26:8-24 (Ruiz-Velez, Zuercher).

21.     Zuercher asked Woody if he knew why the FBI wanted to talk to him, and Woody responded: "[N]ot yet."  April 25 Tr. at 5:3 (Woody).  See id. at 5:1-2 (Zuercher).

22.     When Zuercher stated that Zuercher thought someone had told Woody the FBI was looking for him, Woody said that someone had told him that the FBI wanted to ask him "something about harassment or molests."  April 25 Tr. at 5:13 (Woody).

23.     Zuercher asked: "What would they be talking about, I guess?"  April 25 Tr. at 5:16 (Zuercher).

24.     Woody responded: "I don't know.  They just make those up."  April 25 Tr. at 5:17 (Woody).

25.     Woody then stated: "I was telling that, why should I do that to -- I mean, she's a baby, that person she's talking about."  April 25 Tr. at 5:21-22 (Woody).

26.     Zuercher asked Woody about whom he was talking, and Woody referred to Jane Doe 1.  See April 25 Tr. at 5:23-6:7 (Woody, Zuercher).

27.     After talking about Woody's relationship with Jane Doe 1's mother, Zuercher asked what had happened to a hogan[3] on his property, and Woody said that Jane Doe 1's father had damaged it, because he heard that Woody molested Jane Doe 1.  See April 25 Tr. at 15:12-23 (Woody, Zuercher).

28.     Woody initially denied the sexual abuse allegations against him.  See April 25 Tr. at 23:15-21 (Woody, Zuercher).

29.     Woody also said that he denied the allegations when Jane Doe 1's father confronted him in Wal-Mart.  See April 25 Tr. at 25:10-24 (Woody, Zuercher).

30.     Zuercher later described his own conversations with Jane Doe 1, said that he believed her, and asked Woody if this abuse often happened.  See April 25 Tr. at 38:12-40:10.

_____

[3]A Hogan is a "traditional dwelling and ceremonial structure of the Navajo Indians of Arizona and New Mexico."  Hogan, Encyclopaedia Britannica, https://www.britannica.com/topic/hogan (last accessed June 13, 2020).

31.     Woody responded: "You know what?  I don't know; maybe -- maybe I did it when I was drunk.  I don't know. . . .  Because I don't remember anything, doing that."  April 25 Tr. at 40:11-14 (Woody).

32.     Zuercher continued to press Woody, and Zuercher told Woody: "Francis, well, I can tell you right now when we're done talking I'm out that door, you're here, okay?  You're not going to get arrested or anything like that."  April 25 Tr. at 47:23-25 (Zuercher).

33.     Zuercher said in a normal voice: "Okay, but I've got to know what happened that night just so we can make sure that we've covered everything that we needed to cover, okay?"  April 25 Tr. at 48:2-4 (Zuercher); First Recording at 37:25-40.

34.     Zuercher told Woody:

again, unless your story is, you know, you're -- you're this guy that is constantly -- you know, this monster that's constantly molesting [Jane Doe 1] and all the other kids in the house -- which I don't think you are, right?  I don't think you're that guy, okay?  But I do think it's possible you're probably this guy that maybe just had a mistake, was maybe a little bit too intoxicated and maybe you slipped up once. And that's -- again, that's not a big deal, okay?

April 25 Tr. at 48:12-23 (Zuercher).

35.     Shortly after this statement, Woody vaguely described one incident in which he covered Jane Doe 1 with a blanket.  See April 25 Tr. at 49:12-24 (Woody, Zuercher).

36.     Zuercher asked what Woody would say to Jane Doe 1 if she was present, and Woody said: "Well, I would say I'm, you know, sorry and I love you.  You know."  April 25 Tr. at 50:15-16 (Woody).

37.     Zuercher told Woody:

Francis, I can tell, just by looking at you, it looks like you -- you've got a lot on your shoulders, man.  You know that we've been kind of looking for you.  I feel like you've probably been --  You've been dealing with this probably in the back of your head for probably a very long time, right?  You've probably been

> thinking off and on quite a bit about, 'When is the FBI going to come here and talk
> to me?' You know: 'When is this going to actually happen?' Well, today is the
> day, you know? And today is the day to kind of just get everything off your
> shoulders. Because it's a big burden to carry, right?

April 25 Tr. at 54:23-55:8 (Zuercher).

38.     Woody next described in more detail the incident in which he touched Jane Doe 1's

vagina. See April 25 Tr. at 55:21-58:7 (Woody, Zuercher).

39.     Towards the end of the interview, Zuercher asked Woody to diagram the extent to

which his finger penetrated Jane Doe 1. See Tr. at 27:5-28:13 (Ruiz-Velez, Zuercher); Drawing

of Defendant's Hand (dated April 25, 2018), admitted at Hearing as United States' Ex. 3.

40.     At the end of the interview, Zuercher asked Woody whether he would like to write

an apology letter to Jane Doe 1, and Woody agreed to write one. See Tr. at 28:14-20 (Ruiz-Velez,

Zuercher); Letter from Francis Woody to Jane Doe 1 (dated April 25, 2018), admitted at Hearing

as United States' Ex. 4.

41.     During the interview, Woody did not indicate in any way that he was inebriated or

otherwise did not know what he was doing. See Tr. at 29:15-19 (Ruiz-Velez, Zuercher).

42.     During the interview, the seating position did not change, and the FBI agents did

not get closer to Woody or stand up. See Tr. at 50:22-50:3 (Ruiz-Velez, Zuercher).

43.     Towards the end of the interview, Zuercher asked Woody whether he would take a

lie detector test, and Woody said that he would take a lie detector test. See Tr. at 61:4-11 (Ruiz-

Velez, Zuercher); April 25 Tr. at 64:21-23 (Woody, Zuercher).

44.     Zuercher and Clancy spoke in normal, conversational, and respectful tones for the

entire interview. See generally First Audio Recording of Woody's April 25, 2018 Interview,

admitted at Hearing as United States Ex. 1-A ("First Recording"); Second Audio Recording of

Woody's April 25, 2018 Interview, admitted at Hearing as United States Ex. 1-B ("Second Recording").

45.     Clancy and Zuercher spoke with Woody for just over an hour.  See First Recording at 00:00-57:14; Second Recording at 00:00-05:22.

46.     Zuercher said: "Okay.  All right.  So we may end up calling you in for that; I don't know.  I doubt it, but -- or we may just end up calling you in for some follow-up questions."  April 25 Tr. at 62:5-7 (Zuercher).

47.     At the interview's end, Zuercher told Woody that, if they again need to talk with him, they had his number; then Zuercher shook Woody's hand, and they left.  See Tr. at 30:17-23 (Ruiz-Velez, Zuercher).

48.     After the April 25, 2018, interview, Zuercher and Clancy interviewed Jane Doe 2. See Tr. at 51:1-3 (Zuercher).

49.     Over the summer, Zuercher contacted Marcus McCaskill to arrange a polygraph interview for Woody.  See Tr. at 71:1-10 (McCaskill, Ruiz-Velez).

50.     McCaskill is an FBI polygraph examiner for the FBI's Albuquerque division and has had that position for three years.  See Tr. at 69:4-12 (McCaskill, Ruiz-Velez).

51.     On October 16, 2018, Zuercher called Woody to set up a second interview, and Woody agreed to meet again.  See Tr. at 51:16-52:3 (Ruiz-Velez, Zuercher); id. at 52:18-20 (Ruiz-Velez, Zuercher); Oct. 23 Motion ¶ 2, at 2.

52.     On October 22, 2018, Zuercher called Woody again to tell him that he would like to speak with him the next day at the New Mexico State Police Department substation in Cuba, New Mexico, at 9:00 a.m.  See Tr. at 53:2-8 (Zuercher); Oct. 23 Motion ¶ 2, at 2.

53.     Zuercher told Woody that he would not be arrested on October 23, 2018, regardless what Woody said.  See Oct. 23 Motion ¶ 3, at 2.

54.     The FBI agents chose the Cuba substation so that McCaskill could conduct a polygraph examination on Woody.  See Tr. at 100:7-17 (Hotchkiss, McCaskill).

55.     On October 23, 2018, Zuercher opened a locked entrance door for Woody at the NM State Police substation and shook his hand; then he introduced Woody and McCaskill, and they also shook hands.  See Tr. at 54:18-55:1 (Zuercher); id. at 66:4-8 (Zuercher); id. at 77:1-3 (McCaskill, Ruiz-Velez).

56.     Woody was not searched or patted down when he arrived at the substation.  See Tr. at 55:12-14 (Zuercher); id. at 67:3-7 (Hotchkiss, Zuercher); id. at 75:18-23 (McCaskill, Ruiz-Velez).

57.     Woody did not have to pass through a metal detector to enter the building.  See Tr. at 76:2-4 (McCaskill, Ruiz-Velez).

58.     Zuercher and McCaskill were both dressed in plain clothes, and neither had a visible badge or gun, although at some point McCaskill presented his credentials to Woody.  See Tr. at 55:2-11 (Ruiz-Velez, Zuercher); id. at 76:7-9 (McCaskill); id. at 76:16-18 (McCaskill).

59.     Upon introducing McCaskill, Zuercher reminded Woody that he said he would take a polygraph and explained that the polygraph examination was the reason was why McCaskill was there.  See Tr. at 77:14-17 (Zuercher); id. at 103:8-21 (McCaskill).

60.     McCaskill stated that, whatever questions Woody had about the polygraph procedures, McCaskill could answer once they were inside the test room, if he was still willing to take the polygraph.  See Tr. at 77:17-22 (McCaskill).

