**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                 No. CR 18-3902 JB

FRANCIS WOODY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant's Sentencing Memorandum, filed November 15, 2019 (Doc. 137)("Sentencing Memo"); (ii) the Addendum to Defendant's Sentencing Memorandum, filed March 13, 2020 (Doc. 149)("Sentencing Addendum"); and (iii) the United States Sentencing Memorandum, filed March 13, 2020 (Doc. 146)("U.S. Sentencing Memo"). The Court held a sentencing hearing on May 27, 2020. See Clerk's Minutes at 1, filed May 27, 2020 (Doc. 151) The issue is whether the Court should vary downward and sentence Defendant Francis Woody ("Woody") to the mandatory minimum sentence of thirty years of incarceration, or whether the Court should sentence Woody to the sentence that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") recommends -- life in prison. Having weighed carefully the factors in 18 U.S.C. § 3553(a), the Court determines that a life sentence is appropriate, because any lesser sentence would not be sufficient to reflect the factors in 18 U.S.C. § 3553(a) and to comply with the purposes of 18 U.S.C. § 3553(a)(2).

## FACTUAL BACKGROUND

The Court takes its facts from the Second Presentence Investigation Report, filed March 6, 2020 (Doc. 145)("PSR"), the Sentencing Memo, the Sentencing Addendum, and testimony given at trial. Woody was born in Crownpoint, New Mexico, on the Navajo Reservation in 1959. See

PSR at 3 (no paragraph numbering).  His father was Frank Woody, and his mother was Laura Woody.  See PSR ¶ 70, at 14.  Woody's parents are both deceased.  See PSR ¶ 70, at 14.  He is one of twelve children.  See PSR ¶ 71, at 14.  Woody had a good relationship with his family throughout his childhood, and "denied any verbal, physical, or sexual abuse," although his father used spanking "as a method of discipline."  PSR ¶ 72, at 14.  Woody grew up in a home without running water or electricity, and assisted his family with hauling water and wood, as well as caring for livestock, beginning at age eleven.  See PSR ¶ 72, at 14.  Woody completed the seventh grade, but he "struggled with school and the family needed help at home, so he chose to stop attending school."  PSR ¶ 84, at 16.  He never attained a GED or high school diploma equivalent, although he obtained a plumbing certification.  See PSR ¶ 84, at 16.  Growing up, Woody enjoyed riding horses; he "learned how to break horses at the age of 14 and was even offered to be paid from others for this service and skill."  PSR ¶ 74, at 15.  Woody later left home at age nineteen.  See PSR ¶ 73, at 15.  Woody has a criminal history including "battery and alcohol related offenses." U.S. Sentencing Memo at 6.

Woody has twelve children with two women.  See PSR ¶ 78, at 15.  His first relationship lasted eleven years, and his second relationship lasted five to six years.  See PSR ¶ 78, at 15.  His third significant relationship ended after his arrest in this case.  See Sentencing Memo at 4.

Woody has had two significant periods of employment.  See PSR ¶ 85, at 16.  First, he worked as a machinist for Union Pacific Railroad from 1976 through 1997.  See PSR ¶ 85, at 16. Subsequently, Woody worked at Navajo Engineering and Construction Authority from 2002 through 2011.  See PSR ¶ 85, at 16.  Since 2011, Woody has "earned income by completing 'side jobs.'"  PSR ¶ 85, at 16 (no citation for quotation).  He has one account in collections, amounting to $3,670.00.  See PSR ¶ 87, at 16-17.

Jane Doe 1 and Jane Doe 2, Woody's stepdaughters, both reported that Woody had sexually assaulted them in Indian Country.  See PSR ¶ 6, at 4; PSR ¶ 7, at 4 (stating that Jane Doe 1's mother was married to Woody).  First, around October 29, 2016, Jane Doe 1's father "noticed that Jane Doe 1 looked like something was bugging her, she was shying away when she is not usually shy."  PSR ¶ 7, at 4.  Jane Doe 1 told her father "something that prompted him to take her to the hospital on October 31, 2016."  PSR ¶ 7, at 4.   Jane Doe 1's doctor "did not observe any injuries on Jane Doe 1's vaginal area," but testified that "it is possible not to find physical injuries on patients that have been sexually abused," and "if the last incident of sexual abuse occurred a month prior to the medical examination, it is possible that if Jane Doe 1 sustained any injuries, the injuries could have healed."  PSR ¶ 8, at 5.  Jane Doe 1's mother was married to Woody at the time she disclosed the sexual abuse to her father.  See PSR ¶ 7, at 4.  Jane Doe 1 also lived with Woody while her mother was married to him and testified at trial that:

> when she was in first grade, seven years old, the defendant touched her private part that she uses to pee with his fingers, while she was sleeping.  She woke up and saw the defendant touching her.  Jane Doe 1 testified she felt the defendant's finger moving inside her vagina.  Jane Doe 1 testified that the defendant touched her more than once and the defendant told her not to tell anyone.  Jane Doe 1 also testified that on October 29, 2016, she told her dad about the sexual abuse because she was tired of holding in the information.

PSR ¶ 9, at 5 (summarizing trial testimony).

The Federal Bureau of Investigations ("FBI") interviewed Woody about Jane Doe 1's allegations on April 25, 2018.  See PSR ¶ 10, at 5.  Initially, the Defendant denied that he had molested Jane Doe 1.  See PSR ¶ 12, at 6 (documenting that Woody told the FBI agent "why should I do that . . . .  I mean, she's a baby").  Next, Woody discussed his "troubled relationship with Jane Doe 1's mother" with the FBI agent.  PSR ¶ 13, at 6.  Woody informed the FBI agent that Jane Doe 1's father had damaged a Hogan -- a traditional Navajo dwelling -- on Woody's

property because, as Woody explained, "I guess he heard that . . . I was molesting his daughter."

PSR ¶ 13, at 6.  When the FBI agent again asked Woody about Jane Doe 1's sexual abuse

allegations, Woody stated that "maybe I did it when I was drunk," but, he later maintained that he

did not drink when children were in the home.  PSR ¶ 13, at 6.  Subsequently, Woody admitted

that Jane Doe 1 "would not fabricate the sexual abuse allegations" and stated that Jane Doe 1 "was

not a liar."  PSR ¶ 14, at 6.  Woody informed the FBI agent that he wished to apologize to Jane

Doe "for, you know, what happened, I guess."  PSR ¶ 14, at 6.

Eventually, Woody admitted directly to sexually abusing Jane Doe 1.  See PSR ¶ 15, at 6.

Specifically, Woody stated that he had penetrated Jane Doe 1 using his middle finger.  See PSR

¶ 15, at 6.  The FBI agent asked Woody "to draw a line indicating how far he digitally penetrated

Jane Doe 1 and he drew a line and initialed the drawing."  PSR ¶ 15, at 6-7.  Woody also wrote an

apology letter to Jane Doe 1.  See PSR ¶ 16, at 6-7.

Jane Doe 2, twenty-seven years old at the time of Woody's trial, also maintained that

Woody had sexually abused her when she was six years old.  See PSR ¶ 17, at 7.  Jane Doe 2 stated

that

> when she lived with the defendant during her mother's marriage to the defendant,
> the defendant sexually abused her.  Jane Doe 2 testified that the sexual abuse would
> occur in various forms such as "the touching games," "the horsey ride," and the
> defendant would touch her private parts and would make her touch his private parts.
> There was one incident, (Count 2 of the Indictment) when Jane Doe 2 was six years
> old.  She was sleeping in her bed with her arm extended out and she woke up when
> she felt and saw the defendant had put her hand on his penis and was using it to
> masturbate himself.  Jane Doe 2 testified that she did not tell anyone about what the
> defendant was doing to her because she did not want anyone to know that about
> her.