61.     Woody said that he was still willing to take the test, so McCaskill led Woody to a room where he had his polygraph equipment ready, and then he closed the door behind them while Zuercher waited outside.  See Tr. at 55:22-56:7 (Ruiz-Velez, Zuercher); id. at 77:24 (McCaskill); id. at 78:11-12 (McCaskill, Ruiz-Velez); Oct. 23 Motion ¶ 5, at 3.

62.     The door was unlocked, and although there was a window in the room, its blinds were closed.  See Tr. at 78:13-22 (McCaskill, Ruiz-Velez).

63.     Woody and McCaskill sat facing each other.  See Tr. at 79:21-80:4 (McCaskill).

64.     McCaskill told Woody what he would be doing and the questions he would be asking him; McCaskill told Woody that they would start by making sure that Woody knew his rights and that he still wanted to take the polygraph.  See Tr. at 80:22-81:6 (McCaskill); id. at 102:13-25 (McCaskill).

65.     Woody then signed an Advice of Rights form, which details a suspect's Miranda rights and allows the suspect to sign a waiver of these rights.  See Tr. at 81:8-22 (McCaskill, Ruiz-Velez); Advice of Rights Form (dated October 23, 2018), admitted at Hearing as United States' Ex. 5; Oct. 23 Motion ¶ 5, at 3.

66.     McCaskill asked questions to make sure Woody understood the form that he was signing.  See Tr. at 81:20-82:15 (McCaskill, Ruiz-Velez).

67.     McCaskill asked Woody whether he wanted to answer questions without a lawyer present.  See Tr. at 82:12-13 (McCaskill).

68.     Woody responded: "I guess, because I don't have one."  Tr. at 82:14-15 (McCaskill); Oct. 23 Motion ¶ 5, at 3.

69.     McCaskill replied in a normal voice:

> That's not good enough. If you understand your rights and want an attorney, we can go through the process of getting an attorney appointed to you. But if you want to answer questions today without a lawyer present, that's a choice you have to make now. It's your right to choose either way, but I can't have an in-between.

Tr. at 82:17-23 (McCaskill). See id. at 83:11-17 (McCaskill).

70.   Woody responded: "Well, I guess." Tr. at 83:19 (McCaskill).

71.   McCaskill told Woody that he could answer either "yes" or "no," but not "I guess," because this answer was not a sufficiently clear choice. Tr. at 84:19-85:2 (McCaskill).

72.   Woody then told McCaskill that he would answer questions without a lawyer present. See Tr. at 84:6 (McCaskill); Oct. 23 Motion ¶ 6, at 3.

73.   McCaskill then reviewed a polygraph consent form with Woody, and he said:

> If you don't want to take a polygraph today and don't want to have this used while we talk, then you don't have to. If there are specific questions that I ask you that you don't want to use, or a specific question that I use for the polygraph exam itself that you don't like and don't want to answer, then we'll get a different one. Whatever you want is how we're going to proceed.

Tr. at 85:1-17 (McCaskill); Oct. 23 Motion ¶ 8, at 3-4.

74.   McCaskill then stated: "If you don't want to take the polygraph, you don't have to. You can leave anytime you want." Tr. at 85:18-19 (McCaskill).

75.   Woody signed the polygraph consent form. See Tr. at 86:1-3 (McCaskill, Ruiz-Velez).

76.   McCaskill then asked Woody about his background, health, employment, previous criminal charges, and alcohol use, as well as about other basic background information. See Tr. at 86:21-87:2 (McCaskill).

77.   Woody appeared alert and had no difficulty conversing. See Tr. at 87:20-22 (McCaskill).

- 12 -

78.     Woody told McCaskill that his only alcohol consumption in the last twenty-four hours was a single beer the previous night.  See Tr. at 87:22-25 (McCaskill).

79.     After speaking for approximately twenty minutes, McCaskill directed the conversation towards Jane Doe 2's allegations.  See Tr. at 88:7-20 (McCaskill); Oct. 23 Motion ¶ 9, at 4.

80.     Soon after discussing Jane Doe 2's allegations, McCaskill asked Woody: "Have you ever used her hand to touch your penis, taken your penis out and put it in her hand?"  Tr. at 89:4-6 (McCaskill).

81.     Woody said that he had done these things.  See Tr. at 89:6 (McCaskill).

82.     McCaskill asked: "Okay, what happened?"  Tr. at 89:11-12 (McCaskill).

83.     Woody described what had occurred to McCaskill.  See Tr. at 89:20-23 (McCaskill).

84.     McCaskill told Woody: "All right.  Well, I'm going to step out and tell Agent Zuercher what's happened, what you've said.  And then we'll come back and talk to you, together probably."  Tr. at 90:8-11 (McCaskill).

85.     McCaskill left the room to tell Zuercher that a polygraph was not necessary, because Woody was confessing.  See Tr. at 56:18-24 (Zuercher); id. at 90:16-19 (McCaskill); Oct. 23 Motion ¶ 11, at 4.

86.     Zuercher entered the room, turned on his recorder, and started speaking with Woody.  See Tr. at 57:1-3 (Zuercher).

87.     McCaskill also turned on his recorder.  See Tr. at 91:8-10 (McCaskill); Oct. 23 Motion ¶ 12, at 4.

88.     Woody was aware that the conversation was being recorded.  <u>See</u> Tr. at 91:13-21 (McCaskill).

89.     Zuercher and McCaskill spoke in normal, conversational voices.  <u>See</u> Audio Recording of Woody's October 23, 2018 Interview (dated Oct. 23, 2018), admitted at Hearing as United States' Ex. 7.

90.     McCaskill told Woody that he would ask the same questions as he previously asked, and that "'I want you just to answer them the way you answered them before.'"  Tr. at 92:16-18 (McCaskill); Oct. 23 Motion ¶ 13, at 4-5.

91.     After about twenty-five minutes, Zuercher and McCaskill left the room to discuss whether there was anything else about which they wanted to speak with Woody; they left Woody inside the room writing an apology letter to Jane Doe 2.  <u>See</u> Tr. at 57:20-58:4 (Zuercher); <u>id.</u> at 59:10-14 (Ruiz-Velez, Zuercher); <u>id.</u> at 94:10-24 (McCaskill, Ruiz-Velez); Letter from Francis Woody to Jane Doe 2 (dated Oct. 23, 2018), admitted at Hearing as United States' Ex. 9; Oct. 23 Motion ¶ 17, at 5.

92.     When Zuercher and McCaskill re-entered the room, McCaskill reviewed the letter with Woody.  <u>See</u> Tr. at 95:16-23 (McCaskill).

93.     McCaskill told Woody: "You haven't really said what you're sorry for.  Is that something that you'd like to add to your apology letter?"  Tr. at 95:24-96:1 (McCaskill).

94.     Woody said: "No."  Tr. at 96:2 (McCaskill).

95.     The agents asked Woody to sign the letter, and he signed it.  <u>See</u> Tr. at 96:22-23 (McCaskill).

96.     Zuercher and McCaskill then asked a few follow-up questions about Jane Doe 1 and Jane Doe 2.  <u>See</u> Tr. at 96:22-97:4 (McCaskill).

97. At the end of the interview, Woody and McCaskill shook hands, and Woody left the substation.  See Tr. at 60:18-22 (Ruiz-Velez, Zuercher); id. at 97:19-98:4 (McCaskill).

98. Woody was at the police station for about one hour and fifteen minutes.  See Tr. at 98:5-8 (McCaskill, Ruiz-Velez).

99. Woody had no prior contact with the FBI or any other government agent in relation to this case.  See April 25 Motion ¶ 6, at 2.

100. Woody has an eighth-grade education.  See Oct. 23 Motion ¶ 5, at 3.

101. The agents did not physically touch Woody on October 23, 2018, other than to shake his hand.  See Tr. at 77:1-3 (McCaskill, Ruiz-Velez).

**PROCEDURAL HISTORY**

Woody was arrested on December 6, 2018.  See Arrest Warrant Returned Executed, filed December 7, 2018 (Doc. 9).  Woody pled not guilty at his arraignment.  See Clerk's Minutes at 1, filed December 11, 2018 (Doc. 13).  The Court scheduled a jury trial on Woody's charges from August 22, 2019, to August 26, 2019.  See Notice of Hearing as to Francis Woody, filed August 12, 2019 (Doc. 110)(text-only entry).

1. **The April 25 Motion.**

Woody requests that the Court suppress statements that he made to Zuercher and Clancy on April 25, 2018, as well as evidence it seized as a result of those statements.  See April 25 Motion at 1.  Woody argues that he was seized during the interview and not advised of his Miranda rights. See April 25 Motion ¶ 11, at 4.  He requests an evidentiary hearing pursuant to Jackson v. Denno, 378 U.S. 368 (1964), to determine whether his statements were voluntary.  See April 25 Motion ¶ 14, at 4.

2. **The April 25 Memo.**

Woody filed a separate legal memorandum to support his suppression argument. <u>See</u> Memorandum in Support of Motion to Suppress Statements Made on April 25, 2018, filed May 20, 2019 (Doc. 52)("April 25 Memo."). Woody argues first that Zuercher and Clancy's initial encounter was non-consensual and that the agents lacked reasonable suspicion to seize him. <u>See</u> April 25 Memo. at 2. He asserts that his consent was not "freely and intelligently given" but was instead given under duress or coercion. April 25 Memo. at 3 (citing <u>United States v. Price</u>, 925 F.2d 1268, 1270-71 (10th Cir. 1991)). He argues that no clear evidence of unequivocal and specific consent exists, and that a reasonable person in Woody's position would not feel free to end the encounter with Zuercher. <u>See</u> April 25 Memo. at 3. He also argues that Zuercher never told Woody that he did not have to talk and could end the encounter at any time and that this omission is "not 'strongly indicative of a consensual encounter.'" April 25 Memo. at 4 (quoting <u>United States v. Bloom</u>, 975 F.2d 1447, 1455 n.8 (10th Cir. 1992)).