PSR ¶ 17, at 7 (summering and quoting trial testimony).

On October 23, 2018, the FBI interviewed Woody about Jane Doe 2's allegations at the

New Mexico State Police Station in Cuba, New Mexico.  See PSR ¶ 19, at 7.  During the interview,

Woody denied that he "had ever touched Jane Doe 2 on her vagina, on her breasts, or anywhere else on her body . . . in a way that was sexual." PSR ¶ 20, at 7. Woody admitted, however, that he had used Jane Doe 2's hand to touch his penis on two occasions while she was sleeping. See PSR ¶ 20, at 7-8. Woody "admitted that he did these acts for his own sexual gratification." PSR ¶ 22, at 8. After the interview, Woody also wrote a letter apologizing to Jane Doe 2. See PSR ¶ 22, at 8.

The USPO conducted an interview with Jane Doe 2 on October 17, 2019. See PSR ¶ 26, at 8. Jane Doe 2 indicated that the sexual abuse has had a lasting effect on her life. See PSR ¶ 26, at 8-9. Jane Doe 2 told the USPO:

> Although an outgoing person, she has trust issues, particularly with relationships. She has a general distrust of people and a paranoia about people's motives. She struggles with stress and her coping skills. When she is in a stressful situation, she "shuts down" as a way to protect herself. She has Post Traumatic Stress Disorder (PTSD) and struggles with sleep terrors and nightmares. She has a hatred toward older men and attributes that to the abuse she endured by the defendant. She struggles with depression and anxiety. She has chosen to block out memories of the abuse, but unfortunately, this has also meant that she is missing childhood memories. She has experienced shame and blamed herself for what happened to her at the hands of the defendant.

PSR ¶ 26, at 8-9 (summarizing Jane Doe 2's statements to USPO). Jane Doe 2 also informed the USPO that testifying was stressful for her. See PSR ¶ 27, at 9. Jane Doe 2 stated that she believes Woody deserves the maximum punishment available. See PSR ¶ 28, at 9. She also said that Woody "has ruined my life. He is a liar and I hate him." PSR ¶ 28, at 9. She explained that because "she has had her childhood taken from her . . . it is only fair that he receives maximum penalty." PSR ¶ 28, at 9. Subsequently, Jane Doe 2 stated that she has had to leave her community because Woody's family members have threatened her. See PSR ¶ 29, at 9. She is attending therapy and requests restitution. See PSR ¶ 29, at 9. Jane Doe 2 indicated that "she is working through her trauma but it has not been easy reliving the nightmare that encompassed her life for

ten years."  PSR ¶ 29, at 9.  While more than a decade has passed since the abuse, "Jane Doe 2

feels the victimization happened yesterday."  See PSR ¶ 29, at 9.

Jane Doe 2 elaborated upon the abuse that she suffered during her testimony at trial.  The

abuse began when Jane Doe 2 was four or five years old.  See Transcript of Jury Trial (held May

27, 2020) at 260:20-24 (Doe)("Trial Tr.").  Woody would watch Jane Doe 2 while she changed

clothing or took a shower.  See Trial Tr. at 261:7-8 (Doe).  On one occasion, when Jane Doe 2 was

showering, she "noticed that there was a hole drilled underneath the shower head, and" Woody

"was on the other side and I saw him."  Trial Tr. at 272:7-11  (Doe 2).  Woody also watched Jane

Doe 2 change her clothing through the cracked door.  See Trial Tr. at 272:13-17 (Doe 2).  Woody

would make Jane Doe 2 play a "tickle fight game" with him "just so he could put his penis on my

butt and I could feel it the entire time in front of my family."  Trial Tr. at 270:19-271:2 (Doe).

During the "horsey ride game," Woody "would face up towards the ceiling and" Jane Doe 2

"would sit on his stomach penis area and he would move up and down and say . . . that I need to

hang on so I didn't fall off."  Trial Tr. at 269:11 (Doe).  Woody also offered to allow Jane Doe 2

to ride his horse if she would show him her vagina; she showed him her vagina and he allowed her

to ride the horse.  See Trial Tr. at 271:13-272:4 (Doe 2).  Similarly, after Jane Doe 2 reached

puberty, Woody "would hug me as my breasts started to come out and he would hug me extra tight

to rub and feel my boobs."  Trial Tr. at 270:16-18 (Doe).

Jane Doe 2 also described how Woody touched her vagina over the clothes when she was

six years old.  See Trial Tr. at 261:17-19 (Doe 2); PSR ¶ 20, at 7.  Specifically, Woody "woke up"

Jane Doe 2 "every morning that he was home" by rubbing her vagina.  Trial Tr. at 267:20-25

(Doe).  As a result of the abuse, and because Woody would sexually abuse Jane Doe 2 while she

was sleeping, Jane Doe 2 "found a sleeping bag with zippers. And I would lay on top of the zipper.

That way if he was trying to wake me up, he couldn't get in unless he had to move me, meaning I had to wake up."  Trial Tr. at 266:16-20 (Doe).  Jane Doe 2 also would lock her bedroom door to prevent Woody from entering, "but he convinced my mom to change the locks."  Trial Tr. at 266:22-24 (Doe).  In addition, Woody encouraged Jane Doe 2's brothers to move away from the home.  See Trial Tr. at 266:24-267:2 (Doe).  After Woody would abuse Jane Doe 2, he would ask her not to tell her mother because "she would be upset if she found out."  Trial Tr. at 273:13-20 (Doe 2).  Finally, the day Jane Doe 2 and her mother moved out of Woody's house, "he came into the bedroom and got under the blankets with me," and Jane Doe 2 "just started kicking, and I pushed and eventually he left."  Trial Tr. at 268:13-18 (Doe).

## PROCEDURAL BACKGROUND

On July 9, 2019, a Superseding Indictment was filed charging Woody with the following offenses: (i) Count 1: Aggravated Sexual Abuse, in violation of 18 U.S.C. § 1153, 18 U.S.C. § 2241(c) and 18 U.S.C. § 2246(2)(C); and (ii) Counts 2-3: Abusive Sexual Contact in violation of 18 U.S.C. § 1153, 18 U.S.C. § 2244(a)(5) and 18 U.S.C. § 2246(3).  See PSR ¶¶ 1-2, at 4.  Count 1 occurred on or between March 18, 2015, and October 4, 2016.  See PSR ¶¶ 1-2, at 4.  Count 2 occurred on or between May 1, 1999 and November 30, 2002. See PSR ¶¶ 1-2, at 4.  Both offenses took place in Sandoval County, New Mexico.  See PSR ¶¶ 1-2, at 4.  On August 23, 2019, a jury convicted Woody of all three counts.  See Verdict at 1, filed August 23, 2019 (Doc. 133).

1.    **The PSR.**

Regarding Count 1, the PSR states that Woody's base level offense is 38.  See PSR ¶ 33, at 9 (citing U.S.S.G. § 2A.3).  The PSR adds two offense levels because Jane Doe 1 was "in the custody, care, or supervisory control of" Woody.  U.S.S.G. § 2A.3(b)(3)(A).  See PSR ¶ 34, at 10.  The PSR adds an additional two levels because Woody "kn[e]w or should have known that" Jane

Doe 1 "was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). See PSR ¶ 35, at 10. The PSR calculates Woody's offense level for Count 1, therefore, as 42. See PSR ¶ 38, at 10.