Next, Woody argues that, even if the encounter was initially consensual, it eventually became non-consensual. <u>See</u> April 25 Memo. at 4. He asserts that "Woody could not just walk away as he was at someone else's residence in the midst of repairing a vehicle. Zuercher knew this. This heightened the need for Zuercher to tell Mr. Woody instead that he was free to not consent or to speak with Zuercher, which is relevant." April 25 Motion at 6. Because Zuercher did not tell Woody that he was free to withhold consent and not speak with Zuercher, Woody argues that the encounter was a custodial interrogation. <u>See</u> April 25 Motion at 7. He contends that he submitted to police authority and was therefore in custody. <u>See</u> April 25 Motion at 8. Woody also argues that the fruit of the poisonous tree doctrine requires the Court to suppress evidence seized as a result of his April 25, 2018, comments. <u>See</u> April 25 Memo. at 9-10 (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963)).

###     3.       The Oct. 23 Motion.

Woody also argues that the Court should suppress his statements from October 23, 2018.

See Motion to Suppress Statements by Defendant Made on October 23, 2018, filed May 20, 2019

(Doc. 53)("Oct. 23 Motion").   After providing the facts surrounding Woody's October 23, 2018,

interview, see Oct. 23 Motion ¶¶ 1-19, at 1-6, Woody argues that an "implicitly or explicitly

coercive environment was subtly shaped by the government agents and their stealth conduct

leading up to the interrogation of Mr. Woody," Oct. 23 Motion ¶ 20, at 6.   He notes that the waiver

of rights form that Woody signed was specifically for a polygraph test, which never occurred.  See

Oct. 23 Motion ¶ 19, at 6.  Woody also argues that he was ordered to attend the second interview

without being told he did not have to come and was therefore in custody.  See Oct. 23 Motion ¶ 23,

at 6-7.

###     4.       The April 25 Response.

The United States responds and argues that the Court should not suppress Woody's April

25, 2018, statements.  See April 25 Response at 1.  The first part of its argument is that Woody's

statements were made during a consensual encounter that did not implicate the Fourth Amendment

to the Constitution's prohibition against unreasonable seizures.  See April 25 Response at 7.  The

United States contends that the United States Court of Appeals for the Tenth Circuit considers

multiple factors when determining whether police have seized a suspect.  See April 25 Response

at 7 (citing United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010)).   It asserts that, in the

Tenth Circuit, whether an officer informs a suspect that he or she is free to leave is one factor to

consider, but it is not a prerequisite.  See April 25 Response at 8 (citing United States v. Carloss,

818 F.3d 988, 998 (10th Cir. 2016)).   It notes that "[i]t is not a Fourth Amendment search to

approach the home in order to speak with the occupant, because all are invited to do that.'"  April

25 Response at 8 (quoting United States v. Carloss, 818 F.3d at 993).  The United States then argues that Woody was not seized.  See April 25 Response at 9.  It notes that the FBI agents arrived in an unmarked vehicle in plain clothes and without visible weapons, did not physically touch Woody, and received consent both to speak with Woody and to enter the home.  See April 25 Response at 9.

The United States also argues that the interview remained consensual for its entirety.  See April 25 Response at 9.  It states that, once inside, the FBI agents sat in such a way as to not impede Woody from leaving the room.  See April 25 Response at 10.  It notes that they conducted the interview in a conversational way and did not threaten Woody.  See April 25 Response at 10.  The United States also asserts that Woody's statements were not the product of coercion, because there is no indication that Woody was unusually susceptible to coercion, the interview was only one hour and two minutes long, and Woody indicated several times that he was willing to continue speaking with law enforcement officers.  See April 25 Response at 10-11.  The United States asserts that, given these facts, Woody was not in custody and that the FBI agents were not required to read Woody Miranda warnings.  See April 25 Response at 12-14.

The United States next disputes that the fruit of the poisonous tree doctrine applies to these facts.  See April 25 Response at 14.  It argues first that Woody cannot show any "'actual police misconduct that violated'" his Fourth Amendment rights, because he voluntarily spoke with the FBI agents.  April 25 Response at 14 (quoting United States v. Williams, 356 F.3d 1268, 1272 (10th Cir. 2004)).  The United States also asserts that, while Woody is asking the Court to suppress all evidence obtained after April 25, 2018, the United States obtained much of its evidence independently and without relying on Woody's statements.  See April 25 Response at 15.

Accordingly, the United States requests that the Court not suppress any of Woody's April 25, 2018, statements or evidence it obtained after this interview.  <u>See</u> April 25 Response at 15-16.

    **5.**     <u>**The Oct. 23 Response.**</u>

    The United States responds in opposition to the Oct. 23 Motion, and requests that the Court not suppress any of Woody's statements from his October 23, 2018, interview.  <u>See</u> United States' Response to Defendant's Motion to Suppress Statement by Defendant Made on October 23, 2018 (Doc. 53) at 1, filed June 3, 2019 (Doc. 72)("Oct. 23 Response").  After providing a procedural and factual background, <u>see</u> Oct. 23 Response at 2-6, the United States contends that Woody knowingly and voluntarily spoke with FBI agents on that date, <u>see</u> Oct. 23 Response at 7.  It notes that the voluntariness analysis involves multiple factors, none of which is determinative.  <u>See</u> Oct. 23 Response at 7 (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>United States v. Lopez</u>, 437 F.3d 1059, 1063 (10th Cir. 2006)).

    The United States then argues these factors together suggest that Woody confessed voluntarily.  <u>See</u> Oct. 23 Response at 8.  While it notes that, while Woody has only an eighth grade education, there was no indication that he could not understand the FBI agents' questions and that the Tenth Circuit has found similarly educated defendants can confess voluntarily.  <u>See</u> Oct. 23 Response at 8 (citing <u>United States v. Lamy</u>, 521 F.3d 1257, 1262 (10th Cir. 2008)).  It also notes that Woody has had two previous arrests and presumably had been read his <u>Miranda</u> rights on these previous occasions.  <u>See</u> Oct. 23 Response at 8-9.  The United States also notes that the entire interview on October 23, 2018, took slightly more than an hour and was therefore not unduly coercive.  <u>See</u> Oct. 23 Response at 9-10.  Next, the United States contends that Zuercher and McCaskill did not make any threats or promises of leniency, and their demeanor and appearance throughout the conversation were non-threatening.  <u>See</u> Oct. 23 Response at 10-11.  The United

States also argues that, before Woody was questioned, McCaskill read him his <u>Miranda</u> rights and that Woody voluntarily waived them. <u>See</u> Oct. 23 Response at 11. The United States contends that McCaskill did this even though Woody was not in custody. <u>See</u> Oct. 23 Response at 11-12. The United States argues that, based on these factors, Woody was not coerced and instead voluntarily confessed to his crimes. <u>See</u> Oct. 23 Response at 12-13.

The United States also argues that Woody knowingly and voluntarily waived his right not to self-incriminate. <u>See</u> Oct. 23 Response at 13. It asserts that Woody voluntarily spoke with Zuercher and McCaskill, and that the interview was non-coercive. <u>See</u> Oct. 23 Response at 15. The United States notes that Woody voluntarily arrived for the interview and was told that he would not be arrested at the end of the interview. <u>See</u> Oct. 23 Response at 15. The United States also argues that Woody and McCaskill had a lengthy dialogue concerning what it means to waive his rights to a lawyer, and that Woody eventually did waive his rights. <u>See</u> Oct. 23 Response at 16. It argues that, under these circumstances, Woody "was aware of 'both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Oct. 23 Response at 16 (quoting <u>United States v. Morris</u>, 287 F.3d 985, 988 (10th Cir 2002)).

6. **The Hearing.**

After the United States presented its witnesses, Woody argued the April 23 Motion and the Oct. 25 Motion. <u>See</u> Tr. at 111:21-22 (Hotchkiss). Woody stated that the second interview concerns him the most. <u>See</u> Tr. at 112:14-22 (Court, Hotchkiss). He argued that Zuercher's statement, "[w]e'll call you in," does not suggest that Woody had any choice in whether to come. Tr. at 113:1-4 (Hotchkiss). He also argued that Zuercher misled Woody in his October 16, 2018, and October 22, 2018, calls, because Zuercher did not tell Woody that a polygraph test would be set up for him. <u>See</u> Tr. at 113:5-16 (Hotchkiss). He said that "I'm not sure how somebody who is

uneducated in these things gets the correct understanding of what is going on and what applies and what they're agreeing to, if this has to be voluntary." Tr. at 113:17-21 (Hotchkiss).  Woody argued that this bait-and-switch suggests that the interview was not voluntary.  See Tr. at 114:23-115:7 (Hotchkiss).

As for the April 25, 2018, interview, Woody argued that the most troubling aspect is that Zuercher took a long time before he informed Woody that he had a right not to answer questions and a right to end the interview.  See Tr. at 115:8-16 (Hotchkiss).  Woody also contended that simply telling him that he will not be arrested on the basis of what he says creates an inference, which Zuercher did not dispel, that he could be arrested if he does not talk.  See Tr. at 115:21-116:2 (Hotchkiss).  Woody added that Zuercher's statement to Woody that, "[i]f it only happened once, that's no big deal," was misleading.  Tr. at 116:12-13 (Hotchkiss).  Woody asserted that this is "sleight of hand operating" and coercive.  Tr. at 116:15-16 (Hotchkiss).  Woody then summarized his argument:

> Agent Zuercher employed some tactics that are designed to mislead Mr. Woody to get him to admit to criminal activity, and then Agent Zuercher ties that in to the future by saying, "We'll call you in."  And then the next time that he is called in, that he's called in for a different purpose that was intended when he got in, and then when he got in, that purpose wasn't even fulfilled.