The PSR conducts identical calculations for Count 2 and Count 3. See PSR ¶¶ 39-52, at 10-11. The PSR states that the base level offense for Counts 2 and 3 is 16. See PSR ¶ 39, at 10 (citing U.S.S.G. § 2A3.4(a)(2)). The PSR adds six levels, because Jane Doe 2 was under twelve years old when the offenses occurred. See PSR ¶ 40, at 10 (citing U.S.S.G. § 2A3.4(b)(1)). The PSR adds an additional two levels because Jane Doe 2 "was in the custody, care, or supervisory control of" Woody. U.S.S.G. § 2A3.4(b)(3). See PSR ¶ 42, at 10. Last, the PSR adds two levels because Woody "kn[e]w or should have known that" Jane Doe 2 "was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). See PSR ¶ 42, at 10. Accordingly, the PSR assesses an offense level of 26 for both Count 2 and Count 3. See PSR ¶¶ 45, 52, at 10-11.

Evaluating Counts 1, 2, and 3, the PSR determines that the combined adjusted offense level is 42. See PSR ¶ 56, at 11. The PSR adds five levels to this assessment, because Woody is a "repeat and dangerous sex offender against minors." U.S.S.G. § 4B1.5. See PSR ¶ 57, at 11. The PSR calculates the total offense level as 43, because, "in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43." PSR ¶ 59, at 11. The PSR also notes that Woody's criminal history score is 0, and that, therefore, Woody's criminal history category is I. See PSR ¶ 64, at 12. The PSR states that, considering Woody's offense level of 43 and criminal history category of I, the guideline imprisonment range is life. See PSR ¶ 90, at 17. Last, the PSR concludes that the USPO "has not identified any factors that would warrant a departure from the applicable sentencing guideline range." PSR ¶ 107, at 19.

### 2. The Sentencing Memo.

In the Sentencing Memo, Woody asks the Court to sentence him to 30 years of

imprisonment.  See Sentencing Memo at 1.  Woody notes that he was released from custody to La

Pasada Halfway House, in Albuquerque, New Mexico, and "was compliant with all conditions of

release for months."  Sentencing Memo at 2.  Woody then summarizes the PSR.  See Sentencing

Memo at 3-5.  Woody continues that the Court should

> sentence him to 30 years of incarceration, a 5-year term of supervised release,
> assess no fine, enter an order regarding restitution when there are presently no
> claims for restitution, and order the $300.00 special penalty assessments.  Mr.
> Woody had never been in jail before his incarceration in this case.  At his age of
> 60, 30 years in prison is a substantial and uniquely difficult term to complete, and
> may well be a life sentence, serves punitive goals, and is proportional to similarly
> situated defendants.  30 years will ensure that the child victim in this case will be
> able to be free from him for a substantial period of time, taking the Jane Doe 1 well
> into adulthood, and Jane Doe 2 well beyond middle age.

Sentencing Memo at 6.  Accordingly, Woody insists that a thirty-year sentence "will be sufficient

but not more than necessary" under 18 U.S.C. § 3553(a)(2)(D).  Sentencing Memo at 6-7.

### 3.     The U.S. Sentencing Memo.

The United States argues that Woody's crimes merit a life sentence.  See U.S. Sentencing

Memo at 4.  The United States notes that Woody "systematically preyed on his stepdaughters, Jane

Doe 1 and Jane Doe 2, while they were children under the age of twelve years and residing with"

Woody.  U.S. Sentencing Memo at 4.  The United States avers that Woody sexually abused his

stepdaughters for approximately seventeen years.  See U.S. Sentencing Memo at 4.  The United

States notes that, while Woody was charged with only one count of aggravated sexual abuse of a

child, Jane Doe 1 "recounted that Defendant sexually abused her more than once."  U.S.

Sentencing Memo at 4.  Similarly, the United States contends that, although Woody was charged

with only two counts of abusive sexual contact with Jane Doe 2, Jane Doe 2 testified that Woody

abused her for approximately ten years, beginning when she was five years old.  See U.S.

Sentencing Memo at 4-5.

The United States emphasizes that Woody's offenses "forever changed the lives of his victims."  U.S. Sentencing Memo at 4.  The United States contends that, when Jane Doe 1 identified Woody at trial, her "body started to tremble and she could not contain her tears.  It was evident to those who were present that Defendant's conduct has greatly traumatized Jane Doe 1." U.S. Sentencing Memo at 5.  Likewise, Jane Doe 2 states that "her entire life . . . has been affected by Defendant's criminal conduct."  U.S. Sentencing Memo at 5.  The United States also explains that Woody's offenses were opportunistic, because he "deliberately abused the girls when they were sleeping and their mothers were asleep or not in the home."  U.S. Sentencing Memo at 5. Consequently, the United States concludes that Woody's "criminal conduct warrants a guideline sentence of lifetime incarceration."  U.S. Sentencing Memo at 5.

Next, the United States notes that, although Woody's criminal history category is I, he has a history of "battery and alcohol related offenses."  U.S. Sentencing Memo at 6.  The United States insists that Woody's "criminal history demonstrates that he had other encounters with the criminal justice system and these encounters have not persuaded him to comply with the law."  U.S. Sentencing Memo at 6.  The United States thus argues that the Court should consider Woody's prior criminal history.  See U.S. Sentencing Memo at 6 (citing United States v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005)).

The United States continues that the thirty-year sentence Woody requests "applies only to Count 1 of the Superseding Indictment.  A sentence of 30 years of imprisonment would not consider Defendant's criminal conduct for the sexual abuse of Jane Doe 2."  U.S. Sentencing Memo at 6.  Moreover, the United States argues that the 18 U.S.C. § 3553 factors support a lifetime sentence.  See Sentencing Memo at 6.  The United States contends that a life sentence "would promote respect for the law, provide just punishment, provide for adequate deterrence, and most

significantly, protect the public from any future crimes of Defendant."  U.S. Sentencing Memo at 6.

Last, the United States argues that the Court should impose a lifetime term of supervised release.  See U.S. Sentencing Memo at 7.  The United States notes that "recidivism rates for sex offenders 'do not appreciably decline as offenders age.'"  U.S. Sentencing Memo at 7 (citing H.R. Rep. No. 107-527, at 2 (2002)).  Accordingly, the United States concludes that a lifetime term of supervised release "is reasonable and appropriate in this case to attempt to achieve rehabilitation and to protect other children from further victimization."  U.S. Sentencing Memo at 7.

### 4.    The Sentencing Memo Supplement.

Woody supplemented the Sentencing Memo to include two letters that Woody's counsel received from Woody's brothers.  See Sentencing Supplement at 1.  The first letter states that Woody "is a good man, who has a good personality and is a humorous guy."  J. Woody Letter at 1 (dated October 14, 2019), filed May 18, 2020 (Doc. 149-1).  The J. Woody Letter continues that Woody "has always been my inspiration in many ways.  He persuaded me to accomplish many important task[s] in my life and ha[s] followed through to make my life easier and better."  J. Woody Letter at 1.  The letter also avers that Woody "is a hard-working man, whom I worked with on the Union Pacific Railroad.  He did his job well."  J. Woody Letter at 1.  The J. Woody Letter concludes that Woody "has good behavior and respects people and his family [and] I wish he was among us still.  Please find in your heart that we love my brother."  J. Woody Letter at 1.  Similarly, the second letter states that Woody "is a good man.  Mr. Woody has children[] and grandchildren[] which he dearly love and care for them.  He likes to help out by hauling woods, working on vehicles, . . . and helping around the house.  He is a loving and caring person."  R. Woody Letter at 2 (dated October 15, 2019), filed May 18, 2020 (Doc. 149-1).

5.      **The Sentencing Hearing**.