Tr. at 117:2-9 (Hotchkiss).  Woody requested that the Court grant the two suppression motions. See Tr. at 117:11-12 (Hotchkiss).

The United States then responded and discussed the October 23, 2018, interview first.  See Tr. at 117:19-22 (Ruiz-Velez).  It argued that Zuercher's tone of voice when he said "[w]e will call you in," demonstrates that it was not a command and was just a normal part of the conversation.  See Tr. at 117:20-118:1 (Ruiz-Velez).  The United States noted that the FBI agents

asked Woody if he still wanted to take the polygraph test, noted that he was read his Miranda rights, and that Woody knowingly signed a form waiving them. See Tr. at 118:2-10 (Ruiz-Velez).

Regarding the April 25, 2018, interview, the United States argued that it did not have to inform Woody that, if he did not talk, he would not be arrested, because the "important part, and the main focus, should be that the Defendant was not promised with leniency, and he was not promised that he would not face charges." Tr. at 118:17-20 (Hotchkiss). The United States also noted that the recordings of both interviews speak for themselves, but that the FBI agents never touched Woody except to shake his hand, never raised their voices, and kept the conversation cordial. See Tr. at 118:21-119:10 (Ruiz-Velez). It also said that the April 25, 2018, interview took place in a familiar, safe surrounding, and that Woody was not arrested at the end. See Tr. at 119:14-24 (Ruiz-Velez). The interview was also relatively brief and Woody was not threatened or coerced. See Tr. at 120:15-19 (Ruiz-Velez).

It also argued that Woody was not unsophisticated, because, although he only has an eighth grade education, he has worked seasonal jobs out of state and married multiple times. See Tr. at 119:25-120:8 (Ruiz-Velez). The United States also noted that Woody has some prior experience with the criminal justice system, because he had previously been arrested twice. See Tr. at 121:9-16 (Ruiz-Velez). The United States then argued that, based on the totality of circumstances, Woody's statements in both interviews were voluntary. See Tr. 122:20-24 (Ruiz-Velez).

## RELEVANT LAW REGARDING MIRANDA RIGHTS

The Fifth Amendment to the Constitution requires law enforcement officials to give Miranda warnings to a person subject to "'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444). A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v.

Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)).  The court

must examine "whether 'a reasonable [person] in the suspect's position would have understood

his situation . . . as the functional equivalent of formal arrest.'"  United States v. Hudson, 210 F.3d

at 1190 (alterations in original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

### 1.   **Custodial Interrogation.**

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not

trigger until the suspect is in a custodial interrogation context.  See McNeil v. Wisconsin, 501 U.S.

171, 182 n.3 (1991).  See also United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n

order to implicate Miranda and Edwards,[4] there must be a custodial interrogation.").  "'By

custodial interrogation, we mean questioning initiated by law enforcement officers after a person

has been taken into custody or otherwise deprived of his freedom of action in any significant

way.'"  Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444).  There are

"'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the

circumstances surrounding the interrogation; and second, given those circumstances, would a

reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'"

J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99,

112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North

Carolina)).  See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).  "'Once the

scene is set and the players' lines and actions are reconstructed, the court must apply an objective

test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement

---

[4]Edwards v. Arizona, 451 U.S. 477 (1981), held that once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.

of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting

Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted

in J.D.B. v. North Carolina)).   A suspect's Miranda rights, such as a suspect's right to counsel,

may trigger before a law-enforcement officer gives a Miranda warning.   See United States v.

Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry.   See United States v. Cash,

733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does

not automatically render [an] exchange an interrogation.'"   (alterations in United States v.

Cash)(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)).   A suspect in custody may not

invoke his Miranda rights if he is not also interrogated.   See Rhode Island v. Innis, 446 U.S. 291,

293, 300 (1980).   Interrogation does not require "express questioning of a defendant while in

custody."   Rhode Island v. Innis, 446 U.S. at 298-99.   The Supreme Court of the United States

explained that Miranda was concerned with more than just questioning, but also the "'interrogation

environment,'" which implicated practices that "did not involve express questioning." Rhode

Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 458).   "For example, one of the

practices discussed in Miranda was the use of line-ups in which a coached witness would pick the

defendant as the perpetrator.   This was designed to establish that the defendant was in fact guilty

as a predicate for further interrogation."   Rhode Island v. Innis, 446 U.S. at 299 (citing Miranda,

384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up"
> in which a defendant would be identified by coached witnesses as the perpetrator of
> a fictitious crime, with the object of inducing him to confess to the actual crime of
> which he was suspected in order to escape the false prosecution.

Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 453).  Accordingly, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. at 301 (quoting Miranda, 384 U.S at 439).  See United States v. Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response." (emphasis added by United States v. Cash)(quoting Fox v. Ward, 200 F.3d at 1298)).  "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Rhode Island v. Innis, 446 U.S. at 301.  See United States v. Yepa, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation." Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation).  The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")).  See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning.").  The Tenth Circuit, however, has since walked back from United States v. Bautista and United

States v. Kelsey.  In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent.  United States v. Cash, 733 F.3d at 1278-79.  Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode Island v. Innis commands.  United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301).  See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions.  In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a suspect was interrogated but was not in custody, so Miranda did not apply.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of the questioning."  743 F. Supp. 2d at 1334.  The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect.  See 743 F. Supp. 2d at 1334-35.  See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in

handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

**2.     Miranda Waiver.**

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently."  United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted).  An express statement is not required; the waiver can be inferred from the defendant's actions and words.  See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)).  "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)).  The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred.  See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11.  The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d at 988 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or

threat of physical force against the suspect." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)).   A "state of intoxication does not automatically render a statement involuntary." United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993). "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'" United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect had knowingly waived his Miranda rights after he was given the warning and responded to the officer's questioning related to the investigation.   See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.   See United States v. Begay, 310 F. Supp. 3d at 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).

### 3.   Requests for an Attorney.

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent

questioning.  If the individual cannot obtain an attorney and he indicates that he
wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expanded on that principle in Edwards v. Arizona, concluding

that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that

individual is "not subject to further interrogation by the authorities until counsel has been made

available to him, unless the accused himself initiates further communication, exchanges, or

conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.  See Edwards v. Arizona,

451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and

Fourteenth Amendments would prohibit the police from merely listening to his voluntary,

volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S.

452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject

to further questioning until a lawyer has been made available or the suspect himself reinitiates

conversation.").  The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can

invoke a right to counsel -- before the officers have issued a Miranda warning.  See United States

v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that

the police intended to question Kelsey at some point at his home, and that the police understood

Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his

right to an attorney in that further communication with law enforcement does not mean that he

waived his right to an attorney, unless he initiates the conversation.  Maryland v. Shatzer, 559 U.S.

98, 104 (2010).  "When an accused has invoked his right to have counsel present during custodial

interrogation, a valid waiver of that right cannot be established by showing only that he responded

to further police-initiated custodial interrogation even if he has been advised of his rights."

Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

        The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988)). Accordingly, "a voluntary Miranda waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." Maryland v. Shatzer, 559 U.S. at 105. The Supreme Court noted, however, that the "Edwards rule is not a constitutional mandate, but judicially prescribed prophylaxis." Maryland v. Shatzer, 559 U.S. at 105. A break in custody of fourteen days or more ends the Edwards v. Arizona rule that a subsequent attempt to obtain a Miranda waiver is ineffective when the suspect initially requested counsel. See Maryland v. Shatzer, 559 U.S. at 110.

        The request for counsel must be clear and unequivocal. See Davis v. United States, 512 U.S. at 459. A "suspect need not 'speak with the discrimination of an Oxford don,'" Davis v. United States, 512 U.S. at 459 (quoting Davis v. United States, 512 U.S. at 476 (Souter, J., concurring)), but "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis v. United States, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. at 178). The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to

counsel." <u>Davis v. United States</u>, 512 U.S. at 453. An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. <u>Davis v. United States</u>, 512 U.S. at 453 (emphasis in original). The Supreme Court later explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 382 (2010)(quoting <u>Davis v. United States</u>, 512 U.S. at 461). "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." <u>Berghuis v. Thompkins</u>, 560 U.S. at 382.

The Supreme Court held in <u>Davis v. United States</u> that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel. 512 U.S. at 462. <u>See</u> <u>Maryland v. Shatzer</u>, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'" satisfactorily invoked the defendant's right to an attorney (quoting <u>Shatzer v. State</u>, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); <u>United States v. Zamora</u>, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements). In <u>United States v. Santistevan</u>, 701 F.3d 1289 (10th Cir. 2012), the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel." <u>United States v. Santistevan</u>, 701 F.3d at 1292-93. Although the defendant

agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop." United States v. Santistevan, 701 F.3d at 1293.

In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked how long it would take if she wanted a lawyer and whether she would have to stay in jail while she waited for a lawyer. See United States v. Lux, 905 F.2d at 1381. See Valdez v. Ward, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood his Miranda rights, that "Yes, I understand it a little bit and I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel); Mitchell v. Gibson, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under Davis."); United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007)(unpublished)(collecting appellate court cases). The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel. United States v. Alfaro, No. CR 08-0784 JB, 2008 WL 5992268, at *13 (D.N.M. Dec. 17, 2008)(Browning, J.). See United States v. Martinez, No. CR 02-1055 JB, 2006 WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

4.      **Midstream** Miranda **Warnings**.