The Court held a Sentencing Hearing on May 27, 2020.  <u>See</u> Clerk's Minutes at 1.  The USPO and Woody agreed that Woody's Guideline's sentence range is a life sentence.  <u>See</u> Transcript of Hearing at 3:10-19 (taken May 27, 2020)(Court, Hotchkiss)("Tr.").[1]  Woody spoke first and contended that he "faces perhaps the most substantial mandatory minimum under the U.S. code" of thirty years.  Tr. at 4:1-4 (Hotchkiss).  Woody noted that he has never been imprisoned before the current charges and that he "was in complete compliance while released to the halfway house" while awaiting trial.  Tr. at 4:5-15 (Hotchkiss).  Woody insisted that the Guidelines are advisory, and that the thirty-year statutory mandatory minimum sentence that he requests meets 18 U.S.C. § 3553(a)'s purposes.  <u>See</u> Tr. at 4:16-20 (Hotchkiss).  Woody also argued that he cannot afford to pay a fine, because he has no assets and approximately $3,600.00 in debt.  <u>See</u> Tr. at 4:21-25 (Hotchkiss).

Woody then discussed his personal characteristics, contending that he is a "good family member supporting his family."  Tr. at 5:8-23 (Hotchkiss).  Woody also maintained that he is a hard worker with a strong work ethic.  <u>See</u> Tr. at 6:1-9 (Hotchkiss)(noting that "all told he worked 30 years").  Woody then asked the Court to recommend to the Bureau of Prisons ("BOP") that Woody serve his sentence at FCI Safford in Safford, Arizona, because it is closer "to his family who live on the Navajo reservation, and Mr. Woody has lived his entire life on the Navajo Reservation, and there is a significant population at that facility."  Tr. at 6:20-7:4 (Hotchkiss).  The Court asked Woody if he would like to speak on his own behalf, and Woody stated: "I have nothing to say."  Tr. at 7:10-17 (Court, Woody).

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

The United States then asked the Court to impose a life sentence.  See Tr. at 8:3-6 (Ruiz-Velez).  The United States noted that any sentence below life would be a downward variance, and "there is no justification to vary from the guideline range."  Tr. at 8:9-13 (Ruiz-Velez).  The United States argued that Woody's sexual abuse "spanned approximately seventeen years," and "will have a lifelong affect on Jane Doe 1 and Jane Doe 2."  Tr. at 8:19-21 (Ruiz-Velez).  The United States emphasized that, because Woody "has not accepted responsibility for his actions . . . , as a result Jane Doe 1 and Jane Doe 2 had to endure the trauma of recounting the worst moments of their life during trial."  Tr. at 9:2-6 (Ruiz-Velez).  Although Woody has a Criminal History score of I, the United States insisted that "his criminal history does not accurately capture the predator that the Defendant is.  His criminal conduct was opportunistic by abusing children when they were vulnerable, but moreover they were children who trusted in him and considered him as a father."  Tr. at 9:8-13 (Ruiz-Velez).  The United States also noted that defendants who have sexually abused children are likely to re-offend and maintained that age does not eliminate this threat.  See Tr. at 10:1-7 (Ruiz-Velez).  Accordingly, the United States asked the Court to impose a life sentence on Woody, because it "will avoid a sentencing disparity among situated Defendants," because it will and "deter others from similar conduct."  Tr. at 10:8-12 (Ruiz-Velez).

Jane Doe 1's father and step-mother spoke next, and read a letter that Jane Doe 1 wrote.  See Tr. at 11:1-4 (Doe).  Jane Doe 1 "wrote a letter about everything that affected her . . . , her lifestyle and her activities."  Tr. at 11:6-7 (Doe).  Jane Doe 1 explained that

> throughout my day I have to stop and think of what happened to me as a kid is over and it hurts, it makes me sad because I  was a kid and I still am.  I have to think about it and recover which I hate.  I still do things I used  to.  I still laugh, I still run, I still draw, and I  can still dance and sing, but I have to stop in the middle of it all just to tell myself it's okay, he's not here, he's not watching.

Tr. at 11:5-15 (Doe).

- 13 -

Next, Jane Doe 1 wrote about how the sexual abuse "affected her relationship with family and friends." Tr. at 11:16-17 (Doe). Jane Doe 1 wrote that "my family is my family. I love them, and as always, they have protected me from day one. But my mom . . . I have to be careful because I love her but I don't like how she let everything happened. She believed him instead of me." Tr. at 11:19-22 (Doe). Regarding school, Jane Doe 1 wrote that "there's times in school where I do have to think of what happened. I'm at school. Why am I thinking of this here? I do not and I'm not paying attention because my thoughts are stuck." Tr. at 11:24-12:2 (Doe).

Jane Doe 1 continued:

> I can't even say his name. I have to. And when I do, I have to tell myself it's flashbacks and I'm okay. I wonder why my mom married him in the first place. I have to go to therapy because of him and I don't like what he did to me. And if my mom didn't meet him, I would have been still able to see him and my grandma, so I don't like him not one bit. He practically ruined me and my brothers' visits with my mom. We can now only see her one or twice a month. Other reasons why I don't like him because I have thoughts that I can't get out of my head and they hurt. I messed up my mind because of him and I don't like it. I watch stuff and I'm not supposed to watch, and I hate myself for it. I feel like it's my fault and I really want them to stop. I feel like I'm not normal. I want to be a girl who doesn't have to go through this. I also feel that I have set my parents watching this and I want it all to go away and leave me alone. And sometimes I stress about this. I don't show it, but I am. I shouldn't be stressed or depressed. I'm barely twelve and now the only thing that I keep my mind off is music. Music helps me because my favorite singers are inspirational and they help through tough times like now. They help me because they get my mind off everything and I just sing and dance but I guess this time they didn't help.

Tr. at 12:4-13:20 (Doe). Jane Doe 1's stepmother said that her stepdaughter "is a good student. She works very hard to keep her grades up, but she has this dark side of her that holds her back." Tr. at 14:10:14 (Doe). Jane Doe 1's stepmother told Woody; "I hope you know what you did to [Jane Doe 1], Francis, you know what you did. She's growing up and she's understanding a lot of what happened to her . . . . I don't know how long it's going to take for her to heal, but you hurt her a lot." Tr. at 14:15-20 (Doe).

Next, Jane Doe 2 addressed the Court.  She stated:

I'm 27 years old now.  For 10 years, my life was turned upside-down by Francis Woody.   He was supposed to take care of me.  He was supposed  to protect me. He was supposed to help me grow.  But instead I was molested, tortured, trapped, and unable to embrace myself as a woman.  And what it meant to  be to be a woman. My understanding of the world was altered, and I suffered 23 years trapped in my own mind and in my own body.  I suffered from depression,  paranoia, anxiety, I continue to have PTSD where I have nightmares.  And in my nightmares I am suffering  all over again everything that he's done to me.  I have to go to therapy for things that I shouldn't have to go to therapy for.  I didn't choose anything in this life that he put me through.  I should be out there living my life, but instead there are moments where I have to stop and make time to fix what he broke inside of me. I have to fight for my own life because there are times when these  flashbacks just won't stop and I don't want to think about it and sometimes the only way out I feel is to just end it in my own life now.  Something as simple as wearing beautiful  girl clothing, blouses, those are hard for me.  Having people stair at me, those things are hard for  me.  My connection with other people has been affected.  I knew from the time that I was little  that I didn't want this to ruin me, though.  I worked  hard in more ways than one to become successful and to even sure that my life did not go wrong and turn  for the worse.  I didn't want him to be the life had failed.  I knew once again I would face Francis again, but it would be in court.  It's because of a brave little girl named [Jane Doe 1] who stood up.  She gave me strength to stand up for the little girl who couldn't stand up.  I know we're not the only victims of Francis Woody, but we are here to bring justice for them, ourselves, and any other girl who has survived people like him.  Francis you may have preyed on me and all of us when we were helpless and young, but you forget who raised me.  My mother raised a strong woman.  I am not that little girl anymore who is weak.  You can't even look me in the eye for the things that you've done.  As a traumatized child, I prayed for somebody to save me from my own nightmare.  Never did I think it would be me as an adult now.  I hope you suffer every moment in that jail because I suffered for 23 years and I will continue to do that.  You deserve to be where you're at.  Shame on you for everything that you've ever done to any of these girls. You are pathetic.  Thank you.