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470

U.S. 298 (1985)("Elstad") -- a home-burglary case.  In Elstad, a witness to the burglary implicated

an 18-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives

confronted the teenager in his parents' home.  See Elstad, 470 U.S. at 300.  Without issuing a

Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad

admitted that he was involved in the burglary.  See Elstad, 470 U.S. at 301.  The detectives then

escorted Elstad to the sheriff's headquarters and read him his Miranda rights.  See 470 U.S. at 301.

Elstad waived them and gave a full written confession.  See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police

to provide Miranda warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's

fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471, he contended

that the confession "must be excluded," Elstad, 470 U.S. at 305.  The Supreme Court disagreed

with Elstad, concluding that "procedural Miranda violation[s] differ[] in significant respects from"

Fourth Amendment violations.  Elstad, 470 U.S. at 306 (alterations added).  It explained that,

unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does not necessarily

mean that there was a constitutional violation.  See Elstad, 470 U.S. at 306-07.  The Fifth

Amendment prohibits the use of compelled testimony; "[f]ailure to administer *Miranda* warnings,"

on the other hand, "creates a presumption of compulsion," but "unwarned statements that are

otherwise voluntary" are nevertheless barred under Miranda.  Elstad, 470 U.S. at 306-07. Thus,

the "*Miranda* exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth

Amendment itself."  Elstad, 470 U.S. at 307.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a Fourth

Amendment violation, a Miranda violation does not necessarily require a confession's exclusion.[5]

_____

[5]There is tension in this reasoning and with the Supreme Court's later determination in Dickerson that Miranda is a constitutional rule.  See Dickerson, 530 U.S. at 437-38, 441.  In Dickerson, although conceding that "we have repeatedly referred to the Miranda warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" Dickerson, 530 U.S. at 437-38 (quoting New York v. Quarles, 467 U.S. 649, 653 (1984); Michigan v. Tucker, 417 U.S. 433, 444 (1974)), the Supreme Court concluded that "Miranda is a constitutional decision," because (i) it had consistently applied Miranda to state court decisions and (ii) Miranda had invited legislative action "to protect the constitutional right against coerced self-incrimination," Dickerson, 530 U.S. at 438-40.  If Miranda is a constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself."  Elstad, 470 U.S. at 306.  It is possible that the Supreme Court meant that Miranda implicated additional constitutional amendments, such as the Fourteenth, but the statement's context in Elstad suggests that the Supreme Court meant that Miranda's exclusionary rule arose from judicial rulemaking, and not from some other Amendment beyond the Fifth.  See Elstad, 470 U.S. at 305; Elstad, 470 U.S at 307 ("Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension, noted that Elstad "does not prove that Miranda is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."  Dickerson, 530 U.S. at 441.  But see Dickerson, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with Miranda's rules does not establish a constitutional violation was central to the *holdings* of [Michigan v.] Tucker, [530 U.S. 428 (2000)], [Oregon v.] Hass, [420 U.S. 714 (1975)], [New York v.] Quarles, [467 U.S. 649 (1984)], and Elstad.")(emphasis in original)(alterations added).

Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on Miranda being a nonconstitutional rule, Dickerson's determination that Miranda is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted Miranda warning.  See United States v. Patane, 542 U.S. 630 (2004)("Patane")(plurality op.)("Based on its understanding of Dickerson, the Court of Appeals rejected the post-Dickerson views of the Third and Fourth Circuits that the fruits doctrine does not apply to Miranda violations.").  See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempted to resolve this tension in Patane, but a divided court did not produce a controlling opinion.  See Patane, 542 U.S. at 635-36.  The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda was a prophylactic rule and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-incrimination clause.  Patane, 542 U.S. at 636.  The plurality reasoned that, even taking Dickerson's holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy.  See Patane, 542 U.S. at 643.  It concluded that admitting nontestimonial fruits of a

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the

exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution may still

use a confession obtained in violation of Miranda for impeachment purposes.  See Elstad, 470 U.S.

at 307.  Moreover, the Supreme Court reasoned that categorically barring a confession after a

midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda

rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433

---

voluntary statement do not implicate the self-incrimination clause, so there is no fit between the
Miranda violation and the exclusionary remedy.  See Patane, 542 U.S. at 643 ("The admission of
such fruit presents no risk that a defendant's coerced statements (however defined) will be used
against him at a criminal trial.").  In so concluding, the three justices in the plurality reaffirmed
that Elstad's reasoning was sound.  Patane, 542 U.S. at 639-40.  The Honorable Sandra Day
O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court
of the United States, concurred in the judgment and agreed that Elstad is still good law after
Dickerson.  See Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The two Justices did not,
however, expressly adopt the constitutional "fit" analysis that the plurality deployed.  Patane, 542
U.S. at 645.  They concluded that admitting non-testimonial fruits from a voluntary statement
"does not run the risk of admitting into trial an accused's coerced incriminating statements against
himself."  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  Instead of concluding that such a
remedy would not fit the constitutional violation, however, they concluded that excluding such
evidence would not serve the police "deterrence rationale" infusing Miranda.  Patane, 542 U.S. at
645 (Kennedy, J., concurring).  The concurrence did not comment on Elstad's rationale that
Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment,
Miranda is not a constitutional rule.

Elstad's constitutional reasoning, thus, may no longer be good law, but its trustworthiness
and deterrence rationales may be.  See Elstad, 470 U.S. at 308.  Moreover, despite Dickerson's
suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five
justices eschewed that suggestion in Patane.  Patane, 542 U.S. at 643, 645.  Accordingly, the Court
concludes that a procedural Miranda violation does not require the Court to exclude nontestimonal
evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory.  See Wong Sun
v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court agrees with the Justices who have noted that Miranda is not
properly rooted or found in the Constitution, but instead is the product of the Supreme Court's
power to provide prophylactic rules.  See Maryland v. Shatzer, 559 U.S. at 106.  It may not be a
bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions
valuable and protected police in their work, but its constitutional and judicial underpinnings are
shaky if not non-existent.

("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court held that, once the Miranda warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309. See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-Miranda confessions were voluntary and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."  Elstad, 470 U.S. at 310. However, where the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible.  Elstad, 470 U.S. at 310.  Rather, the Miranda warning

"serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary. Elstad, 470 U.S. at 315. With no additional facts demonstrating that the second confession, post-Miranda was elicited under coercive conditions, the Supreme Court deemed it admissible. See Elstad, 470 U.S. at 314. That Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way creating a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314. Dissenting justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions." Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion. Seibert, 542 U.S. at 603-05.[6] In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of neglect, because the boy's body was covered in bedsores. See Seibert, 542 U.S. at 604. The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence

---

[6]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion joined by the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court. See Seibert, 542 U.S. at 603. Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment. See Seibert, 542 U.S. at 617-18. Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented. See Seibert, 542 U.S. at 622.

of neglect by burning the family's mobile home with the boy's dead body in it.  See Seibert, 542 U.S. at 604.  To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while they set fire to it.  See Seibert, 542 U.S. at 604.  The conspirators executed their plan, and Rector died in the fire.  See Seibert, 542 U.S. at 604.

Missouri officers subsequently arrested the mother.  See Seibert, 542 U.S. at 604.  Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters.  See Seibert, 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire."  Seibert, 542 U.S. at 605.  After a twenty-minute break, Hanrahan issued a Miranda warning, obtained a signed waiver of rights and secured the same confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "question first, then give the warnings, and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda warnings later, was not confined to Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384 U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers, whereas "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed," Seibert, 542 U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. . . .  Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. . . .  What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silent being of no avail.  Thus, when <u>Miranda</u> warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

<u>Seibert</u>, 542 U.S. at 613-14 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 424 (1986)).  <u>But</u> <u>see</u> <u>Seibert</u>, 542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of the bag" theory that the Supreme Court rejected in <u>Elstad</u>).  Accordingly, the plurality held that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."  <u>Seibert</u>, 542 U.S. at 611-12 (quoting <u>Miranda</u>, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream <u>Miranda</u> warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

<u>Seibert</u>, 542 U.S. at 615.  In its analysis, the plurality added another factor: whether officers advise the suspect that the pre-<u>Miranda</u> confession could not be used against him.  <u>See</u> <u>Seibert</u>, 542 U.S. at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality noted that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as

it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concluded that the midstream Miranda warning was ineffective, because the pre- and post-Miranda questioning occurred in the same location, the post-Miranda phase occurred only twenty minutes after the pre-Miranda phase, the officers treated the two phases of questioning as continuous, and the pre-Miranda phase left "little, if anything, of incriminating potential left unsaid."  Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasted Seibert with Elstad, and concluded that the officer's failure to warn in Elstad was a good faith Miranda mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'"  Seibert, 542 U.S. at 615 (quoting Elstad, 470 U.S. at 313).  "In Elstad, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience."  Seibert, 542 U.S. at 615.  Moreover, the police station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room.  542 U.S. at 614.  Justice Breyer concurred, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith."  Seibert, 542 U.S. at 617 (Breyer, J., concurring).  He joined "the plurality's opinion in full," however, because he believed that "the plurality's approach in practice will function as a 'fruits' test."  Seibert, 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different test.  Seibert, 542 U.S at 622 (Kennedy, J., concurring).  First, he extrapolated a general principle

from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of Miranda are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring). From that general principle, he concluded that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of Miranda and furthers no legitimate countervailing interest." Seibert, 542 U.S. at 621 (Kennedy, J., concurring). He disagreed with the plurality, however, because the test the plurality articulated "cuts too broadly." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. Cf. Berkemer v. McCarty, 468 U.S. 420, 430 . . . (1984). I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring). Accordingly, Justice Kennedy articulated the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[7]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissented. See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting). The dissenting justices

---

[7]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated. See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

concluded that Elstad's voluntariness inquiry should control, and not a multi-factor balancing test or a subjective-intent test.  See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting). According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad.  542 U.S. at 627 (O'Connor, J., concurring)(alteration in original).  The dissent explained that to adopt that approach "would effectively immuniz[e] a suspect to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity."  542 U.S. at 627 (O'Connor, J., dissenting)(alteration in original).  Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made.  See 542 U.S. at 628 (O'Connor, J., dissenting).