Tr. at 15:18-17:20 (Doe).

Next, the Court imposed a sentence.  See Tr. at 19:20-25 (Court).  The Court reiterated that Woody's offense level is 43, his criminal history category is I, and the Guidelines' imprisonment range is life.  See Tr. at 201:1-4 (Court).  The Court explained that it had identified "about twenty-two, twenty-three factors that put downward pressure on the Guidelines' sentence to the requested mandatory minimum."  Tr. at 17:19 (Court).  The Court noted that Woody's lack of significant

prior criminal history "gives the Court a great deal of concern." Tr. at 20:20-22 (Court). The Court also addressed Woody's good behavior on supervised release. See Tr. at 20:20-25 (Court). The Court noted that, given Woody's current age, the debate between the United States and Woody "may be moot . . . whether it's the mandatory minimum" sentence of thirty years, or "life is probably going to put him well beyond any sort of actuarial life span for a male in New Mexico." Tr. at 21:4-11 (Court). The Court noted that it was "impressed with Mr. Woody's work ethic . . . which always gives the Court encouragement that he can rehabilitate and do well." Tr. at 21:20-24 (Court). The Court also discussed Woody's close family relationships. See Tr. at 21:25-22:3 (Court). The Court concluded that "the general rule that age reduces recidivism" for sex offenders "still continues to put some downward pressure" on Woody's sentence. Tr. at 22:8-11 (Court).

Next, the Court discussed factors that put upward pressure on Woody's sentence, noting that it had "identified about 53 of those." Tr. at 22:15 (Court). First, the Court explained that "Congress has recognized this as a serious crime, so the Court has to be very cautious about varying form the Guidelines." Tr. at 22:22-24 (Court). The Court continued that it "agree[s] with the Government that the nature and circumstances of the crime are particularly noteworthy in this case." Tr. at 22:25-23:3 (Court). Regarding Jane Doe 2's statements, the Court explained that "you can hear the suffering in her voice and her remarks. The suffering of the victims here is a considerable factor that puts upward pressure . . . . You wonder what could have been without Mr. Woody doing the things that he did." Tr. at 23:10-17 (Court). The Court also emphasized that "there has been testimony that there have been more than three instances" of sexual abuse "over a considerable amount of time, double digit years." Tr. at 24:11-16 (Court). The Court also discussed "the fact that he didn't accept responsibility and forced these young ladies to endure

testifying is something that has not helped in bringing things to some closure." Tr. at 24:19-23

(Court). The Court continued that Jane Doe 1's letter "underscores the seriousness of the offense."

Tr. at 25:2-11 (Court). Last, the Court discussed the harm that Woody's actions have caused to

Jane Doe 1's relationship with her mother, as well as "tension . . . on the reservation . . . the specter

of bullying going on and split families. The families have paid a lot for what Mr. Woody did for

a few moments of pleasure. It has been very destructive not only to the girls' lives, but for the

families." Tr. at 25:12-25 (Court).

Consequently, the Court explained that the factors placing upward pressure on Woody's

sentence overwhelm the factors placing downward pressure on his sentence. See Tr. at 26:1-7

(Court). The Court concluded that "I carefully considered the defendant's request for a thirty-year

mandatory minimum. In some ways, I think it might be enough given that it's going to put him

out very old man, but nonetheless, I just simply couldn't justify it with the § 3553(a) factors." Tr.

at 26:10-14 (Court). The Court did not impose a fine, because of Woody's lack of financial

resources. See Tr. at 31:7-9 (Court). The Court also recommended that Woody be imprisoned at

Safford FCI because "I think probably being close to his family is more important than the sex

treatment given a lifetime sentence." Tr. at 32:8-11 (Court).[2] The Court advised Woody of his

rights on appeal, and Woody indicated that he understood those rights. See Tr. at 32:19-33:11

(Court, Woody).

## **LAW REGARDING THE GUIDELINES**

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States

of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-

---

[2]Sex offender treatment is not available at Safford FCI, the facility where Woody asked
the Court to request that he be placed.

473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising

the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact,

including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors

that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past,

in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18

U.S.C. § 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective
> manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the offense' nature and the nature of the defendant's character; (iii) the

available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit

similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States

Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C.

§ 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the

- 19 -

advisory[3] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

---

[3]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

> . . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-

552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate,

---

Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." Koon v. United States, 518 U.S. 81, 106 (1996). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. at 92. Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue . We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented the seriousness of his criminal history and the likelihood that he would commit other crimes. See 877 F. Supp. 2d at 1044-45. The Court noted that Jim's criminal history included: (i) two DWI convictions; (ii) a

conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child. See 877 F. Supp. 2d at 1044-45. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim. See 877 F. Supp. 2d at 1022-23, 1044-45.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. 877 F.Supp.2d at 1044-45.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service. See 2011 WL 831279, at *3.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover.  The Court noted that in many child pornography cases, such as Jager's, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately.  Jager's case was thus not distinguishable from other defendants sentenced under the Guidelines.  Additionally, Jager was not in intense combat during his military career, most of his time was spent in the support role of a mechanic.  The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure.  See 2011 WL

831279, at *10-11.

## ANALYSIS

In 18 U.S.C. § 3553(a), Congress instructs courts to consider a number of factors when imposing a sentence.  In Woody's case, these factors indicate that the Court should impose the Guidelines sentence of life.  See Tr. at 26:1-5 (Court)(explaining that, "after careful consideration of the factors, it appears the factors that put upward pressure to keep this sentence in the Guidelines range overwhelm any factors that put downward pressure on the sentence"); 18 U.S.C. § 3553(a). This sentence is "sufficient but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2).  18 U.S.C. § 3553(a).  Accordingly, the Court sentences Woody to life imprisonment.

The Court has considered the Guidelines, and, in arriving at its sentence, has taken account of the Guidelines with other sentencing goals.  Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant.  The Court concludes that the punishment set forth in the Guidelines is appropriate for this sort of offense.  It has considered the kinds of sentence and remedies that the Guidelines establish.  The Court concludes that a sentence of life in prison reflects the offense's seriousness, promotes respect for the law, provides just punishment, affords adequate deterrence both at a specific and general level, protects the public, avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and effectively provides the defendant with needed education, training and care and fully reflects each of the factors that 18 U.S.C. § 3553(a) embodies.  The Court concludes that the sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