No published Tenth Circuit opinion has determined what opinion from Seibert is controlling.  In United States v. Carrizales-Toledo, 454 F.3d 1142 (10th Cir. 2006), the Tenth Circuit considered the issue at length,but then declined to decide it.  See 454 F.3d at 1151.  It recognized that the rule from Marks v. United States, 430 U.S. 188 (1977), ordinarily dictates that the Supreme Court's holding "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  United States v. Carrizales-Toledo, 454

F.3d at 1151 (citing <u>Marks v. United States</u>, 430 U.S. at 193).  The Tenth Circuit noted, however, that "the <u>Marks</u> rule produces a determinate holding 'only when one opinion is a logical subset of other, broader opinions'" and that "[w]e do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive."  <u>United States v. Carrizales-Toledo</u>, 454 U.S. at 1151 (quoting <u>King v. Palmer</u>, 950 F.2d 771, 781 (D.C. Cir. 1991)(en banc)).  "Determining the proper application of the <u>Marks</u> rule to <u>Seibert</u> is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."  <u>United States v. Carrizales-Toledo</u>, 454 F.3d at 1151 (citing <u>United States v. Rodriguez-Preciado</u>, 399 F.3d 1118, 1138-41 (9th Cir. 2005)(Berzon, J., dissenting in part)).  After explaining that three of the four justices in the plurality and the four dissenters decisively rejected Justice Kennedy's test -- what it characterized as a "subjective [test]" -- the Tenth Circuit skirted the issue by holding that the statements at issue in <u>United States v. Carrizales-Toledo</u>, "would be admissible under the tests proposed by the plurality and by the concurring opinion."  <u>United States v. Carrizales-Toledo</u>, 454 F.3d at 1151 (alteration in original).

Applying the plurality's five-factor test first, the Tenth Circuit concluded that all five factors weighed toward admitting the statement.  <u>See United States v. Carrizales-Toledo</u>, 454 F.3d at 1151-52.  The first factor -- "the completeness and detail of the questions and answers in the first round of interrogation" -- weighed toward admitting the suspect's statements, because the initial questioning was brief and "spontaneous."  454 F.3d at 1152.  The second factor -- "the overlapping content of the statements" -- weighed toward admissibility, because the suspect "provided significant new information" during the second round of questioning.  454 F.3d at 1152.  The third and fourth factors -- "the timing and setting of the first and second," and "the continuity of police personnel" -- similarly favored admissibility, because new agents joined the second

round of questioning, and the second interview occurred at a different location, so it "was a new and distinct experience." 454 F.3d at 1152. The fifth factor, which the Tenth Circuit characterized as "the most important factor" -- "the degree to which the interrogator's questions treated the second round as continuous with the first" -- also weighed toward admissibility, because the questioning agents never "referred back to [the suspect's] initial statements during the second interrogation." 454 F.3d at 1152.

Applying the subjective-intent test, the Tenth Circuit concluded that "the suddenness" of the suspect's initial confession, "the fact that [the suspect's] confession was in response" to the law-enforcement agent's first question, "and the open-ended nature of the question" all suggest that the agent "did not anticipate the confession." United States v. Carrizales-Toledo, 454 F.3d at 1153. The Tenth Circuit thus concluded that there was no subjective intent to circumvent Miranda. See United States v. Carrizales-Toledo, 454 F.3d at 1153. Because the agent obtained the first confession in good faith, the only remaining question is whether the initial confession was voluntary. See United States v. Carrizales-Toledo, 454 F.3d at 1153 ("Unless his initial confession was involuntary . . . [the suspect's] motion to suppress the second confession was properly denied."). The Tenth Circuit determined that the hallmarks of coercion were missing. See 454 F.3d at 1153. The suspect was a thirty-three-years-old, a year shy of obtaining a chemical engineering degree, the questioning was short, and the agent did not threaten the suspect with physical punishment. See 454 F.3d at 1153. Accordingly, the Tenth Circuit admitted the initial confession. See 454 F.3d at 1153.

The only other Tenth Circuit cases to have addressed midstream Miranda warnings are unpublished. See United States v. Sanchez-Gallegos, 412 F. App'x 58 (10th Cir. 2011)(unpublished); United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010)(unpublished). In

United States v. Sanchez-Gallegos, a per curiam affirmance with three concurring judges, the Honorable David Ebel, United States Circuit Judge for the Tenth Circuit, determined in a concurring opinion that a confession obtained after a midstream Miranda warning was admissible. See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J., concurring).[8]  He adopted Justice Kennedy's concurrence from Seibert.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72 (Ebel, J., concurring)(noting a lopsided Court of Appeals split on the issue with the majority of Courts of Appeals treating Justice Kennedy's concurrence as controlling).   He characterized Justice Kennedy's test as a two-step inquiry: (i) was the two-step interrogation technique used purposefully to undermine the Miranda process; and (ii) if not, the post-Miranda statement is admissible if the pre-Miranda interrogation was not coercive.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J., concurring).  Judge Ebel determined that there was no evidence that the law-enforcement agents intended to undermine Miranda with the two-step process they employed.  See 412 F. App'x at 72-73 (Ebel, J., concurring).  Instead, the record reflected that Border Patrol agents asked an unplanned question to a driver crossing the Mexican border on legitimate suspicion that the driver was smuggling children into the United States from Mexico.  See 412 F. App'x at 59-60 (Ebel, J., concurring).  Judge Ebel also concluded that the pre-Miranda statements were not coerced, because the questioning, although accusatory, did not have the other hallmarks of coercion -- e.g., the suspect was not threatened with physical mistreatment, thrown into a holding cell, or questioned for a lengthy period before a Miranda warning was given. See 412 F. App'x at 71, 73 (Ebel, J., concurring).

---

[8]In their concurrences, the Honorable Mary Briscoe, then-Chief Judge of the Tenth Circuit, and the Honorable Jerome Holmes, United States Circuit Judge for the Tenth Circuit, did not reach the midstream-Miranda issue.  See United States v. Sanchez-Gallegos, 412 F. App'x at 67 (Holmes, J., concurring); id. at 69 (Briscoe, J., concurring).

In United States v. Crisp, the Tenth Circuit, in an opinion that Judge Holmes wrote, and in which Chief Judge Briscoe and the Honorable William Holloway, United States Circuit Judge for the Tenth Circuit joined, again declined to decide which test to apply to midstream Miranda warnings. See 371 F. App'x at 929. In that case, Oklahoma officers arrested Crisp after Crisp fled on foot from his vehicle at a traffic stop. See 371 F. App'x at 926. A small bag of marijuana was later found on the route that Crisp took while fleeing from officers. See 371 F. App'x at 926. After taking Crisp to a police station, but before issuing a Miranda warning, Crisp and the officers "bantered" about "the pursuit," including "how Mr. Crisp had pulled his hamstring as he fled," Crisp's "social agenda for the evening," and how Crisp's companion in the car smelled of marijuana. 371 F. App'x at 926. Responding to an officer's question whether Crisp's companion had smoked marijuana that evening, Crisp admitted that he was the one who had been smoking weed. See 371 F. App'x at 926. Officers then issued Miranda warnings, which Crisp waived. See 371 F. App'x at 926. Crisp also asserted that he was presently sober and that he understood his rights, noting that the situation was not his "first rodeo." 371 F. App'x at 926. The officers re-questioned Crisp about using marijuana and also secured a confession that Crisp possessed a stash of cocaine at his mother's house. See 371 F. App'x at 926-27.

The Tenth Circuit applied three tests -- the Seibert plurality's five-factor balancing test, Justice Kennedy's "intent-based" Seibert test, and the Elstad voluntary test -- and concluded that, under all three, Crisp's post-Miranda statements were admissible. 371 F. App'x at 929. Crisp's statements were admissible under the Seibert plurality, because: (i) the pre-Miranda questions were "brief," (ii) the pre- and post-Miranda statements did not overlap as to the cocaine admission; and (iii) the officers did not treat the interrogations as continuous with regard to the cocaine topic. 371 F. App'x at 930-31. That the officers and the interview room were the same for both the pre-

and post-<u>Miranda</u> interrogation weighed "against the admissibility of the self-incriminating statements," but the Tenth Circuit did not find those two factors dispositive and ruled that "the efficacy of the *Miranda* warnings would appear not to have been materially called into question." 371 F. App'x at 930-31.

The result was the same under Justice Kennedy's <u>Seibert</u> concurrence. <u>See</u> 371 F. App'x at 931-32. The Tenth Circuit concluded that there was no evidence of intent to circumvent <u>Miranda</u>: "[T]o the contrary, the pre-<u>Miranda</u> statement occurred after the parties had bantered about the pursuit and in response to a question about the marijuana use of Mr. Crisp's female companion." 371 F. App'x at 932. Moreover, Crisp's pre-<u>Miranda</u> admissions "were unrelated to the post-<u>Miranda</u> statements regarding cocaine." 371 F. App'x at 932. Accordingly, Crisp's statements were also admissible under Justice Kennedy's <u>Seibert</u> concurrence.