In a context similar to Woody's, in United States v. Jim, the Court considered a defendant's request to depart downward from the Guidelines sentence, and declined to do so. See United States v. Jim, 347 F. Supp. 3d 847, 862 (D.N.M. 2018)(Browning, J.), aff'd and remanded, 804 F. App'x 895 (10th Cir. 2020)(remanding because, on appeal, the United States agreed to remove an imposed condition of the defendant's supervised release). The Court also denied the defendant's request for a downward variance. See 347 F. Supp. 2d at 1045. There, the defendant, a member of the Navajo Nation, "grabbed" the victim by the "ankles and dragged her down the hall," then "removed her clothes, forced himself on her, and penetrated her vaginally and anally with his penis." United States v. Jim, 347 F. Supp. 3d at 850. The defendant caused the victim "overwhelming pain" and "she tried to fight him." United States v. Jim, 347 F. Supp. 3d at 850. The defendant contended that the Court should depart or vary downward from the Guidelines sentence of life imprisonment, because he had "severe mental limitations, learning disabilities, and memory deficits." United States v. Jim, 347 F. Supp. 3d at 855. The Court refused to depart or vary downward. See United States v. Jim, 347 F. Supp. 3d at 862. The Court explained that "the factors putting downward pressure on the sentence do not outweigh the factors putting pressure to keep the sentence within the Guideline range." United States v. Jim, 347 F. Supp. 3d at 862. Likewise, here, the factors placing downward pressure on Woody's sentence do not outweigh the factors that counsel the Court to sentence him to life imprisonment. The Court agreed with Jim that "a departure based on loss of memory is authorized under the Guidelines and the applicable case law," but, nonetheless concluded "that a departure is not warranted on those bases given this case's facts." United States v. Jim, 347 F. Supp. 3d at 862. Similarly, in this case, the Court agrees that Woody had identified factors, including his strong work ethic and bonds with his brothers, that place downward pressure on Woody's sentence. Yet, even considered together, Woody's

personal characteristics "do not make his case an exceptional one, given that the Court often sees defendants with similar" characteristics.  United States v. Jim, 347 F. Supp. 3d at 866.  Moreover, the facts of this case do not warrant varying downward from the Guidelines, because many factors -- including severe psychological trauma for the victims and Woody's refusal to take responsibility for his crimes -- indicate that the Court should impose a life sentence.

There are twenty-two factors which put downward pressure on Woody's sentence.  See Tr. at 21:19 (Court).  These twenty-two factors are grouped into six broad categories: (i) the defendant's employment history; (ii) the defendant's personal characteristics and family ties; (iii) the defendant's age at sentencing; (iv) the defendant's financial situation; (v) the defendant's compliance with conditions of release; and (vi) other factors.   Notably, Woody has a lengthy employment history.  See PSR ¶ 85, at 16; J. Woody Letter at 1 (discussing Woody's work for the Union Pacific Railroad).   See also U.S.S.G. § 5H1.5 (Employment Record).   First, the Court considers Woody's employment with Union Pacific Railroad.   See Tr. at 21:19-21 (Court). Second, Woody worked in plumbing, and third, he broke horses on the Navajo Reservation.  See Tr. at 21:19-21 (Court).   Fourth, Woody has generally a strong work ethic.  See J. Woody Letter at 1.  Fifth, Woody's work history "gives the Court encouragement that he could rehabilitate."  Tr. at 21:23-25 (Court).  A district court may consider a defendant's "excellent employment record" when imposing a sentence.   United States v. Big Crow, 898 F.2d 1326, 1331 (8th Cir. 1990)(affirming the district court's consideration of a defendant's employment record when granting a downward departure where the defendant made "consistent efforts to overcome the adverse environment of the . . . reservation").   See United States v. Jones, 158 F.3d 492, 498 (10th Cir. 1998)("[N]either the Sentencing Guidelines nor Tenth Circuit precedent categorically precludes the district court's consideration of employment history in making its departure

decision.").

Woody's personal characteristics and family ties also place downward pressure on his sentence. Sixth, as the Court noted at the sentencing hearing, Woody "seem[s] to have loving brothers" and, seventh, he has other "close family relationships." Tr. at 22:1-3 (Court). See U.S.S.G. § 5H1.5 (Family Ties and Responsibilities); United States v. Big Crow, 898 F.2d at 1331; J. Woody Letter at 1; R. Woody Letter at 2. Eighth, the Court was "impressed with the letters from his brothers." Tr. at 21:25 (Court). Ninth, Woody "persuaded his brothers to do things that they indicate they wouldn't have done without him." Tr. at 22:5-7 (Court). Tenth, Woody stopped attending school at a young age in order to help his family care for livestock, haul water, and haul wood. See Sentencing Memo at 4. Eleventh, Woody has personal "redeeming qualities." Tr. at 22: When evaluating Woody's family ties, however, the Court also considers "the danger . . . to members of the defendant's family as a result of the offense." U.S.S.G. § 5H1.5 Application Note 1(A)(iii). Compare United States v. McClatchey, 316 F.3d 1122 (10th Cir. 2003), with United States v. Gauvin, 173 F.3d 798 (10th Cir. 1999). Here, both victims were Woody's stepdaughters, and Woody endangered these children by sexually abusing them over a period of seventeen years. See U.S. Sentencing Memo at 4.

Twelfth, the "general rule that age reduces recidivism" also places some downward pressure on Woody's sentence. Tr. at 22:8-11 (Court). See The Effects of Aging on Recidivism Among Federal Offenders, United States Sentencing Commission (Dec. 7, 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (stating that "older offenders were substantially less likely than younger offenders to recidivate following release"). In this case, however, "the age factor and the recidivism is probably at best a neutral one given the mixed evidence we have for pedophiles" regarding recidivism rates.

Tr. at 24:25-25:1 (Court).   Thirteenth, given Woody's age at sentencing, he would be approximately ninety years old when released from prison if the Court imposed a sentence below the Guidelines sentence.  Fourteenth, although Woody indicated that he may have been intoxicated when the abuse occurred, "it is improper to depart downward based upon a defendant's intoxication or alcoholism."  Federal Sentencing Guidelines Handbook at 1702.  See Tr. at 24:5-8 (Court)(stating that "the alcohol is an issue . . . but in any case there is no justification for what was done here").  While it would not be proper for the Court to depart from the Guideline range for alcohol use during the crimes -- and Woody does not ask for a downward departure on this basis -- the Court can consider it in its variance calculus, and it puts some downward pressure on the sentence.  Fifteenth, Woody "had never been in jail before his incarceration in this case." Sentencing Memo at 5.  Sixteenth, sentencing Woody to thirty years in prison would allow the "child victim in this case to be free from him for a substantial period of time."  Sentencing Memo at 6.  Any sentence imposed here will reflect some of the § 3553(a) factors.

The Court also considers Woody's financial situation in factors seventeen through twenty. Seventeenth, Woody lacks assets that would enable him to pay a fine.  See Sentencing Memo at 3. Eighteenth, similarly, Woody would struggle to pay restitution.  See Sentencing Memo at 3. Nineteenth, Woody retained court-appointed counsel in this case, further demonstrating his indigence.  See Sentencing Memo at 3.  Twentieth, Woody is more than $3,000.00 in debt.  See Sentencing Memo at 3.

Twenty-first, while on pre-trial release, Woody complied with all conditions of release, suggesting that the Court could rely more heavily on supervised release than imprisonment when crafting a sentence that reflects the § 3553(a) factors.  See Tr. at 4:10-15 (Hotchkiss).  Twenty-second,  the Court will recommend that Woody be placed in a facility close to his family and the

Navajo reservation, because he has friendly family members who may come see him, and this could speed up his rehabilitation in prison.  See Tr. at 6:20-7:4 (Hotchkiss).

At the sentencing hearing, the Court also identified fifty-three factors that put "upward pressure to keep" Woody's sentence "within the Guideline range and give a life sentence here." Tr. at 22:12-15 (Court).  The fifty-three factors are grouped into seven categories: (i) the impact of the defendant's actions on the victims; (ii) the impact of the defendant's actions on his family and his community; (iii) the specific nature of the defendant's offenses; (iv) the defendant's uncharged conduct; (v) the defendant's refusal to accept responsibility for his actions; (vi) the defendant's prior criminal history; and (vii) Section 3553(a)'s remaining factors.  These fifty-three factors putting upward pressure on Woody's sentence overwhelm the factors placing downward pressure on his sentence.  See Tr. at 26:1-5 (Court).  "Some of the factors that put upward pressure overlap with each other, but that's partly because of the serious crime that we're dealing with here."  Tr. at 22:18-21 (Court).