Finally, there was no indicia of coercion surrounding Crisp's confession, so the statements were also admissible under the <u>Elstad</u> voluntary test. <u>See</u> 371 F. App'x at 932-33. The Tenth Circuit concluded that the following factors weighed toward finding his confession voluntary: (i) Crisp was thirty-nine years old; (ii) he was a high school graduate; (iii) he had experience with the criminal justice system based on his statement that "this ain't my first rodeo"; and (iv) he was not subjected to any physical punishment or threats of punishment. <u>See</u> 371 F. App'x at 932. Accordingly, the Tenth Circuit determined that, under all three tests, Crisp's post-<u>Miranda</u> statements were admissible. <u>See</u> 371 F. App'x at 933.

## RELEVANT LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily. <u>See</u> <u>Dickerson</u>,

530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement

that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against

self-incrimination and the Due Process Clause of the Fourteenth Amendment.")(citing Brown v.

Mississippi, 297 U.S. 278 (1936); Bram v. United States, 168 U.S. 532, 542 (1897)).

> It is now axiomatic that a defendant in a criminal case is deprived of due process
> of law if his conviction is founded, in whole or in part, upon an involuntary
> confession, without regard for the truth or falsity of the confession, and even though
> there is ample evidence aside from the confession to support the conviction.

Jackson v. Denno, 378 U.S. at 376 (citation omitted).

The Supreme Court has declared that a defendant has the constitutional right "at some stage

in the proceedings to object to the use of the confession and to have a fair hearing and a reliable

determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation

omitted). The United States must show that the statement was voluntary by a preponderance of

the evidence. See Missouri v. Seibert, 542 U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489

(1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the

confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The

prosecution has the burden of proving by at least a preponderance of evidence that the confession

was voluntary." (citation omitted)).

The due process voluntariness test examines "whether a defendant's will was overborne by

the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (internal

quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. at 226). "The due process test

takes into consideration the totality of all the surrounding circumstances -- both the characteristics

of the accused and the details of the interrogation." Dickerson, 530 U.S. at 434 (internal quotations

omitted)(citations omitted). The Court must weigh "the circumstances of pressure against the

power of resistance of the person confessing." Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)). The Supreme Court reaffirmed this analysis in 2000. See Dickerson, 530 U.S. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily."). The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 479 U.S. at 164. There are two steps to the voluntariness analysis. To analyze voluntariness, the Tenth Circuit first examines whether the police conduct at issue is coercive. See United States v. Lopez, 437 F.3d at 1064. If the officers' conduct was coercive, the next step is to analyze the defendant's personal characteristics "to answer the ultimate question: whether [the defendant's] statements were voluntary." United States v. Young, _ F.3d _, 2020 WL 3248108, at *6 (10th Cir. 2020).

The Court analyzed voluntariness in United States v. Martinez, 2006 WL 4079686, at *13-14, and United States v. Salazar, No. CR 18-3500, 2020 WL 520941 (D.N.M. Jan. 31, 2020)(Browning, J.). In United States v. Martinez, it concluded that a defendant voluntarily confessed where he was in custody for five hours and interrogated for only about two hours. See 2006 WL 4079686, at *14. While the defendant argued that agents had made promises of leniency to him, the Court concluded that "the agents indicated to him that they could not make him any promises" and that his fate was in the hands of the judge and prosecutors. 2006 WL 4079686, at *14. The defendant also signed a Miranda waiver and a statement that no promises had been made to him. 2006 WL 4079686, at *14. On the other hand, the Court suppressed a defendant's

statements in <u>United States v. Salazar</u> where officers appeared to threaten to jail his girlfriend without probable cause, promised that they would not prosecute him if he told the truth, and promised to protect him against serious threats of violence from his drug suppliers.  <u>See</u> 2020 WL 520941, at *46.

**ANALYSIS**

The Court will not suppress Woody's statements made on April 25, 2018, and October 23, 2018.  Woody's confessions were not the products of custodial interrogations, and they were voluntary.  Accordingly, the Court denies the April 25 Motion and the Oct. 23 Motion.

## I.    **THE COURT WILL NOT SUPPRESS WOODY'S APRIL 25, 2018, STATEMENTS.**

Woody argues that the encounter between himself and the FBI agents was initially non-consensual and that the officers lacked reasonable suspicion to speak with him.  <u>See</u> April 25 Memo. at 2.  He adds that, if the initial stop was consensual, the interview eventually became a custodial interrogation.  <u>See</u> April 25 Memo at 4.  Because Woody's encounter with Zuercher and Clancy was consensual, and remained consensual, it does not implicate the Fourth Amendment, and the FBI agents did not need reasonable suspicion.

Consensual encounters, as opposed to seizures, do not implicate a citizen's Fourth Amendment rights.  <u>See</u> <u>United States v. Fox</u>, 600 F.3d at 1257 (citing <u>United States v. Lopez</u>, 443 F.3d 1280, 1283 (10th Cir. 2006)("[C]onsensual encounters . . . do not implicate the Fourth Amendment").  The Supreme Court has stated that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required."   <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991)(quoting

<u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)).  To determine whether an individual has been seized, the Tenth Circuit has directed courts to consider factors including:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

<u>United States v. Jones</u>, 701 F.3d 1300, 1313 (10th Cir. 2012).  No factor is dispositive, and these factors are not exhaustive.  <u>See</u> <u>United States v. Rogers</u>, 556 F.3d 1130, 1138 (10th Cir. 2009).

The totality of circumstances suggests that Woody's encounter with Zuercher and Clancy was consensual.  Zuercher and Clancy were dressed in plain clothes, did not display any weapons, and arrived in an unmarked vehicle.  <u>See</u> FOF ¶¶ 6-8, at 4.  That there were two agents instead of one agent does not suggest necessarily a threatening presence.  <u>See</u> <u>United States v. Hernandez</u>, 847 F.3d 1257, 1266 (10th Cir. 2017)("Although the presence of two uniformed and armed officers does not automatically transform every police-citizen encounter into a nonconsensual one, it is a relevant factor."); <u>United States v. Jones</u>, 525 F.3d at 1242 (stating that an encounter with four agents did not weigh in favor of concluding that the suspect was seized where the officers were in plain clothes, did not brandish weapons, and spoke calmly).  The Court has reviewed the First Recording and the Second Recording, and they demonstrate that Zuercher and Clancy spoke to Woody throughout the interview in conversational and respectful tones.  <u>See</u> FOF ¶ 44, at 8.  Although a defendant is seized if he involuntary admits law enforcement officers into his home or admits officers under orders, <u>see</u> <u>United States v. Reeves</u>, 524 F.3d 1161, 1168 (10th Cir. 2008), the circumstances surrounding Woody's invitation to Clancy and Zuercher suggest that the invitation was not coerced.  Zuercher suggested that they talk somewhere more private, because

Woody's girlfriend was nearby when Zuercher arrived, see FOF ¶ 14, at 5, and Woody agreed, see FOF ¶ 17, at 5.  Zuercher did not threaten Woody or give him orders; Woody instead led the officers inside  See FOF ¶ 18, at 5.  See United States v. Flowers, 336 F.3d 1222, 1224 (10th Cir. 2008)(concluding that a defendant was seized when police ordered him to open the door in a firm voice); United States v. Maez, 872 F.2d 1444, 1447, 1449-50 (10th Cir. 1989)(concluding that a defendant was seized when ten officers, including a SWAT team surrounded his trailer with rifles and ordered him outside over loudspeakers).  Had Zuercher informed Woody that he was free to end the questioning at any time, it would have been, as Woody argues, "'strongly indicative of a consensual encounter.'"  April 25 Memo. at 4 (quoting United States v. Bloom, 975 F.2d at 1455 n.8).  Nevertheless, "[t]he Supreme Court has admonished, however, that an officer's failure to inform the defendant that she is free to leave, standing alone, does not make an encounter nonconsensual," and all the surrounding factors suggest the encounter was consensual.  United States v. Concepcion-Ledesma, 447 F.3d 1307, 1315 (10th Cir. 2006)(citing United States v. Drayton, 536 U.S. 194, 206 (2002)).

Even if a police encounter begins consensually, courts still must determine if the encounter became non-consensual.  See United States v. Lopez, 443 F.3d at 1284.  Woody first argues that the encounter became non-consensual, because Zuercher at one point told him: "I've got to know what happened that night."  See April 25 Memo. at 4; FOF ¶ 33, at 7.  He argues that this phrase reasonably communicated that Woody was not free to leave.  See April 25 Memo. at 4.  The Tenth Circuit has concluded that the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory" indicates that an encounter is no longer voluntary.  United States v. Concepcion-Ledesma, 447 F.3d at 1314.  Officers are allowed to speak with an authoritative tone of voice if they are not aggressive or threatening.  See United States v.

Benard, 680 F.3d at 1211.  See also Kaupp v. Texas, 538 U.S. 626, 631 (2003)(holding that the phrase "we need to go and talk" was coercive, where officers entered the defendants bedroom at 3 a.m., woke him up with a flashlight, and then led him handcuffed, mostly undressed, and shoeless to a patrol car); Hatheway v. Thies, 335 F.3d 1199, 1207 (10th Cir. 2003)(concluding that telling a defendant to "shut up," suggested that an interview was not consensual).  Zuercher's statement, while phrased imperatively, was spoken gently and politely rather than aggressively or threateningly.  See First Recording at 37:30-33; FOF ¶ 33, at 7.  It did not, therefore, suggest to a reasonable person that they were required to prolong the encounter.