The impact on the victims of Woody's crimes is particularly notable here.  See Tr. at 23:10-14 (Court)(noting that "the suffering of the victims here is a considerable factor").  First, Jane Doe 1 has suffered "extreme psychological injury" as a result of Woody's conduct.  U.S.S.G. § 5K2.3. See Tr. at 23:10-14 (Court)(discussing "the fact that she's been in therapy and should be living her life, but instead has to live and relive the incidents she experienced as a little girl").  Second, Jane Doe 2 also has suffered extreme psychological injury, because Woody sexually abused her.  See Tr. at 23:10-14 (Court).  The Tenth Circuit affirmed a district court's upward departure from the Guidelines' sentence where "the record [wa]s rife with evidence of the extreme nature of" the "psychological injuries" of the victim -- the defendant's young daughter.  United States v. Begaye, 635 F.3d 456, 465 (10th Cir. 2011).  There, the defendant's daughter was diagnosed "with post-

traumatic stress disorder [("PTSD")] and chronic anxiety, and indicat[ed] that she suffered from recurrent dreams and hallucinations that required medication" as a result of recurrent sexual abuse by the defendant.  United States v. Begaye, 635 F.3d at 465.  Similarly, here, Jane Doe 2 indicates that she "suffered from depression, paranoia, anxiety, and I continue to have PTSD where I have nightmares.  And in my nightmares I am suffering all over again for everything he's done to me."  Tr. at 16:1-4 (Doe).  Third, Jane Doe 2 asserts that Woody "has ruined my life."  PSR ¶ 28, at 9.  Fourth, Jane Doe 2 "has a hatred toward older men and attributes that to the abuse she endured by the defendant."  PSR ¶ 26, at 8.  Fifth, Jane Doe 2 "experienced shame and blamed herself for what happened to her."  PSR ¶ 26, at 8.  Sixth, Jane Doe 1 has had difficulty moving on with her life; she has informed the Court that "throughout my day I have to stop and think of what happened to me as a kid and it hurts; it makes me sad because I was a kid and still am . . . .  I have to go to therapy because of him and I don't like what he did to me."  Tr. at 11:16-12:9 (Doe).  Seventh, the abuse has made it more difficult for Jane Doe 1 to succeed at school.  Tr. at 12:1-3 (Doe).  Because "the extraordinary nature of the victims' psychological injury is self-evident," the Court concludes that Jane Doe 1 and Jane Doe 2 exhibit signs of serious psychological injury that place upward pressure on Woody's sentence to keep it a Guidelines sentence.  United States v. Begaye, 635 F.3d at 463.  See United States v. White Twin, 682 F.3d 773, 777 (affirming a district court's upward departure where the defendant's violent actions caused his "children extreme psychological difficulties requiring counseling"); Tr. at 11:16-12:9 (Doe); id. at 16:1-4 (Doe).

Woody's conduct also harmed his family and his community.  See Tr. at 25:12-25 (Court).  The eighth factor the Court considers is that Jane Doe 1 wrote that the abuse damaged her relationship with her mother: "I have to be careful because I love her but I don't like how she let everything happen.  She believed him instead of me."  Tr. at 11:20-22 (Doe).  Jane Doe 1

emphasizes that Woody "practically ruined me and my brother's visits with my mom.  We can now only see her once or twice a month."  Tr. at 12:12-14 (Doe).  Ninth, Jane Doe 1's stepmother also states that she "can't even let my kids go to the same school as [Woody's] sister's, his nieces and nephews because my kids get bullied," and, tenth, she "can't even go into town without knowing that his family is looking at us and saying something to us.  I get bullied as a parent."  Tr. at 14:24-15:2 (Doe).  Jane Doe 1's stepmother told Woody that "your family doesn't understand what you did, but we're paying for it the most because we're going through all your bullying that they put us through and my kids through."  Tr. at 15:5-7 (Doe).  Eleventh, Jane Doe 2 "has been threatened by members of the defendant's family and has chosen to leave her community to avoid any issues."  PSR ¶ 29, at 9.  Woody's crimes fractured relationships in his family and in the greater community, and these factors place upward pressure to keep Woody's sentence a Guidelines sentence.

The specific nature of Woody's offenses also places pressure on his sentence to keep it within the Guideline range.  Twelfth, Woody's conduct was opportunistic, in that he committed his offenses while the girls were sleeping or, thirteenth, while their mothers were not at home. Fourteenth, both Jane Doe 1 and Jane Doe 2 also trusted Woody, and, fifteenth, they viewed him as a father figure.  See Trial Tr. at 259:1-5 (Doe 2)(testifying that she had "a normal daughter and father relationship as far as him being a good dad . . . .  It would be normal other than what we're here for"); Tr. at 15:20-23 (Doe 2)(explaining that Woody was supposed take care of her, and "instead I was molested, tortured, trapped").  That Woody took advantage of this trust and vulnerability places further upward pressure on his sentence.

Woody's uncharged conduct also places upward pressure to keep Woody's sentence a Guidelines sentence.  See U.S.S.G. § 5K2.21.  The Court "may depart upward to reflect the actual

seriousness of the offense based on conduct . . . underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason." U.S.S.G. § 5K2.21. Sixteenth, although Woody was charged with only three counts of child sex abuse crimes, both Jane Doe 1 and Jane Doe 2 testified that the abuse happened continuously over a seventeen-year period. See Trial Tr. at 224:6-8 (Doe 1, Hotchkiss)(testifying that Woody sexually abused her more than once); id. at 259:7-8 (Doe 2)("I reported him for sexually abusing me for 10 years"); id. at 267:20-25 (Doe 2)(testifying that Woody woke her by inappropriately touching her "every morning that he was home"). The Tenth Circuit has "routinely permitted a district court to enhance a defendant's sentence using uncharged conduct proven to the court by a preponderance of the evidence." United States v. Rodriguez-Felix, 450 F.3d 1117, 1131 (10th Cir. 2006). The Court has examined and found credible the "testimony that there has been more than three instances and multiple abuse over a considerable amount of time, double digit years." Tr. at 24:13-15 (Court). The eighteenth factor that the Court considers is that Woody told Jane Doe 1 not to tell anyone about after he engaged in aggravated sexual abuse. See Tr. at 226:1-9 (Doe 1). Nineteenth, Woody "would watch [Jane Doe 2] in the bathroom." Trial Tr. at 261:7-8 (Doe). Twentieth, Woody and Jane Doe 2 "had a water balloon fight, and my shirt was see through and he saw my nipples. And he was looking at me and gesturing . . . ." Trial Tr. at 260:9-12 (Doe). Twenty-first, the abuse began when Jane Doe 2 was four or five years old, underscoring the offense's seriousness and the victim's vulnerability. See Trial. Tr. at 260:20-24 (Doe). Twenty-second, Woody touched Jane Doe's vagina over the clothes when she was six years old, although he denied doing so during his interview with the FBI. See Trial Tr. at 261:17-19 (Doe 2); PSR ¶ 20, at 7. Twenty-third, because of the abuse, and because Woody would abuse Jane Doe 2 sexually while she was sleeping, Jane Doe 2 "found a sleeping bag with zippers. And I would lay on top of the zipper. That way if he