Woody also argues that, because he was not at his own residence, Zuercher had a heightened need to inform Woody of his right to not answer questions.  See April 25 Memo. at 6. Woody does not support this argument with citations to cases that stand for this legal proposition. See April 25 Memo. at 6 (citing United States v. Caro, 248 F.3d 1240, 1248 (10th Cir. 2001); United States v. Little, 60 F.3d 708, 713-14 (10th Cir. 1995)).  The Tenth Circuit has stated that the location of an interview is important to the seizure analysis, and courts should look more leniently at an encounter occurring in an open public place.  See, e.g., United States v. Hernandez, 847 F.3d at 1264 (citing United States v. Lopez, 443 F.3d at 1284).  The encounter initially began outside in Woody's girlfriend's view.  See FOF ¶ 14, at 5.  Zuercher asked if Woody wanted to move somewhere else to talk, and Woody agreed.  See FOF ¶ 17, at 5.  Woody led Zuercher and Clancy inside his niece's home.  See FOF ¶ 18, at 5.  In these circumstances, the fact that the conversation occurred privately inside the home does not suggest coercion.  See United States v. Easley, 911 F.3d 1074, 1080 (10th Cir. 2018)(noting that, "when we speak of a coercive environment, we mean an environment that is the creation of law enforcement conduct").

Accordingly, the Court will not suppress Woody's April 25, 2018, statements to Zuercher and Clancy, and it will not suppress any evidence obtained as a result of those statements.

## II.   THE COURT WILL NOT SUPPRESS WOODY'S OCTOBER 23, 2018, <u>STATEMENTS</u>.

Woody asks the Court to suppress his October 23, 2018, statements.  <u>See</u> Oct. 23 Motion at 1.  He argues that "[a]n implicitly or explicitly coercive environment was subtly shaped by the government agents and their stealth conduct leading up to the interrogation of Mr. Woody," Oct. 23 Motion ¶ 20, at 6, and that his interview was a seizure that required McCaskill and Zuercher to read him his <u>Miranda</u> rights, <u>see</u> Oct. 23 Motion ¶¶ 23-24, at 6-7.  The Court will not suppress Woody's October 23, 2018, statements, because his confession was not the product of an unduly coercive environment, and because he was not seized within the meaning of the Fourth Amendment.

### A.   WOODY'S CONFESSION WAS NOT THE RESULT OF UNLAWFUL COERCION.

"To be admissible, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort."  <u>Griffin v. Strong</u>, 983 F.2d at 1542 (10th Cir. 1993).  "[E]ven if a defendant is not subject to custodial interrogation -- and therefore not entitled to <u>Miranda</u> warnings -- his incriminating statements, if involuntarily produced, are inadmissible."  <u>United States v. Cash</u>, 733 F.3d at 1280. The United States must show that the statement was voluntary by a preponderance of the evidence. <u>See</u> <u>Missouri v. Seibert</u>, 542 U.S. at 608 n.1; <u>Lego v. Twomey</u>, 404 U.S. at 489 ("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); <u>United States v. McCullah</u>, 76 F.3d at 1100.  Courts determine confessions' voluntariness based on the totality of the circumstances, which includes both the details of the interrogation and the

defendant's characteristics.  See United States v. Lopez, 437 F.3d at 1063.  Relevant factors

include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3)

the length and nature of the questioning; (4) whether the defendant was advised of his

constitutional rights; and (5) whether the defendant was subjected to physical punishment." United

States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002).

In this case, the factors that the Tenth Circuit has identified as relevant suggest that

Zuercher and McCaskill did not unlawfully coerce Woody into providing an involuntary statement.

First, Woody's background and education do not suggest he was unusually susceptible to coercion.

Woody has an eighth-grade education, but he appeared capable of answering Zuercher and

McCaskill's questions.  See FOF ¶ 100, at 15.  Woody's apparent understanding is enough to

neutralize his poor education.  Even where a defendant was "functionally illiterate," had an ability

to integrate information "at the retarded level," and was "psychologically inclined to acquiesce to

authority figures,"  the Tenth Circuit concluded that the defendant's background did not weigh in

favor of suppression where he appeared "capable of understanding the agents' questions and

assessing the risks of answering or declining to answer those questions." United States v. Lamy,

521 F.3d at 1260, 1262.

The other factors also do not suggest Woody was unduly coerced.  Woody was at the police

station for an hour and fifteen minutes, and he was allowed to leave after the interview.  See FOF

¶ 98, at 15.  The Court previously has concluded that interrogations of roughly the same length are

not so long as to be coercive.  See United States v. Salazar, 2020 WL 520941, at *37; United States

v. Martinez, 2006 WL 4079686, at *13-14.  The Tenth Circuit also allows prolonged questioning.

See, e.g., Carter v. Bigelow, 787 F.3d 1269, 1295 (10th Cir. 2015)(noting that questioning was not

unusually rigorous where a defendant was interrogated for eight to ten hours across two days).

McCaskill also reviewed Woody's constitutional rights with him, and McCaskill made sure that Woody understood them before proceeding.  See FOF ¶¶ 64-72, at 11-12.  Neither Zuercher nor McCaskill touched Woody other than to shake his hand; neither physically punished him.  See FOF ¶ 101, at 15.  Beyond these enumerated factors, Woody has not identified, and the Court does not see, any other unusually coercive behavior that warrants suppression.  See United States v. Salazar, 2020 WL 520941, at *38 (suppressing statements derived from improper threats to arrest the defendant's girlfriend, promises of leniency, and promises to protect him from violent threats against himself and his family).  Accordingly, the Court concludes that Woody's statements were not the result of unlawful coercion.

### B. WOODY'S OCTOBER 23, 2018, INTERVIEW WAS NOT A SEIZURE, AND WOODY KNOWINGLY WAIVED HIS RIGHTS NOT TO INCRIMINATE HIMSELF.

Woody also argues that his October 23, 2018, interview was a seizure, and the Court should suppress his resulting statements.  Although McCaskill reviewed with him an "Advice of Rights" form that laid out Woody's Miranda rights, Woody contends that the interview's structure was ambiguous and that it was not clear whether Woody had waived his Miranda rights once McCaskill decided he would not conduct a polygraph exam.  Oct. 23 Motion ¶ 19, at 6; Tr. at 113:17-21 (Hotchkiss).  Relatedly, Woody argues that Zuercher's statement, "[w]e'll call you in," did not suggest that Woody had any choice in whether to come for a follow-up interview and that the interrogation was custodial.  Tr. at 113:1-4 (Hotchkiss).  See Oct. 23 Motion ¶ 24, at 7.

Woody's October 23, 2018, encounter with Zuercher and McCaskill was voluntary and not custodial under the totality of circumstances.  Although some factors point in favor of concluding that Woody was in custody -- Zuercher told Woody that he would "call you in" for some follow-up questions, organized the interview at the Cuba Police Station, and spoke with him privately in

a separate room -- most factors suggest that Woody was not in custody.  See United States v. Jones, 701 F.3d at 1313; FOF ¶¶ 54, 61, at 10, 11.  For example, Zuercher and McCaskill were dressed in plain clothes and did not have visible weapons.  See FOF ¶ 58, at 10.  Woody made his first incriminating statements in a room alone with McCaskill.  See FOF ¶ 81, at 13.  Other than shaking his hand, Zuercher and McCaskill did not touch Woody during the interview.  See FOF ¶ 101, at 15.  McCaskill and Zuercher spoke in normal, conversational tones throughout the interview.  See FOF ¶ 89, at 14.  During the pre-interview, McCaskill told Woody that he was free to leave at any time.  See FOF ¶ 74, at 12.  Woody only spent one hour and fifteen minutes at the police station and left at the interview's end.  See FOF ¶ 98, at 15.  In light of these facts, and having carefully listened to audio recordings of Woody's confession, Woody was not in custody when he made incriminating statements on October 23, 2018.  See United States v. Jones, 701 F.3d at 1313.

Even if Woody was in custody, he had acknowledged and waived his Miranda rights. McCaskill carefully reviewed the Miranda waiver with Woody, and made sure that he clearly and unequivocally was waiving his rights.  See FOF ¶¶ 65-72, at 11-12.  Although Woody argues that he may have thought that the Advice of Rights form applies only to the polygraph portion of the interview, see Tr. at 113:17-21 (Hotchkiss), the form is unambiguous.  See Advice of Rights Form at 1; FOF ¶ 65, at 11.  The Advice of Rights Form is not limited to questions asked during a polygraph; it is prefaced by the line: "Before we ask you any questions, you must understand your rights."  Advice of Rights Form at 1.  Woody signed the form and then proceeded to incriminate himself.  See Advice of Rights Form at 1; FOF ¶¶ 65, 81, at 11, 13.  Thus, even if Woody was subject to a custodial interrogation, he knowingly waived his Miranda rights.  See United States v. Burson, 531 F.3d at 1256.  Accordingly, the Court will deny Woody's Oct. 23 Motion and will allow the United States to admit Woody's incriminating statements.

**IT IS ORDERED** that the Defendant's Motion to Suppress Statements by Defendant Made on April 25, 2018, filed May 20, 2019 (Doc. 51), is denied; and (ii) the Defendant's Motion to Suppress Statements by Defendant Made on October 23, 2018, filed May 20, 2019 (Doc. 53), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

John C. Anderson
  United States Attorney
Raquel Ruiz-Velez
David Patrick Cowen
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Todd B. Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

      *Attorney for the Defendant*