was trying to wake me up, he couldn't get in unless he had to move me, meaning I had to wake up." Trial Tr. at 266:16-20 (Doe).  Twenty-fourth, Jane Doe 2 also would lock her bedroom door to prevent Woody from entering, "but he convinced my mom to change the locks."  Trial Tr. at 266:22-24 (Doe).  Twenty-fifth, Woody convinced Jane Doe 2's brothers to move away from the home to "isolate her."  Trial Tr. at 266:24-267:2 (Doe).  Twenty-sixth, Woody "woke up" Jane Doe 2 "every morning that he was home" by rubbing her vagina.  Trial Tr. at 267:20-25 (Doe).  Twenty-seventh, Jane Doe 2 also experienced "touching incidents outside the house . . . .  When we would go to Walmart and he would sneak in a little tap like on butt or something like that."  Trial Tr. at 268:1-4 (Doe).  Twenty-eighth, on Jane Doe 2's final day at Woody's home, "he came into the bedroom and got under the blankets with me" and Jane Doe 2 "just started kicking, and I pushed and eventually he left."  Trial Tr. at 268:13-18 (Doe).  Twenty-ninth, "[t]here was an incident where he was in his bed and he would face up towards the ceiling and" Jane Doe 2 "would sit on his stomach penis area and he would move up and down and say it was like a horsey ride that I need to hang on so I didn't fall off."  Trial Tr. at 269:11 (Doe).  Thirtieth, as Jane Doe 2 reached puberty, Woody "would hug me as my breasts started to come out and he would hug me extra tight to rub and feel my boobs."  Trial Tr. at 270:16-18 (Doe).  Thirty-first, Woody would engage in a "tickle fight game" with Jane Doe 2 "in front of my family but turn me around . . . just so he could put his penis on my butt and I could feel it the entire time in front of my family."  Trial Tr. at 270:19-271:2 (Doe).  Thirty-second, there was an incident where Woody offered to allow Jane Doe 2 to ride his horse if she would show him her vagina; she did so, and he allowed her to ride the horse.  See Trial Tr. at 271:13-272:4 (Doe 2).  Thirty-third, once, when Jane Doe 2 was taking a shower, she "noticed that there was a hole drilled underneath the shower head, and I just happened to look inside of it and he was on the other side and I saw him."  Trial Tr. at 272:7-11

(Doe 2).  Thirty-fourth, Woody also watched Jane Doe 2 shower through the cracked door.  See Trial Tr. at 272:13-17 (Doe 2). Thirty-fifth, after Woody would abuse Jane Doe 2, he would ask her not to tell her mother, stating that "she would be upset if she found out."  Trial Tr. at 273:13-20 (Doe 2).  Thirty-sixth, the uncharged conduct here is "closely related to the offenses" of which Woody was convicted.  United States v. Goossen, 723 F. App'x 608, 610 (10th Cir. 2018).

Thirty-seventh, Woody has refused to accept responsibility for his actions.  Thirty-eighth, Woody's refusal to accept responsibility force Jane Does 1 and 2 to endure testimony, further traumatizing them.  See PSR ¶ 27 (stating that "having to testify was a stressful situation").  Thirty-ninth, although age reduces recidivism rates, sex offenders who target children have higher recidivism rates than the general population.  See Roger Przybylski, Recidivism of Adult Sexual Offenders at 3, United States Department of Justice Office of Sex Offender Sentencing, Monitoring,      Apprehending,      Registering,      and      Tracking      (July      2015), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwij6My ns7DuAhXUElkFHWsVCKkQFjABegQIBhAC&url=https%3A%2F%2Fsmart.ojp.gov%2Fsites %2Fg%2Ffiles%2Fxyckuh231%2Ffiles%2Fmedia%2Fdocument%2Frecidivismofadultsexualoff enders.pdf&usg=AOvVaw1gf8yIfKJ1Z_YQtjMdl62N.

Woody's prior criminal history involves alcohol abuse, violence, and child endangerment, and thus also counsels against a downward departure.  The fortieth factor the Court notes is that, on March 10, 1997, Woody was convicted of "intentionally or recklessly causing bodily harm to another person."  PSR ¶ 60, at 11-12.  Forty-first, on December 7, 2017, Woody was cited for having an open container and for having a child not properly restrained in his vehicle.  PSR ¶ 61, at 12.  This charge relates to Woody's current conviction, because the present conviction also endangered children under his care.  See United States v. Goossen, 723 F. App'x at 610.  Forty-

- 34 -

second, Woody also was arrested for driving under the influence of alcohol or drugs when he was apprehended "driving on the wrong direction of a four-lane highway."  PSR ¶ 65, at 12.  Forty-third, on December 7, 2017, Woody was arrested for (i) Driving While Under the Influence (Second Offense); (ii) child abuse; (iii) child not properly restrained in vehicle; and (iv) open container possession.  See PSR ¶ 66, at 13. Specifically, Woody was intoxicated, with the vehicle engine on "and there was an open can of Budweiser beer observed in plain sight.  There was also a child, age two, in the backseat, and the child was not in a car seat nor was a car seat observed in the vehicle."  PSR ¶ 66, at 13.  This incident relates to Woody's current conviction, because, in this instance, he also endangered a child and stated that he might have been drunk when the offense occurred.  See PSR ¶ 13, at 6.  In sum, "the nature and circumstances of the offense and the history and characteristics of the defendant" support imposing a Guidelines sentence of life imprisonment. 18 U.S.C. § 3553(a)(1).

Section 3553(a)'s remaining factors also support imposing a Guidelines sentence.  A life sentence is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  See Tr. at 26:15-15 (Court)(concluding that "a sentence of life is necessary but also adequate to reflect the seriousness of the offense, promote respect for the law, provide just punishment").  Forty-fourth, the seriousness of the offenses at issue here -- sexual abuse of children under Woody's care -- weighs heavily against varying downward from the Guidelines sentence.  Forty-fifth, the sentence must also promote respect for the law, and Woody's repeated illegal conduct over two decades does not support a downward variance from the Guidelines.  Forty-sixth, a life sentence is also necessary to "afford adequate deterrence" to Woody, both at a specific level and at a general level. 18 U.S.C. § 3553(a)(2).  Forty-sixth, Woody's commission of multiple similar crimes underscore this need

for deterrence, and likewise, forty-seventh, it is important that similar defendants who sexually abuse vulnerable children in their care are deterred.  Forty-eighth, a life sentence is necessary to "protect the public from further crimes of" Woody.  18 U.S.C. § 3553(a)(2).  This sentence will incapacitate Woody, who remains a danger to children.  Forty-ninth, Woody's large family -- including twelve children and numerous grandchildren -- counsel against a lower sentence, because he is likely to encounter children regularly if released from custody.  Fiftieth, as the Court explained at the sentencing hearing "because I am required to impose supervised release, even if the sentence is life . . . it effectively provides the Defendant with some needed education and training and care to try to assist him with some of the problems that have brought him to this point."  Tr. at 26:22-27:1 (Court).  See 18 U.S.C. § 3553(a)(2)(A).  Fifty-first, a life sentence comports with "the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines."  18 U.S.C. § 3553(a)(4)(A).  See PSR ¶ 90, at 17.  Fifty-second, the Court has considered "pertinent policy statement[s] issue by the Sentencing Commission," and found that they support a life sentence.  18 U.S.C. § 3553(a)(5).  Fifty-third, sentencing Woody to life in prison also supports "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Court should not create an unwarranted sentencing disparity among similar defendants who committed similar crimes; this factor counsels that the Court give Woody a Guidelines sentence.  Consequently, the Court has considered these factors and concludes that a life sentence is sufficient, but not greater than necessary, to comply with the four purposes that 18 U.S.C. § 3553(a)(2) enumerates.

      **IT IS ORDERED** that the Defendant Francis Woody is sentenced to life imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

John C. Anderson
   United States Attorney
Raquel Ruiz-Velez
David Patrick Cowen
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*


Todd B. Hotchkiss
Todd. B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

      *Attorney for the Defendant*